IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| KIMBERLY COLLINS, ) | C. A. No:  2:15-cv-4465-PMD-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| CHARLESTON PLACE, LLC, ) | |
| d/b/a BELMOND CHARLESTON PLACE, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Charleston Place, LLC d/b/a Belmond Charleston Place (hereinafter "Defendant" or "the hotel"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56, and files this Memorandum in Support of Motion for Summary Judgment.

## I.     INTRODUCTION

In her Complaint, Plaintiff (Caucasian) alleges reverse race discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 and wrongful termination in violation of public policy.   The bases of Plaintiff's claims stem from her termination from employment in April of 2015, as a result of her aggressive confrontation of three high-level hotel managers.

The discovery period closed on October 24, 2016, without Plaintiff producing any evidence in support of her claims.  Accordingly, Defendant is entitled to summary judgment.

## II.     STATEMENT OF FACTS

Plaintiff was a long-term employee of the hotel from 1987 until 2015, most recently as an executive secretary.  (Compl. ¶¶ 10-11, 27; Ex. A, Pl. Dep. at 8-9; Ex. B, Stracey Dep. at 136.)

In that position, Plaintiff reported directly to the hotel's General Manager Paul Stracey, also Caucasian. (Compl. ¶ 13; Pl. Dep. at 9, 86; Stracey Dep. at 32, 36, 136.) Plaintiff's performance reviews over the years were, for the most part, "very good," and she received pay increases on a regular basis. (Stracey Dep. at 138; Pl. Dep. at 12-13; Ex. C (2010-2014 performance reviews).)

On Monday, April 13, 2015, Plaintiff aggressively threatened and intimidated three top management officials (Regional Director of Human Resources Carol Etheridge, Director of Rooms Leon Scott, and Director of Security Shawn Crawford) in the employee cafeteria. Immediately after her confrontation of the three managers, Plaintiff reported to another manager that she believed she would be fired for her conduct. As a result of her behavior, Plaintiff was suspended and ultimately terminated by Mr. Stracey. Plaintiff was replaced by a Caucasian female. (Ex. D, Def.'s Answer to Int. 15; Pl. Dep. at 86.)

The facts require some context and by way of background. Following the alleged murder of Walter Scott by a Caucasian North Charleston police officer on April 4, 2015, racial tensions were at a high level in the Charleston area. On April 13, 2015, a group of demonstrators who were not guests or employees of the hotel staged a protest in the hotel lobby and the adjoining Palmetto Café. (Ex. E, Matesi Aff. ¶ 4.) There were approximately 12-15 demonstrators. (*Id.*) The demonstrators were loud but did not cause any physical damage to the hotel or its guests. (*Id.*) Notably, the diners in the Palmetto Café continued eating, and the staff continued serving. (*See* Facebook video.)[1] Geno Matesi (Caucasian), the Director of Food and Beverage, called 911, the police arrived at the hotel, and the crowd disbursed and left the property. (Matesi Aff. ¶¶ 2, 5.) There were no arrests made by the police. (*Id.* ¶ 5.)

---

[1] https://m.facebook.com/story.php?story_fbid=10204242632682986&id=1142838350&refsrc=http%3A%2F%2Ft.co%2FMSYZe4n05o (requires Facebook log-in) (last visited 12/28/2016).

A few minutes after the demonstration, Leon Scott sent an e-mail to his fellow managers describing the protest as "loud" but concluded by observing that the protestors were "well-guided and respectful." (Ex. F, 4/13/2015 E-mail; *see also* Ex. G, Etheridge Dep. at 133-34.) The protest itself lasted about five minutes. (*See* Facebook video.)

At approximately 2:00 p.m., Plaintiff stormed downstairs to the employee cafeteria where Ms. Etheridge, Mr. Scott, and Mr. Crawford (all African American) were sitting at one of the tables. (Pl. Dep. at 25; Ex. H, Crawford Aff. ¶ 3.) Having read Mr. Scott's earlier e-mail, Plaintiff yelled, "I can't believe you sent that e-mail about the protestors being respectful!" (Crawford Aff. ¶ 4.) She was extremely disrespectful to Mr. Scott and accused him of violating hotel rules by "comping" a room for Al Sharpton.[2] (Pl. Dep. at 35; Etheridge Dep. at 152-53; Crawford Aff. ¶ 5.) Plaintiff then turned to and pointed her finger at Ms. Etheridge, addressed her as: "You, Miss Regional HR Director," and began to yell at Ms. Etheridge about an employee training session that had occurred more than three months earlier. (Etheridge Dep. at 143; Crawford Aff. ¶ 6.)

Plaintiff continued her tirade by saying, "I'm sick of it. And I'm speaking for all the white people in the hotel. I know by saying what I've said, I'll be fired but I don't care." (Ex. I, Scott Dep. at 107; Crawford Aff. ¶ 9.) Ms. Etheridge urged Plaintiff to "calm down," but to no avail. (Crawford Aff. ¶ 7.) Plaintiff was obviously angry and was yelling right in the faces of Ms. Etheridge, Mr. Scott, and Mr. Crawford. (Crawford Aff. ¶ 8; Scott Dep. at 103-04, 107-08.) At one point Plaintiff walked away but turned around and stormed back saying, "I'm so sick of

---

[2] Plaintiff admits she does not know whether there was a "comp" room given to Al Sharpton in April of 2015. (Pl. Dep. at 36-37.) The record establishes that Mr. Scott has the "absolute authority" to "comp" rooms, but that he did not do so with respect to Al Sharpton in April of 2015. (Stracey Dep. at 154; Scott Dep. at 91-93.)

all of this.  Our country is in the worst place it's ever been." (Crawford Aff. ¶ 9.)  Mr. Scott urged her to calm down saying, "enough is enough" and "we can talk about this later [away from the employees]." (Scott Dep. at 110; Pl. Dep. at 42; Crawford Aff. ¶ 7.)  The episode ended with her reference to the deceased Walter Scott, saying something to the effect of: "if he had listened to the police he would never have gotten shot." (Etheridge Dep. at 153; Scott Dep. at 107.)

Ms. Etheridge, Mr. Scott, and Mr. Crawford were in shock.  They had never seen anything like this in the workplace – Plaintiff simply blew her top.  When she finally left the cafeteria, Leon Scott observed, "what the **** happened?" (Scott Dep. at 112-13.)

In the view of Ms. Etheridge, Plaintiff's actions were "over the top," loud, and aggressive. (Etheridge Dep. at 151, 154-55.)  Mr. Scott observed Plaintiff's actions as "angry," "unprofessional," and "pretty horrendous" and her tone as "loud" and "yelling." (Scott Dep. at 104, 107-08.)  "[You] could see [her] dislike and even hate in the conversation." (Crawford Aff. ¶ 8.)  "[I]t doesn't matter [what Plaintiff] said.  It's the tone, the aggressive nature that was troublesome in that [employee cafeteria] setting." (Etheridge Dep. at 154-55.)  "If [Plaintiff] had the same message in a professional tone, . . . it would have been all right." (Scott Dep. at 115.)  The inappropriateness of her conduct was underscored by the fact that the city was still grieving over Walter Scott's death.

Mr. Stracey was out of the country when the incident took place on April 13.  Leon Scott sent him an e-mail on April 14 which said: "Kimberly lost it.  Even I was surprised at what she was spewing out.  Let's discuss when you return." (Ex. J, 4/14/2015 E-mail.)  Mr. Scott attached an earlier e-mail that he had sent to Ms. Etheridge and Director of Human Resources Jennifer Casselli (Caucasian) which read:

> I don't know if we have any option.  What she said was not only offensive and wrong, it was intended to hurt and have full impact to all who heard.  It did!  . . .

