# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Kimberly Collins, )
)
Plaintiff, )
)
v. ) Case No.:
) 2:15-cv-4465-PMD-BM
Charleston Place, LLC, d/b/a )
Belmond Charleston Place, )
)
Defendant. )

*****************************************************

VIDEOTAPED
DEPOSITION OF: KIMBERLY COLLINS

DATE TAKEN: July 28, 2016

TIME: 10:01 a.m.

PLACE: Ogletree, Deakins, Nash, Smoak & Stewart
211 King Street
Charleston, South Carolina

REPORTED BY: Kendra E. Johnston, RPR, CRR
Registered Professional Reporter,
Certified Realtime Reporter
and Notary Public

*****************************************************

POST OFFICE BOX 21784
CHARLESTON, SOUTH CAROLINA 29413-1784

A. I was there from '85 to '87.
Q. And then you went where?
A. Then I went to Kiawah Island.
Q. Why did you leave Thalhimers?
A. I wanted to do something different.
Q. And what did you do at Kiawah?
A. I was a front desk clerk.
Q. Paid by the hour?
A. Yes.
Q. Seven dollars an hour?
A. Yes.
Q. How long were you at Kiawah?
A. I was there from eighty -- April of '87 to August of '87.
Q. And you left. Why did you leave there?
A. It's a seasonal job. They lay off people.
Q. And where did you go next?
A. I went to Charleston Place Hotel.
Q. And it was known as Omni at that time?
A. Yes, it was Omni Hotel at Charleston Place.
(Defendant's Exhibit No. 1 marked for identification.)
BY MR. GEDDIE:
Q. Okay. Let me show you what's been marked as Exhibit No. 1.

MR. POTTS: Thank you.

BY MR. GEDDIE:

Q. And I believe this is the resume that you have prepared?

A. Yes.

Q. Has your name across the top?

A. Yes.

Q. And it has your employment history. And let me focus on your job at Belmond. What was your job, your title?

A. I was the executive administrative assistant or executive secretary to Paul Stracey.

Q. All right. And Paul Stracey was the general manager of the hotel?

A. Correct. He was regional vice president/general manager.

Q. How would you describe your relationship with Mr. Stracey?

A. Good.

Q. Did he hire you?

A. No.

Q. Oh, he came in later and --

A. Right.

Q. -- you were already in --

A. I was already --

Q. -- excuse me -- the position?

A. -- in the executive office, yes, sir.

Q. All right. You also reported to the director of food and beverage. Was that Mr. Matesi?

A. When I started?

Q. Uh-huh. No. When you ended.

A. Ended, yes. I was also food and beverage secretary, and I reported to Geno Matesi.

Q. All right. And who was the financial controller?

A. I worked for the regional controller, which was Filipe Da Costa.

Q. And you also reported to the director of rooms?

A. Yes.

Q. And who was that?

A. Leon Scott.

Q. How would you describe your relationship with Mr. Matesi?

A. Good.

Q. How about Mr. Da Costa?

A. Good.

Q. How about Mr. Scott?

A. Good. Got along with all of them very well.

Q. Up until the events of mid April --

I will introduce the disclaimer, which is -- I've marked as Exhibit No. 2.

(Defendant's Exhibit No. 2 marked for identification.)

MR. POTTS: Thank you.

THE WITNESS: Thank you.

BY MR. GEDDIE:

Q. And this disclaimer and acknowledgment says that you've gotten the handbook, you've read it, and you understand it; correct?

A. Correct.

Q. And that is your signature, and it's dated September 24th of 2014?

A. Yes.

Q. So this handbook was the -- they were the policies that were in effect when the incidents occurred in April of 2015?

A. Yes.

Q. All right. Now, did the company also have a harassment -- anti-harassment policy?

A. Yes.

Q. And did the company have periodic training on that harassment policy?

A. Yes.

(Defendant's Exhibit No. 3 marked for

identification.)

BY MR. GEDDIE:

Q. And let me show you Exhibit No. 3 and ask you if you recognize that as your signature?

A. It is.

Q. And it's dated January the 9th of -- I believe that's 2014.

A. 2014, yes.

Q. What do you remember about the hotel's anti-harassment policy?

A. The training or the policy itself?

Q. Well, let's start with the policy.

A. That you cannot harass other employees.

Q. And you had no problem with that as a policy of the -- of any employer, would you?

A. No, huh-uh, no, not at all.

Q. In fact, you would support that.

A. Yes.

Q. All right. What do you recall about the training?

A. The training took place for all employees.

Q. Uh-huh.

A. Everyone had to attend. And the session that I attended, the whole meeting started off perfectly fine. The training was fine. There was a --

me this mem -- memo to read, and I did, and I was concerned for Leon's job security, actually, and I -- I called him up and -- I called him up.