> Questioning my authority who I may comp rooms to . . . . "If he (Walter Scott) didn't bolt he wouldn't have gotten shot!"  . . . What she said was despicable, distasteful, embarrassing, and hurtful to those associates who heard her.  One associate left the table in embarrassment.  As we all know what would happen, it's the topic of today.  I suggest we suspend her pending investigation.

(*Id.*)

On April 15, 2015, Mr. Stracey returned to the hotel and began his investigation into the April 13 incident by "go[ing] to the top" and first meeting with Ms. Etheridge, as she was the "senior HR director, and was in the room and was part of the whole situation." (Stracey Dep. at 172-73.)  Ms. Etheridge reported to Mr. Stracey that Plaintiff had come into the employee cafeteria and approached Ms. Etheridge, Mr. Scott, and Mr. Crawford, "and was very visibly agitated and upset and was very aggressive towards them regarding the Walter Scott issue, the Black Lives Matter protest, . . . was very insubordinate, out of control almost, venomous[,] and wagging her finger in the face and that sort of thing." (*Id.* at 175.)  Mr. Stracey also spoke with Mr. Crawford, Mr. Scott, and Mr. Matesi regarding the April 13 incident.  (*Id.* at 177; Matesi Aff. ¶ 10.)    Both Mr. Crawford and Mr. Scott confirmed Ms. Etheridge's version of the April 13 incident.  (Stracey Dep. at 178.)

In speaking with Mr. Matesi, Mr. Stracey learned that Plaintiff had gone directly to Mr. Matesi following her confrontation of Ms. Etheridge, Mr. Scott, and Mr. Crawford and that the version of events Plaintiff recounted to Mr. Matesi corroborated what Ms. Etheridge, Mr. Scott, and Mr. Crawford had reported regarding Plaintiff's unacceptable behavior.  (Matesi Aff. ¶¶ 7-12.)  Specifically, just after the confrontation, Plaintiff had told Mr. Matesi that she had "gotten into it" in the employee cafeteria with Ms. Etheridge, Mr. Scott, and Mr. Crawford and that she was worried she was going to be fired for her conduct.  (*Id.* ¶¶ 7-8.)  Mr. Matesi reported the events to Mr. Stracey as follows:

> A:    [Mr. Matesi] said after the situation [in the employee cafeteria] had happened, [Plaintiff] came to his office and was very, very upset and said: I am going to get fired.  And [Plaintiff] recounted every single thing to [Mr. Matesi] that Carol [Etheridge] and the others had recounted to [Mr. Stracey] verbatim. . . . [Plaintiff] came and sought [Mr. Matesi] out in his office and said: I am going to get fired and this is what I have done.

(Stracey Dep. at 178; Matesi Aff. ¶ 10.)

On April 16, 2015, Mr. Stracey called Plaintiff into his office and counseled her that she could not "act like that in a hostile, insubordinate way to people like Carol Etheridge who are her superiors."  (Stracey Dep. at 180.)  Mr. Stracey welcomed Plaintiff's comments and opened the floor for her to provide her side of the story, but she did not, nor did she deny the allegations as raised by Ms. Etheridge, Mr. Scott, Mr. Crawford, and Mr. Matesi.  (*Id.* at 180-82; Pl. Dep. at 94.)  Mr. Stracey suspended Plaintiff at the end of the meeting for her "inappropriate conduct towards [her] superior people" and "told her the way in which she delivered the message was inappropriate and unacceptable."  (Stracey Dep. at 184-85, 187; *see also id.* 187-88; Etheridge Dep. at 158.)  It was Mr. Stracey's decision to suspend Plaintiff.  (Stracey Dep. at 185; Etheridge Dep. at 159.)

> A:    It's not so much what she said.  It's how she said it and how she attacked three people who are superior – high ranking managers in a hotel in a public area.  It's – that's the issue.  It's the aggressiveness and the insubordination and the way they described it is a very venomous attack.
>
> . . . [As a] professional executive secretary, you can't – you know, go off on three managers in that way.  I mean, it just is totally unacceptable. . . . [Plaintiff] [s]hook her finger at them, raised her voice at them, wouldn't let it go, kept going and going at it.

(Stracey Dep. at 180-81, 183 (emphasis added).)

After completing his investigation, Mr. Stracey made the decision to terminate Plaintiff from employment.  Frankly, he had no other choice.  The information obtained from Mr. Matesi was the strongest factor in Mr. Stracey's decision to terminate Plaintiff's employment.

A:    Because, to me, Geno's – was not involved in the actual thing that happened. What he told me from [Plaintiff's] own admission. So I talked at length with him about the whole thing, and, to me, that made it seem pretty cut-and-dry really. The fact that it came from Kimberly to somebody that wasn't involved seemed like a pretty – pretty strong case.

. . .

Q:    You didn't feel that what she did was a terminable offense, did you?

A:    After I spoke to Geno, I most certainly did.

Q:    Really?

A:    Yeah. It was Geno's testimony that really – the fact that she came and said exactly what all the others had said to me was the – the kicker. The main thing. Because it was totally separate. It wasn't corroborated. It was exactly verbatim what they had told me, he recounted to me from [Plaintiff].

(*Id.* at 189, 201.)

On Monday, April 20, 2015, Plaintiff and Mr. Stracey spoke again, at length, this time via telephone. (*Id.* at 192.) Mr. Stracey again invited Plaintiff to give her side of the story, but she did not provide any new information that changed his mind. (*Id.* at 193.) Plaintiff came into Mr. Stracey's office on April 21, 2015, and he terminated her from employment with the hotel. (*Id.* at 196-97.)

Race and the content of Plaintiff's speech on April 13 had absolutely nothing to do with her termination – it was her <u>conduct</u> that cost her the job.

## III.    <u>LEGAL ARGUMENT</u>

Defendant is entitled to summary judgment as there are no material facts in dispute that would allow Plaintiff to prevail on her claims.

### A.    <u>Summary Judgment Standard</u>

The United States Supreme Court has emphasized the importance of the summary judgment procedure under Rule 56:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In order to establish that a genuine issue of material fact exists, the plaintiff must show that there is evidence upon which a finder of fact can reasonably hold in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  While all facts and the reasonable inferences therefrom must be construed in the light most favorable to the non-moving party, that party only creates a "genuine" issue of fact when he produces evidence that would create a reasonable *probability*, and not a mere *possibility*, of a jury finding in her favor. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993).  Under this standard, the existence of a mere scintilla of evidence in support of Plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  In making a determination on genuineness of a factual issue, the court must examine the entire record before it.  "Genuineness

means that the evidence must create fair doubt; wholly speculative assertions will not suffice.  A trial, after all, is not an entitlement.  It exists to resolve what reasonable minds would recognize as real factual disputes." *Ross*, 759 F.2d at 364; *see also Williams v. Grimes Aerospace Co.*, 988 F. Supp. 925, 933 (D.S.C. 1997).