Q. Well, let's put it in perspective. Leon was one of your supervisors.

A. Yes.

Q. And you were calling him for what purpose?

A. Regarding this e-mail.

Q. What did you want him to do? To retract the e-mail or change it?

A. No.

Q. Well, why did you want to talk to him about it?

A. Well, I went down -- I called him up, and he said, "Come on down," and "I'm in the -- I'm in the employee cafeteria," said, "Okay." So I went downstairs, and I observed that Leon Scott, Shawn Crawford, and Carol Etheridge were sitting at a table, and I just got down there like at 2:00, right before they closed the cafeteria.

Q. All right. Let's -- let's identify the players here.

A. Okay. Sure.

Q. We know Leon Scott.

A. Uh-huh.

to Carol. I just wanted to tell Leon concerned about his job. After that, I got up, and I stood next to the table, but I did not pace back and forth or leave the table or put up a tray. I didn't eat.

Q. Right. You did not eat --

A. No.

Q. -- or have any tea or liquid or anything like that.

A. No; didn't have time.

Q. Well, when did you accuse Leon of comping Al Sharpton's room?

A. After I stood up. I said that, "I don't understand why you comped his room." I said, "The family does not want" -- of Walter Scott did not want Al Sharpton to be in town to take away from the funeral and their family. I just thought that was common knowledge, so I told him that.

Q. Well, what -- You heard the testimony of Mr. Stracey and --

A. Yes.

Q. -- Mr. Scott the other day that --

A. I did.

Q. -- that he had complete authority to comp anybody's room that he thought was appropriate. Did you hear that testimony?

A. I did.
Q. Do you understand that to be the policy of the hotel?
A. From Belmond's point of view, we had training from Belmond corporate. It was a videotape from the corporate offices, like, if something's controversial, like, we could not comp, like, political, like a president or something, any -- any longer, like we had in the past.
Q. Well, is it your position that Mr. Stracey and Mr. Scott's use of the comp policy when requested by the City of Charleston was inappropriate?
A. I wasn't aware it was by the City of Charleston that asked for.
Q. But you now know that it was.
A. That's what he said. I don't know if it was or not.
Q. Well, do you have any evidence to dispute that?
A. No, I do not.
Q. Okay. And, in fact, Mr. Sharpton's room was not comped, was it?
A. I don't -- it -- it was made complimentary that morning, canceled in the afternoon, and remade with a rate of 850. I don't know if it was ever

reversed or if he paid for it with a credit card. I don't know how he paid for it.

Q. So you don't know.

A. Yeah; I don't know how he paid for it.

Q. Well, why did you accuse Leon Scott of comping a room when you didn't know that to be the truth?

A. Because I saw it in the reservation system. I was in reservations all the time. VIPs -- I'm aware VIPs come into town. I look through reservations all the time. I looked at the VIP report.

Q. Okay.

A. I just -- I mean, it was like the third reservations office was in the executive office. All we did was make reservations as well, a great many.

Q. Well, based on that experience, how many rooms are comped at the -- provided free at the hotel in a -- in a month?

A. Oh, it depends on space availability. There could be -- We donated to many charities.

Q. Yes.

A. So it could be we comped room and tax based upon availability for charities, for guests that we had invited back due to a bad stay or director of -- someone in the sales office inviting people to come

so defensive when I brought this up. I had no idea that they would. Otherwise, I would not have come down there to try to save Leon's job or -- I mean, I was just being a friend to him.

Q. And by "they," you mean Shawn and Carol and Leon.

A. Yeah. They got very defensive and aggravated.

Q. And were you defensive and aggravated as well?

A. I was shocked at their demeanor towards me. I -- I was totally blindsided by it.

Q. How would you describe your demeanor?

A. Calm. I just spoke to them. I was not yelling, pacing, like they said in their testimony. I wouldn't do that.

Q. So you deny raising your voice?

A. Yes, I do.

Q. Do you deny putting your finger -- wagging your finger at Carol Etheridge's face?

A. I most certainly do.

Q. Who is Michael Slager?

A. He is the officer that shot Walter Scott.

Q. Do you remember asking Leon, "What more do these people want? Michael Slager was only doing his

job. Walter Scott bolted, and that's why he was shot. If he had obeyed the police, he would still be here today." Did -- did you say words to that effect?