### B.        Plaintiff's Reverse Race Discrimination Claim Fails as a Matter of Law

While a plaintiff may present circumstantial evidence to support her claim of reverse discrimination, unsupported speculation is insufficient to defeat a motion for summary judgment. *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 960 (4th Cir. 1996) (citing *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987)).  Indeed, an aggrieved employee's "own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action."  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989)); *see also Causey v. Balog*, 162 F.3d 795, 801-02 (4th Cir. 1998) (without specific evidentiary support, conclusory allegations that the employer treats employees of one race less favorably than employees of another race is insufficient to support a finding of pretext); *Evans*, 80 F.3d at 962 (self-serving opinions without objective corroboration are not legally probative); *Carter v. Ball*, 33 F.3d 450, 461-62 (4th Cir. 1994) (unsubstantiated general allegations are not sufficient to establish an actionable claim of harassment); *Ross*, 759 F.2d at 364 ("wholly speculative assertions" do not create a genuine issue of material fact).

Here, as in *Hawkins*, Plaintiff attempts to frame her employer's behavior in discriminatory terms by charging that Defendant did not subject non-Caucasian employees to similar treatment.  Compl. ¶ 39; *Hawkins*, 203 F.3d at 281.  However, Plaintiff

presents no facts that tend to show this allegedly disparate treatment was due to race rather than [Defendant's] admittedly low regard for [Plaintiff's] individual performance. [Plaintiff has] demonstrated that [she] and [Defendant] did not see eye-to-eye. But this showing of a difference of opinion, coupled with [Plaintiff's] conclusory allegations of racism, cannot reasonably support the conclusion that [Plaintiff's] discharge was motivated by racial animus.

*Hawkins*, 203 F.3d at 281.

Plaintiff obviously disagrees with Defendant's conclusions following the investigation into her misconduct, but such a difference of opinion, along with Plaintiff's unsupported assertions of racism or other alleged prejudice, does not reasonably support the conclusion that Defendant's behavior was motivated by racial animus. *Id.* "And no court sits to arbitrate mere differences of opinion between employees and their supervisors." *Id.*

### 1. Plaintiff Has Failed to Prove Her Reverse Race Discrimination Claim

Plaintiff has failed to present any direct evidence to support her allegations of reverse race discrimination.[3] In the absence of direct evidence, to survive Defendant's Motion for Summary Judgment, Plaintiff must make a proper *prima facie* showing of discrimination based on her protected characteristics under the judicially created burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Under the *McDonnell Douglas* burden-shifting scheme, Plaintiff must first prove by a preponderance of the evidence the existence of facts that establish a *prima facie* case of unlawful discrimination. *Burdine*, 450 U.S. at 252-53. The typical *prima facie* case consists of the following elements:

_____

[3] The elements of a *prima facie* case are the same under Title VII and 42 U.S.C. § 1981. *See Causey*, 162 F.3d at 804 (citing *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985)).

1.    Plaintiff is a member of a protected class;

2.    She was qualified for her job, and her job performance was satisfactory;

3.    She suffered an adverse employment action at the hands of the employer; and

4.    The employer has not treated race neutrally, but has instead discriminated based upon it by retaining other employees who were not members of the protected class under apparently similar circumstances.

*Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir. 1995); *Gilyard v. S.C. Dep't of Youth Servs.*, 667 F. Supp. 266, 269-70 (D.S.C. 1985).

However, because Plaintiff alleges "reverse discrimination," the *prima facie* case requirements "are more onerous." *Green v. Clarendon Cnty. Sch. Dist. Three*, 923 F. Supp. 829, 840 (D.S.C. 1996). "Rather than showing that the plaintiff is a member of a protected class, the plaintiff must establish background circumstances which support the suspicion that the defendant is among those unusual employers who discriminate against the majority." *Id.* (citing *Tatum v. Philip Morris, Inc.*, 809 F. Supp. 1452 (W.D. Okla. 1992), *aff'd*, 16 F.3d 417 (10th Cir.1993); *Martin–Trigona v. Bd. of Trustees*, 668 F. Supp. 682 (D.D.C. 1987); *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63 (6th Cir. 1985)). That is, Plaintiff "[i]s required to allege and produce evidence to support specific facts to support a reasonable inference that, but for [her Caucasian race], [she] would not have been terminated." *Tatum*, 809 F. Supp. at 1462.

The record is devoid of evidence supporting that Defendant has discriminated against Caucasians. In fact, completely undercutting Plaintiff's claim in this regard is the fact that she was replaced by another Caucasian female. (Pl. Dep. at 86.) *See Patterson-Womble v. Mabus*, No. 2:11-cv-834-RMG-BHH, 2013 WL 12148124, at *3 (D.S.C. Jan. 4, 2013) (Report & Recommendation) ("As the *prima facie* case implicitly recognizes, where an employer replaces one individual of a protected class with another from the same protected class, discrimination

based on those characteristics is almost certainly disqualified as the possible explanation. . . . [W]here only a black female is selected as a replacement over an aggrieved employee of those same protected demographics, it reasonably makes a finding of discrimination on account of the black race and female gender a virtual impossibility."); *see also Gregg-Wilson v. EFC Trade, Inc.*, No. 3:12-cv-2923-TLW, 2013 WL 5231489, at *4 (D.S.C. Sept. 13, 2013) ("Because Plaintiff alleges he was replaced by an employee in his same protected category, Plaintiff has not stated a plausible claim for relief under § 1981 for race discrimination."), *appeal dismissed by* 557 F. App'x 244 (Feb. 28, 2014) (per curiam); *Garrow v. Economos Props., Inc.*, 406 F. Supp. 2d 635, 640 (E.D. Va. 2005) ("It is not discrimination to replace a member of a protected class with another member of the same protected class."), *aff'd*, 242 F. App'x 68 (4th Cir. 2007).

Further, even if Plaintiff were able to establish the first prong of her *prima facie* case (or should the Court determine that the more onerous burden for the first prong does not apply),[4] Plaintiff cannot prove the second and fourth elements of a *prima facie* case of discrimination.

---

[4] In *Benson v. Savannah River Nuclear Solutions LLC*, No. 1:11-02621-JMC, 2013 WL 5350805, at *8 n.7 (D.S.C. Sept. 20, 2013), *appeal dismissed*, No. 13-2287 (4th Cir. Feb. 26, 2014), "[t]he court found that Plaintiff satisfied the first prong requiring that he be a member of a protected class because Title VII prohibits discrimination against all groups, including majority groups (such as males) that have been historically favored[,]" but recognized that "this court has previously held a plaintiff to the more onerous standard by requiring him to establish that the defendant was among those unusual employers that discriminate against the majority." *Id.* (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279-280 (1976); *Youmans v. Manna, Inc.*, 33 F.Supp.2d 462, 464 (D.S.C.1998)). The Circuit Courts of Appeals "are split on whether a non-minority plaintiff is entitled to the same inference of discrimination as a minority plaintiff when he or she proves a prima facie case. The Sixth, Eighth and District of Columbia Circuits have held that a reverse discrimination plaintiff only raises an inference of impermissible racial discrimination when he satisfies the *McDonnell Douglas* prima facie test and also presents evidence of background circumstances to support the suspicion that the defendant discriminates against the majority group in question." *Benson*, 2013 WL 5350805, at *8 n.7 (citing *Murray*, 770 F.2d at 67-68; *Donaghy v. Omaha*, 933 F.2d 1448, 1458 (8th Cir.1991); *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C. Cir. 1983)). "The Fourth Circuit has not issued a decision on this issue." *Benson*, 2013 WL 5350805, at *8 n.7.

a.     **At the time of her termination, Plaintiff was not performing her job satisfactorily**

Plaintiff must demonstrate she was qualified for her job and was satisfactorily performing her job. *Hughes*, 48 F.3d at 1383. This she has not done. Instead, as discussed above, the evidence shows Plaintiff engaged in inappropriate and insubordinate confrontational behavior toward three of her superiors in the employee cafeteria on April 13, 2015.