A. Can you say the first part again?

Q. Could you read it back, please, ma'am.

(Question read back.)

A. No.

Q. Did you say to Carol Etheridge, "I'm sure you're going to have me fired tomorrow," and then you pointed directly at her?

A. No.

Q. Do you recall what she said to you?

A. I don't remember her saying that to me at all.

Q. Well, didn't she say, "No, not me. That decision is up to Paul"?

A. No. I didn't think I was going to be fired. I wasn't -- I didn't think I was in a being fired situation.

Q. Do you remember Leon saying at that point, "Whatever your issues are are not going to be solved in this cafeteria today"?

A. I -- He said, "Let's stop talking about this and talk about this later."

Q. Okay.

Q. But all of these were -- they were the bosses.

A. Yes.

Q. Okay.

A. Yeah. I'm their secretary.

Q. And did you -- and you had no hesitancy in discussing or bringing matters to their attention that you felt were important.

A. On outside events that were happening in the world, city, nation?

Q. Inside, outside, internationally, yeah.

A. If -- if I had time. I was extremely busy. We didn't really sit around and chat that much because Geno, he was in and out of the office constantly. He never really sat in his office. Paul was always out and about.

Q. So you worked for Mr. Stracey since 1995?

A. Uh-huh.

Q. Twenty plus --

A. Yes.

Q. -- years. And during that period of time, and we went through them the other day, he gave you, I would describe them as, glowing reviews --

A. Yes.

Q. -- for all of those years.

A. He did.

Q. And but for the events that we've talked about at the -- at the confrontation --

A. Uh-huh.

Q. -- do you believe you'd still be employed at Charleston Place today?

A. Yes.

Q. So that is the sole reason for your termination.

A. I think it was -- Paul described to me during my suspension that he could not have me discussing or -- political opinions, expressing my political opinions in the cafeteria with the managers; due to the environment of the Charleston area, he couldn't have someone in his office speak about that.

Q. Well, one thing I wanted to ask you about. In your job as executive office administrative assistant --

A. Uh-huh.

Q. -- did you consider yourself to be a part of the management team?

A. I made decisions as a management team would.

Q. All right. Do you believe that other employees in the hotel --

A. Uh-huh.

her.

Q. Okay. How about Barbara Thomas?

A. I have not spoken to her.

Q. How about Kendall Jones?

A. No, I have not spoken to her.

Q. All right. Now, the person who terminated you was Paul Stracey, and he's Caucasian; right?

A. Yes.

Q. And you are as well.

A. Yes.

Q. And Kendall Jones replaced you, and she's also Caucasian.

A. Yes.

Q. Have you talked to Donna Strouse?

A. She wasn't aware that I was suspended, and she called to see where I was. I told her I was suspended, and she sent me the Black Lives Matter protest that occurred in the Palmetto Cafe.

Q. That was the Facebook video?

A. Correct, yes.

Q. Right. Okay. Any other subjects that you would expect her to testify to?

A. Not -- not that I can recall.

Q. All right. How about Michael Saladin, doctor?

A. Probably between five, ten minutes. I don't recall how long it was. I was shocked that he called me, and -- and I said to him, you know, "Paul" -- you know, he told me he was going to have to terminate me, and I said to him I was surprised that he didn't ask me my side of the story.

Q. Then did you go ahead and give your side of the story?

A. Well, I was coming in the next day, but no, I did not give him that side of the story at that time.

Q. But you -- you certainly had the opportunity to if you wanted to.

A. Yes, but I was bubbling crying all over the place.

Q. Well, but you had the -- you had the opportunity to compose yourself and give him your side of the story. He didn't cut you off. That's what I'm saying.

A. No, but he had made -- appeared like he made up his mind. I just wanted to tell him that he didn't even ask me my side of the story at the time of the suspension.

Q. All right. Well, when you were first suspended, this is on Wednesday afternoon.

A. Uh-huh.

C E R T I F I C A T E

STATE OF SOUTH CAROLINA:
COUNTY OF CHARLESTON:

I, Kendra E. Johnston, Registered Professional Reporter and Notary Public, State of South Carolina at Large, certify that I was authorized to and did stenographically report the foregoing deposition of Kimberly Collins; and that the transcript is a true record of the testimony given by the witness, and was sworn as such.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

WITNESS MY HAND AND OFFICIAL SEAL this 5th day of August, 2016, in the City of Charleston, County of Charleston, State of South Carolina.

Kendra E Johnston

Kendra E. Johnston, RPR,
CRR and Notary Public
My commission expires:
August 24, 2022

NDTCA Signed Electronic Transcript