Plaintiff received copies of Defendant's policies, including the Involuntary Terminations & Disciplinary Action policy contained in the 2014 Associate Handbook, which was in place at the time of the April 13, 2015 events. (Ex. K, pp. 71-74; Pl. Dep. at 12-13.) As provided in the policy:

> The following is some conduct which may result in disciplinary action, up to and including termination:
>
> 3.     Insubordination, including failure or refusal to comply with a lawful order or to accept a reasonable and proper assignment from a supervisor.
>
> 24.     . . . Using obscene, abusive or threatening language.
>
> 25.     [V]erbal altercations toward fellow associates, guests or the public.
>
> 29.     [Any] grossly offensive behavior or act.

(Ex. K, pp. 72, 74.) By her actions on April 13, 2015, Plaintiff violated Defendant's Involuntary Termination & Disciplinary Action policy. Accordingly, Plaintiff has failed to establish that she met Defendant's reasonable expectations. *See Goodman v. Family Dollar Stores, Inc.*, No. 06-2605, 2008 WL 4200160, at *5-6 (D.S.C. May 7, 2008) (violations of company policy demonstrated that plaintiff was not meeting the employer's "legitimate performance expectations"), *adopted in part by* 2008 WL 4200158 (D.S.C. Sept. 2, 2008).

In addition, all of the witnesses (Ms. Etheridge, Mr. Scott, Mr. Crawford, and Mr. Matesi) provided the same information to Mr. Stracey: that Plaintiff had spoken to her superiors

in an unacceptable and inappropriate fashion. (Stracey Dep. at 175-78; Matesi Aff. ¶¶ 7-12.) Plaintiff did not provide Mr. Stracey with "her side" of the story (Pl. Dep. at 94) – and so the only information on which Mr. Stracey was operating in making the decision to terminate Plaintiff's employment was the consistent testimony he received from the other witnesses.

Plaintiff denies the various allegations directed at her by Ms. Etheridge, Mr. Scott, Mr. Crawford, and Mr. Matesi. (Pl. Dep. at 41.) This denial does not create an issue of material fact, since the question is whether Mr. Stracey had legitimate reason to believe those witnesses, not whether those witnesses' allegations are ultimately proven to be true. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217-18 (4th Cir. 2007) (affirming summary judgment for employer where there was no evidence company president and ultimate decision maker did not believe plaintiff had threatened supervisor when president made decision to terminate him); *see also Merrit v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) ("We must of course be cautious about attributing to any ultimate decision maker . . . the most unfortunate expressions and beliefs of those around him and those who work in his employ . . . . It is regrettable that any distasteful comments will arise in the workplace, but that cannot mean that the actual decision maker is impugned thereby. It is the decision maker's intent that remains crucial . . . .") (emphasis added). Plaintiff has presented no evidence of any reason to question the honesty or integrity of Mr. Matesi, the witness upon whom Mr. Stracey ultimately relied in making the decision to terminate Plaintiff's employment. And the version of events told by Plaintiff to Mr. Matesi corroborated the versions told by Ms. Etheridge, Mr. Scott, and Mr. Crawford. (Stracey Dep. at 178; Matesi Aff. ¶¶ 7-12.)

Because Plaintiff was not performing her job satisfactorily at the time of her discharge, she fails to meet the second prong of her *prima facie* case of race discrimination.

**b.    Plaintiff fails to satisfy the fourth prong because she offers no evidence that similarly-situated non-Caucasian employees were treated more favorably than Plaintiff**

As to the fourth prong, Plaintiff alleges Defendant "terminated [her] under circumstances that give rise to an inference of race discrimination – namely, defendant did not terminate African-American employees who engaged in the same alleged behavior as plaintiff[,]" and "replaced plaintiff with someone outside of plaintiff's protected class and/or the position remained open."  (Compl. ¶¶ 39-40.)  As discussed above, Plaintiff was replaced by Kendall Jones, another Caucasian female (Pl. Dep. at 86), and so her claim fails on that basis.

> Plaintiff has failed to establish a prima facie case of race discrimination in that [she] fails to show that [she] was replaced by an African-American or that [her] position otherwise remained open. Also, [she] has not met the higher burden associated with reverse discrimination cases by showing that [Defendant] is an unusual employer which discriminates against the majority.

*Collins v. Network Exp., Inc.*, No. 4:07-1564-RBH, 2008 WL 4280382, at *4 (D.S.C. Sept. 12, 2008) (citing *Green*, 923 F. Supp. at 840).  "Another factor which weakens [Plaintiff's] claim of reverse discrimination is that [Mr. Stracey], the decisionmaker, is also a [Caucasian]."  *Id.* (citing *Love v. Alamance Cnty. Bd. of Educ.*, 757 F.2d 1504 (4th Cir. 1985)).

In addition, that the African-American employees (Ms. Etheridge, Mr. Scott, and Mr. Crawford) were not terminated cannot support Plaintiff's claim, as they did not engage in the same conduct and, as high-ranking managers, were not similarly-situated to Plaintiff, an executive secretary who reported to several managers, including Mr. Scott.  (Pl. Dep. at 10.)  As such, Ms. Etheridge, Mr. Scott, and Mr. Crawford cannot be used as Plaintiff's comparators to support her discrimination claim.  *See Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589-90 (D. Md. 2009) ("After the fight, Popo was suspended and ultimately terminated after a hearing. The evidence does not show whether the same decision-makers evaluated Wink's conduct. Wink and Popo, however, had dissimilar qualifications.  As a grocery specialist, Wink was

responsible for overseeing the grocery managers of numerous Giant stores. Popo was one of the grocery managers supervised by Wink. As Wink was not similarly situated to Popo, his subordinate, he cannot be used as a comparator to show disparate treatment."); *see also Lawrence v. Glob. Linguist Sols. LLC*, No. 1:13-cv-1207, 2013 WL 6729266, at *4 (E.D. Va. Dec. 19, 2013) ("[Where the plaintiff] has based her allegations 'completely upon a comparison to an employee from a non-protected class[,] the validity of [her] prima facie case depends upon whether that comparator is indeed similarly situated.' A plaintiff must show that she is 'similar in all relevant respects to [her] comparator.' Employees are similarly situated where they 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010))). Plaintiff cannot show that she was "actually similarly situated" to Ms. Etheridge, Mr. Scott, and Mr. Crawford. *Coleman v. Md. Ct. of Appeals,* 626 F.3d 187, 191 (4th Cir. 2010). Accordingly, her claim of reverse race discrimination fails.

Moreover, another non-Caucasian employee has been terminated for similar aggressive behavior. Specifically, around the same time as the April 13, 2015 incident, an African-American employee was terminated for aggressive behavior toward her co-workers, including "loud [and] inappropriate behavior." (Etheridge Dep. at 48-49; Ex. L, Confidential Employee Termination Letter; Ex. M, Casselli Dep. at 119-20.) Accordingly, Plaintiff has completely

failed to establish different, less harsh discipline or treatment of similarly-situated non-Caucasians or any other evidence of reverse discrimination.[5]

As Plaintiff has failed to establish the second and fourth prongs of her *prima facie* case, Defendant's motion for summary judgment should be granted.

### 2. Defendant Had a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff

Even if the Court were to find that Plaintiff has established a *prima facie* case of reverse discrimination, Plaintiff still could not prevail. In that case, the burden would shift to Defendant to articulate a legitimate, nondiscriminatory reason for its actions in terminating Plaintiff. *Burdine*, 450 U.S. at 254-55. According to the *McDonnell Douglas* burden-shifting scheme, a defendant is required to respond to a *prima facie* case by "merely articulating" a nondiscriminatory reason for the employment action. *Gillins v. Berkeley Elec. Coop., Inc.*, 148 F.3d 413, 416 (4th Cir. 1998). Once Defendant offers a legitimate, nondiscriminatory reason for its action, any presumption raised by Plaintiff's *prima facie* case is dropped, and Plaintiff continues to bear the ultimate burden of proving that Defendant's reason for taking adverse employment actions against her is pretextual. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993) (citing *Burdine*, 450 U.S. at 256).

As discussed at length above, Plaintiff's superiors (Ms. Etheridge, Mr. Scott, and Mr. Crawford) reported Plaintiff's insubordinate and unacceptable behavior to Mr. Stracey, and Mr. Matesi corroborated their version of the events on April 13, 2015. (Stracey Dep. at 178, 201; Matesi Aff. ¶¶ 7-12.) Thus, Defendant has articulated a legitimate, nondiscriminatory reason for

---

[5] Additionally, this incident supports that Defendant is <u>not</u> "among those unusual employers who discriminate against the majority," *Green*, 923 F. Supp. at 840, as Defendant treated Caucasian and non-Caucasian employees in exactly the same manner.

Plaintiff's termination from employment. *See, e.g., Ose-Afiana v. Coastal Int'l Sec., Inc.*, No. ELH-12-1834, 2014 WL 3052492, at *7 (D. Md. July 3, 2014) (employer's legitimate, non-discriminatory reason for termination included that employee "acted inappropriately toward his supervisor"); *Kowalewski v. Gates*, No. CCB-12-3288, 2014 WL 1212972, at *10 n.8 (D. Md. Mar. 24, 2014) ("Even assuming that Kowalewski could make out a prima facie case of discriminatory termination, the defendant provides a legitimate, nondiscriminatory reason for his termination: his inappropriate behavior towards co-workers and even supervisors."); *Staley v. Gruenberg*, No. L:12-cv-530, 2013 WL 12096490, at *12 (E.D. Va. May 10, 2013) (the defendant cited the plaintiff's "'disregard of management instructions,' coupled with Plaintiff's 'inappropriate interactions with FDIC supervisors,' 'poor judgment,' and 'inappropriate behavior' as the reasons for its non-conversion decision"), *aff'd*, 575 F. App'x 153 (4th Cir. 2014); *Livingston v. Datex-Ohmeda, Inc.*, No. WDQ-05-3401, 2008 WL 7289608, at *4 (D. Md. May 7, 2008) (the defendant cited several instances of "disruptive and insubordinate behavior that contributed to [the plaintiff's] termination, including . . . her yelling at other employees and her supervisor after receiving her annual review), *aff'd sub nom. Livingston v. Gen. Elec. Co.*, 316 F. App'x 233 (4th Cir. 2009); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 423 (D. Md. 2006) (employer's legitimate, nondiscriminatory reason for adverse action was that the plaintiff's supervisor received two separate telephone calls from individuals complaining about his inappropriate and unprofessional conduct), *aff'd*, 266 F. App'x 274 (4th Cir. 2008); *Farrar v. Dorothea Dix Hosp.*, 829 F. Supp. 140, 144 (E.D.N.C. 1993) (hospital articulated a legitimate, nondiscriminatory reason for termination of plaintiff, including inappropriate and disrespectful conduct and insubordination).

Further, Plaintiff's conduct clearly violated Defendant's Involuntary Termination & Disciplinary Action policy. (Ex. K, pp. 71-74.) For this additional reason, the information Mr. Stracey received regarding Plaintiff's conduct on April 13, 2015 provided Defendant with a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. *See Bennett v. New Founds. Children & Family Servs., Inc.*, No. 08-557, 2010 WL 517900, at *7 (D.S.C. Feb. 10, 2010) (citing *Holiday v. New Hanover County Registrar of Deeds*, No. 07-2120, 2009 WL 667416, at *1 (4th Cir. Mar. 13, 2009) (per curiam); *Cupples v. AmSan, LLC*, No. 07-1403, 2008 WL 2369174, at *4 (4th Cir. June 10, 2008)) ("Violations of a company policy constitute legitimate and nondiscriminatory reasons for the termination of employment.").

Therefore, any presumption raised by Plaintiff that Defendant discriminated against her drops from the case, and the burden shifts back to Plaintiff to prove that Defendant's proffered reason is pretextual, and that the real reason for her termination was unlawful discrimination. *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1129-30 (4th Cir. 1995).

### 3.    Plaintiff Cannot Demonstrate Pretext

To show pretext, a plaintiff must provide evidence demonstrating that the employer's asserted reason is false and that discrimination was the actual motivation. *See St. Mary's*, 509 U.S. at 515-16; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000). That is, Plaintiff's protected trait must have "'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" *Reeves*, 530 U.S. at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

There are many facts in the record that demonstrate Defendant's reason for terminating Plaintiff was not pretextual. First, Plaintiff understood Defendant's Involuntary Termination & Disciplinary Action policy. (Pl. Dep. at 12-13.) The Policy provides for discipline, up to and

including termination, for insubordination, using threatening language, verbal altercations, and/or grossly offensive behavior.  (Ex. K, pp. 72, 74.)  Plaintiff violated the policy by her actions towards Ms. Etheridge, Mr. Scott, and Mr. Crawford on April 13, 2015.

Most importantly, Mr. Stracey relied on the facts known to him at the time he decided to terminate Plaintiff's employment, which were that Plaintiff had acted in an insubordinate and unacceptable fashion by confronting her superiors in the employee cafeteria on April 13, 2015. (Stracey Dep. at 178, 201.)  Plaintiff did not deny the version of events provided to Mr. Stracey by Ms. Etheridge, Mr. Scott, and Mr. Crawford, which were corroborated by Mr. Matesi.  (*Id.* at 180-82, 201; Matesi Aff ¶¶ 7-12.)  For these reasons, Defendant decided to terminate Plaintiff's employment.

Plaintiff has produced no evidence that anyone made any derogatory remarks to her or in her presence regarding her race or someone else's race.  Plaintiff has alleged that she was subjected to what she perceived as discrimination because she is Caucasian.  (Compl. ¶¶ 39-40.) However, Plaintiff has produced no evidence of this alleged discrimination or pretext.  Plaintiff's "own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Cerberonics*, 871 F.2d at 456 (citing *Gairola*, 753 F.2d at 1288).

Plaintiff's superiors reported Plaintiff's transgressions to Mr. Stracey, and Mr. Stracey alone decided to terminate Plaintiff.  Plaintiff has not demonstrated any racial animus held by her superiors, let alone any nexus between any discriminatory motive and the ultimate decision to terminate Plaintiff.  For this additional reason, Plaintiff cannot establish that Defendant's asserted reason for dismissing her was pretextual.  *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) ("declin[ing] to endorse a construction of the

discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision").

Plaintiff cannot avoid summary judgment by merely questioning Defendant's judgment in making the employment decision. *See Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 383 (4th Cir. 1995). The question before the Court is whether Defendant violated Title VII, not "the wisdom or folly" of Defendant's business judgment. *Id.* "Title VII does not require that employment decisions be impeccable." *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir. 1991). "[T]he use of discretion in termination is not equivalent to discrimination." *Gilbert v. Penn-Wheeling Closure Corp.*, 917 F. Supp. 1119, 1126 (N.D. W.Va. 1996). The issue is not whether Plaintiff agrees with Defendant's decision, but whether there is a nexus between Plaintiff's race and the decision to terminate her. *See, e.g., Holder v. Raleigh*, 867 F.2d 823, 825 (4th Cir. 1989). Plaintiff has not provided and cannot produce any evidence creating a sufficient nexus between her race and Defendant's decision to terminate her employment. This is underscored by the fact that, around the same time Plaintiff was terminated, an African American employee was terminated for being "disrespectful, aggressive, showing – displaying aggressive behavior. . ." toward her co-workers. (Etheridge Dep. at 48-49; Ex. L.)

Even considering the facts in the light most favorable to Plaintiff, her failure to establish a *prima face* case, her failure to produce any evidence of intentional discrimination, and her failure to produce any evidence that other employees were treated more favorably based on their race, make Plaintiff's Title VII race discrimination claim appropriate for summary judgment. Because Plaintiff cannot carry her ultimate burden of showing that she was intentionally

discriminated against by Defendant due to her race, Plaintiff's claims must be denied, and summary judgment is warranted. *St. Mary's*, 509 U.S. at 516-17. Defendant, therefore, requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's claim entirely.

### C.     Plaintiff Has Failed to Prove Race Was "A Determining Factor" In Her Termination Based on the "Same Actor" Doctrine

Plaintiff must demonstrate that "but for" her race, she would not have been terminated.

*See Causey*, 162 F.3d at 801.

> With respect to proving whether the plaintiff has been the victim of invidious discrimination under the *McDonnell Douglas* paradigm, we have opined that if: "the employee was hired and fired by the same person within a relatively short time span . . . this fact creates a strong inference that the employer's stated reason for acting against the employee is not pretextual . . . In short, employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing."

*Jiminez*, 57 F.3d at 378 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir.1991)); *see also Jeter v. Smi-Owen Steel Co.*, No. 95-0001, 1996 WL 906351, at *4 (D.S.C. Sept. 30, 1996) ("[T]he Fourth Circuit has not limited the *Proud* proposition to age discrimination cases; to the contrary, it recently applied *Proud* in a Section 1981 race discrimination case such as plaintiff's . . . .").

"In assessing whether [Plaintiff] established that [race] was a motivating factor for [her] discharge, [the] focus [is] on the undisputed fact that the individual who fired [Plaintiff] is the same individual who [gave her good performance evaluations and multiple pay increases] . . . months earlier with full knowledge of [her race]." *Proud*, 945 F.2d at 797. "From the standpoint of the putative discriminator, '[i]t hardly makes sense to [praise] workers from a group one dislikes . . . , only to fire them [months later].'" *Id.* (quoting Donohue & Siegelman, *The Changing Nature of Employment Discrimination Litigation,* 43 Stan. L. Rev. 983, 1017 (1991)).

Mr. Stracey was Plaintiff's immediate supervisor.  He gave Plaintiff positive performance evaluations and pay increases, year after year.   (Compl. ¶ 14 ("[P]laintiff always received excellent ratings on her performance evaluations."); Pl. Dep. at 79-80; Stracey Dep. at 139-47; Ex. C.)  Mr. Stracey's last positive evaluation of Plaintiff occurred in July of 2014, within ten (10) months of him making the decision to terminate her, and she received a bonus in March of 2015, one month prior to her termination.  (Ex. C; Compl. ¶ 14.)

As Mr. Stracey was the evaluator of Plaintiff, as well as the individual who made the decision to terminate her employment, the "same actor" rule adopted by the Fourth Circuit in *Proud* applies.   The common question is, "If Mr. Stracey was going to discriminate against Plaintiff because of her race, why did he provide positive evaluations and pay raises in the first place?"  The Fourth Circuit held:

> Therefore, in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a motivating factor for the adverse action taken by the employer.

*Proud*, 945 F.2d at 797.  Similarly, in *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310 (4th Cir. 1993), the court affirmed summary judgment for the employer in an age discrimination suit, in part because:

> this case is fortified by the influence in favor of Data General's position that is drawn from the fact that Gilvey, who selected Mitchell for inclusion on the list for reduction in force, was the same person who, only four months earlier, selected Mitchell from among ten applicants to fill the position Mitchell held . . . . If Gilvey had wanted to discriminate on the basis of age, it would have been much easier for him to do so in June 1990 when he hired Mitchell, rather than in November 1990, when he fired Mitchell.

*Id.* at 1318.

While there is no hard and fast rule on what is considered a "relatively short time span," courts have applied the "same actor influence" doctrine to time periods significantly longer than

the one month at issue here.  *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) (expressly approving *Proud* and applying the "same actor" doctrine to an employee hired four years earlier); *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 175 (8th Cir. 1992) (applying the doctrine when termination occurred two years after hiring and finding the same actor inference as "fatal" to the plaintiff's case).

*Proud* is the controlling principle here.  Mr. Stracey was aware of Plaintiff's race when he consistently evaluated her positively and gave her pay raises.  If Mr. Stracey had wanted to discriminate against Plaintiff on the basis of race, it would have been much easier for him to do so over the course of the years when he gave her positive evaluations and pay raises, rather than in April of 2015 when Plaintiff was terminated.

### D.    Plaintiff's Wrongful Termination Claim Fails as a Matter of Law

Summary judgment is also warranted on Plaintiff's cause of action for wrongful termination in violation of public policy.  Under South Carolina law, employment relationships are generally at will.  *Prescott v. Farmers Tel. Coop.*, 516 S.E.2d 923, 925 (S.C. 1999); *Ludwick v. This Minute of Carolina, Inc.*, 337 S.E.2d 213, 221-22 (S.C. 1985).   An employer may terminate an at-will employee "at any time for any reason or for no reason, with or without cause[,]" without incurring liability for wrongful discharge.  *Hessenthaler v. Tri-County Sister Help, Inc.*, 616 S.E.2d 694, 697 (S.C. 2005); *Culler v. Blue Ridge Elec. Co-op., Inc.*, 422 S.E.2d 91, 92 (S.C. 1992).  One of the few exceptions to this general rule exists where the circumstances of the termination would violate a clear mandate of public policy.  *See Barron v. Labor Finders of S.C.*, 713 S.E.2d 634, 636-37 (S.C. 2011) (citing *Ludwick*, 337 S.E.2d at 225); *Cervantes v. Wells Fargo Bank, N.A.*, No. 12-2966, 2013 WL 120697, at *2 (D.S.C. Jan. 9, 2013), *reconsideration denied by* 2013 WL 1186730, at *1 (Mar. 20, 2013).  To be actionable, "the

termination must always violate a *clear mandate* of public policy." *Greene v. Quest Diagnostics Clinical Labs., Inc.*, 455 F. Supp. 2d 483, 490 (D.S.C. 2006) (emphasis in original).

This "public policy" exception is typically applied to situations where (1) an employer requires an employee to violate a criminal law in order to retain employment, or (2) the reason for the employee's termination itself is a violation of a criminal law. *See Garner v. Morrison Knudsen Corp.*, 456 S.E.2d 907, 909 (S.C. 1995). "While [the South Carolina Supreme Court has] made clear that the exception 'is not limited to these situations,' [it has] specifically recognized no others." *Taghivand v. Rite Aid Corp.*, 768 S.E.2d 385, 387 (S.C. 2015) (quoting *Barron*, 713 S.E.2d at 637)). "The determination of what constitutes public policy is a question of law for the courts to decide." *Barron*, 713 S.E2d at 638.

Plaintiff alleges Defendant's reason for her termination was itself a violation of criminal law. Specifically, Plaintiff bases her claim on the allegation that Defendant violated S.C. Code Ann. § 16-17-560, which states as follows:

> It is unlawful for a person to . . . discharge a citizen from employment or occupation . . . because of political opinions or the exercise of political rights and privileges guaranteed to every citizen by the Constitution and laws of the United States or by the Constitution and laws of this State.
>
> A person who violates the provisions of this section is guilty of a misdemeanor and, upon conviction, must be fined not more than one thousand dollars or imprisoned not more than two years, or both.

(Compl. ¶¶ 30-31.) Plaintiff alleges that Defendant violated "her political rights and privileges guaranteed to her by the South Carolina Constitution – namely, freedom of speech." (*Id.* ¶ 31.)

This is not a case such as *Cunningham v. Anderson County*,[6] in which the Court denied summary judgment on the plaintiff's claim for wrongful discharge in violation of public policy where the plaintiff "alleged that the county conditioned his continued employment on his agreement to engage in acts that would violate S.C. Code Ann. § 16-17-560," or *Culler*, in which the court recognized that, if the plaintiff "was discharged because he refused to contribute to a political action fund, he would have a cause of action for wrongful discharge under *Ludwick* and S.C. Code Ann. § 16-17-560." 422 S.E.2d at 93.[7]

Rather, in this case, Plaintiff was terminated for her insubordination toward her superiors. Thus, Plaintiff's claim should be dismissed because: (1) the evidence establishes it was Plaintiff's conduct – as opposed to the content of her speech – that led to the termination of her employment; (2) as a private employer, Defendant is permitted to restrict its employees' speech (which it did not do here); and (3) even if Plaintiff were able to establish the existence of an issue of material fact with regards to the content of her speech as a factor leading to her termination, Plaintiff's claim still must fail because Defendant cannot be constrained in its ability to prevent and eliminate the workplace harassment in which Plaintiff was engaged when she "spewed" hateful speech toward Ms. Etheridge, Mr. Scott, and Mr. Crawford on April 13, 2015.

---

[6] 741 S.E.2d 545, 555 (S.C. Ct. App. 2013), *affirmed in part, reversed in part by*, 778 S.E.2d 884 (S.C. 2015).

[7] "The trial judge, however, found that [the plaintiff in *Culler*] was not terminated for refusing to contribute to PAC." 422 S.E.2d at 93. "Blue Ridge employees testified that contribution to PAC was not a prerequisite to continuing employment at Blue Ridge. Further, there was testimony that Culler was terminated because of his 'bad attitude.'" *Id.* Accordingly, the South Carolina Supreme Court affirmed the trial judge's findings that Culler "did not have an actionable claim under the public policy exception to the doctrine of employment at will" and "that the evidence did not support Culler's claim." *Id.* at 92-93.

**1. The Evidence Establishes that It Was <u>Not</u> the Content of Plaintiff's Speech that Led to Her Termination**

Plaintiff's conclusory allegations notwithstanding, the record evidence establishes that Plaintiff was <u>not</u> terminated from her employment because of the <u>content</u> of her speech on April 13, 2015, but rather because of her <u>conduct</u> on that day.  Specifically, Plaintiff was confrontational toward her superiors, and Defendant terminated her employment because of that behavior.  (Stracey Dep. at 180-81, 183.)

> A:  [T]he tone in which she said it is what was troublesome for me.  It doesn't matter what she says.  It's not the first time that [Plaintiff] made disparaging or inappropriate comments about President Obama.  I don't give a hoot, but it's the tone in which she was delivering them, especially when it was directed towards me.  (Etheridge Dep. at 155.)

> Q:  . . . [D]o you think that what [Plaintiff] did in the cafeteria that day was a terminable offense?

> A:  Let me say this: If it were anybody else, they would be terminated, yes.

> Q:  And is it your testimony that you believe that that's a terminable offense because of how she – how she stated the message rather than the message?

> A:  No.  Didn't have anything to do with the message.  If she had the same message in a professional tone, I think it would have been all right. . . . But it was – it was the – it was the tone.  (Scott Dep. at 114-15.)

Section 16-17-560 makes it a criminal offense for an employer to terminate an employee "because of political opinions."  The evidence makes clear that Mr. Stracey made the decision to terminate Plaintiff's employment because of "the aggressiveness and the insubordination and the way [Ms. Etheridge, Mr. Scott, Mr. Crawford, and Mr. Matesi] described it is a very venomous attack. . . . [I]t just [was] totally unacceptable. . . ."  (Stracey Dep. at 180-81, 183.)

Because Defendant terminated Plaintiff for her <u>conduct</u> and <u>not</u> because of her political opinions, Defendant's termination of Plaintiff cannot have been a violation of criminal law.  Therefore, her claim for wrongful termination in violation of public policy warrants dismissal.

**2. Even if the Content of Plaintiff's Speech Were the Reason for Her Termination (Which It Was Not), Her Claim Must Fail Because There Is No Right to Freedom of Speech and Expression in the Private Sector Workplace**

Even if the Court were to find that there is a material issue of fact as to whether Plaintiff was terminated for the content of her speech (as opposed to her conduct), Plaintiff's claim still fails as a matter of law. Plaintiff alleges she was terminated because she "exercised her political rights and privileges guaranteed to her by the South Carolina Constitution – namely, freedom of speech." (Compl. ¶ 31.) The South Carolina Constitution provides, in relevant part, "The General Assembly shall make no law . . . abridging the freedom of speech . . . ." S.C. Const. Art. I, § 2. By its terms, the South Carolina Constitution forbids the government from placing general restrictions on the exercise of free speech. However, private employers are not so constrained. *Hishon v. King & Spaulding*, 467 U.S. 69, 78 (1984) (in the context of the First Amendment to the United States Constitution) ("'[I]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections.'" (quoting *Norwood v. Harrison*, 413 U.S. 455, 470 (1973).)). Thus, the expression of speech in the private context is not entitled to the same protections as that which occurs in the public sector.

Defendant, as a private employer, is constitutionally permitted to place whatever restrictions it deems appropriate in order to ensure a safe and productive workplace. *See, e.g., Johnson v. Mayo Yarns, Inc.*, 484 S.E.2d 840, 843 (N.C. App. 1997) (holding that a former employee who was terminated from his private sector job for refusing to remove a Confederate flag decal from his toolbox could not maintain a cause of against his employer for wrongful discharge in violation of public policy, as "the right of free speech and expression does not extend to the workplace where a private employer must have flexibility in adopting and enforcing its employment policies and practices"), *review denied*, 488 S.E.2d 802 (N.C. 1997).

28

Plaintiff's right to freedom of speech "is not implicated because the United States Constitution simply does not secure rights to individuals against other individuals."  *Id.* at 844 (Greene, J., concurring) (citing *Pub. Utils. Comm'n v. Pollak*, 343 U.S. 451, 461 (1952)).  "It is only the officials of the State 'that are obligated to conduct themselves in accordance with the Constitution.'"  *Id.* (quoting *Pollak*, 343 U.S. at 461).  *See also Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1246 (10th Cir. 1999) ("[A] court may, without violating the [F]irst [A]mendment, require that a private employer curtail the free expression in the workplace of some employees in order to remedy the demonstrated harm inflicted on other employees.") (internal quotation omitted), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  Thus, Defendant, as a private sector employer, may restrict speech that it believes may unduly disrupt the work environment.

> **3.    Even if the Content of Plaintiff's Hateful Speech Were the Reason for Her Termination  (Which It Was Not), Her Wrongful Discharge Claim Must Fail Because Defendant Cannot Be Constrained in Its Ability to Prevent and Eliminate Workplace Harassment and Other Forms of Discrimination**

After the April 13, 2015 incident, Mr. Scott complained to Ms. Casselli and Ms. Etheridge that Plaintiff's speech was "offensive and wrong, . . . intended to hurt and have full impact on all who heard [and] was despicable, distasteful, embarrassing, and hurtful."  (Ex. J; Casselli Dep. at 81.)

> A:    I remember, and it may not be the exact word, but [Plaintiff said]: I am speaking on behalf of the white people, and she said that – something like: If he [Walter Scott] had listened to the police, it would never [have] happened.  And, you know, I can't remember – but it was – it was – you know, it was a – negative.

(Scott Dep. at 107.)

Title VII prohibits discrimination against a covered individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Harassment based on these protected categories is a form of discrimination under Title VII, and workers have the right to be employed in a workplace that is "free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank, F.S.B. v. Vinson*, 477 U.S. 57, 65 (1986).

As the Supreme Court held in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), employers have a legal obligation to exercise reasonable care to prevent and correct workplace harassment.  Under the *Faragher/Ellerth* standards, with respect to harassment committed by a non-supervisory employee, an employer will be held liable for its employee's misconduct if it knew or should have known of the behavior and failed to take prompt action to correct it.  *See Mikels v. Durham*, 183 F.3d 323, 329 (4th Cir. 1999).  Thus, Defendant, as a conscientious employer, has both an incentive and an affirmative obligation to respond appropriately to harassment complaints.  "Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms.  Were employer liability to depend in part on an employer's effort to create such procedures, it would effect [sic] Congress' intention to promote conciliation rather than litigation in the Title VII context . . . ."  *Ellerth*, 524 U.S. at 764 (citing *EEOC v. Shell Oil Co.*, 466 U.S. 54, 77 (1984)).

There are not many cases in which the courts have examined the application of S.C. Code Ann. § 16-17-560, but the concurring opinion in *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811 (4th Cir. 2004) is very instructive and applicable to the facts of this case, as it examined "the potential clash between an employer's duties and liabilities under Title VII, . . . and those which purportedly flow from S.C. Code Ann. § 16-17-560 if the statute applies in the manner that [Plaintiff] advocates."  *See id.* at 820-21 (Gregory, C.J., concurring).

By way of background, Dixon, a member of the Sons of Confederate Veterans, had brought with him to work a personal tool box, to which he had affixed two decals of the Confederate battle flag. *Id.* at 814. Dixon's coworkers were offended and complained to Coburg management. *Id.* Coburg asked Dixon to remove the decals, and when he refused, offered to buy him an unadorned toolbox. *Id.* Dixon declined, "explaining that 'his heritage was not for sale,' and asserting that he had a First Amendment right to display the Confederate battle flag." *Id.* Unable to reach a compromise, Coburg terminated Dixon from employment. *Id.* Dixon filed suit, alleging he had been terminated in violation of S.C. Code Ann. § 16-17-560 and that the discharge was in retaliation for his exercise of constitutional rights. *Id.* The district court granted Coburg Dairy's motion for summary judgment and dismissed the case. *Id.* at 815. On appeal, the Fourth Circuit did not reach the issue of whether the termination violated S.C. Code Ann. § 16-17-560 because the Fourth Circuit held the district court did not have original jurisdiction to hear the case. *Id.* at 819.

As in *Dixon*, "to prevent harassment in the workplace and to avoid charges of a hostile working environment, [Defendant] has implemented an anti-harassment policy through which it investigates and responds to employee complaints." *Id.* at 822; *see* Ex. K, pp. 13-16; Pl. Dep. at 12-13. In this case, Mr. Scott was offended by Plaintiff's comments on April 13, 2015 and reported her behavior to human resources and then to Mr. Stracey. (Ex. J.) Mr. Stracey investigated the incident and ultimately decided to terminate Plaintiff's employment, which amounted to Defendant "'[taking] prompt and adequate action to stop' the offensive conduct after being placed on notice." *Dixon*, 369 F.3d at 822 (quoting *Mikels*, 183 F.3d at 332). "[T]he South Carolina Code places a burdensome competing duty on employers. On the one hand, under Title VII, an employer must provide a harassment-free workplace. On the other, if

[Plaintiff's] interpretation of S.C. Code § 16-17-560 prevails, the employer must allow employees to [engage in conduct], which other employees find offensive [and] harassing." *Id.*

> As Judge Gregory recognized:
>
> If indeed South Carolina has carved out this safe haven for [Plaintiff's hateful speech], such action threatens to undermine the federal protections that individuals possess to be free of discrimination in the workplace. [Essentially], [the] employer will have to "pick their poison. They can choose to provide a harassment-free workplace by barring expressions of allegedly constitutionally protected but arguably harassing opinions and material . . . and get sued by that employee for violating Section 16-17-560. Or they can submit to the logic of Section 16-17-560 . . . and face a lawsuit alleging the creation of an ethnically and religiously hostile work environment in violation of Title VII."

*Id.* (quoting Br. of Appellee at 18.).

Defendant cannot be expected to tolerate the type of hateful speech "spewed" by Plaintiff in the employee on April 13, 2015. To force Defendant to do so would force it to incur potential liability under Title VII. That cannot have been the intention of the General Assembly in enacting Section 16-17-560. Plaintiff's cause of action for wrongful discharge in violation of public policy based on Section 16-17-560 must be dismissed.

## IV.    CONCLUSION

Mr. Stracey determined that Plaintiff acted inappropriately toward her superiors on April 13, 2015. Mr. Stracey's decision was based on the information provided to him by three high-level managers at the hotel, all of which was corroborated by the version of events as Plaintiff had told it to Mr. Matesi. Mr. Stracey's decision to terminate Plaintiff was carefully weighed after a prompt and thorough investigation into multiple witnesses' consistent and corroborated accounts of egregious behavior by Plaintiff. Given that Plaintiff has completely failed to demonstrate that race played any role in this decision, and that she was replaced by another Caucasian and that Mr. Stracey had repeatedly recommended Plaintiff for pay raises in the past, there is simply no evidence to support Plaintiff's claim that race played any role in the decision

to terminate her.  Similarly, Plaintiff has failed to demonstrate that the <u>content</u> of her speech (as opposed to her conduct) was the reason for the termination of her employment.  Plaintiff has failed to meet her burdens of proof with respect to her claims for reverse discrimination and wrongful termination in violation of public policy.

For the foregoing reasons, Defendant respectfully requests that this Court dismiss Plaintiff's claims, with prejudice.

Dated this 13th day of January 2017.

Respectfully submitted,

*s/Luci L. Nelson*

L. Gray Geddie
Fed. I.D. No. 1020

OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
The Ogletree Building
300 North Main Street, Suite 500 (29601)
Post Office Box 2757
Greenville, SC  29602
Telephone:    864.271.1300
Facsimile:      864.235.8806
gray.geddie@ogletreedeakins.com

Luci L. Nelson
Fed. I.D. No. 10341

OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART
211 King Street, Ste. 200
Post Office Box 1808 (29402)
Charleston, SC 29401
Telephone:    (843) 853-1300
Facsimile:      (843) 853-9992
luci.nelson@ogletreedeakins.com

*Attorneys for Defendant*