# Exhibit B

```
 1              UNITED STATES DISTRICT COURT
              DISTRICT OF SOUTH CAROLINA
 2                 CHARLESTON DIVISION

 3
      KIMBERLY COLLINS,
 4
                   Plaintiff,
 5
            vs.          C.A. NO.: 2:15-cv-4465-PMD-BM
 6
      CHARLESTON PLACE, LLC, d/b/a BELMOND CHARLESTON
 7    PLACE,

 8                 Defendant.

 9


10    DEPOSITION OF:   PAUL STRACEY

11    DATE:            July 26, 2016

12    TIME:            9:47 AM

13
      LOCATION:        HITCHCOCK & POTTS
14                     31 Broad Street, 2nd Floor
                       Charleston, SC
15


16
      TAKEN BY:        Counsel for the Plaintiff
17
      REPORTED BY:     JANE MESSINEO, Registered
18                     Professional Reporter, CSR-NJ

19
           A. WILLIAM ROBERTS, JR., & ASSOCIATES
20
                Fast, Accurate & Friendly
21
      Charleston, SC    Hilton Head, SC   Myrtle Beach, SC
22    (843) 722-8414    (843) 785-3263    (843) 839-3376

23
       Columbia, SC    Greenville, SC     Charlotte, NC
24    (803) 731-5224    (864) 234-7030    (704) 573-3919

25
```

32

1        A.    Maybe not quite once a year.

2        Q.    Who did you have under you in the chain

3  of command in 2014, 2015?

4        A.    I have -- well, obviously, the whole

5  hotel --

6        Q.    Sure.

7        A.    But within the closest managers or what

8  they call the executive committee, you would have

9  food and beverage director.  Rooms director.  Sales

10  director.  Health and safety director.  Security

11  director.  Engineering director.  Who am I

12  missing -- marketing director.  HR director.

13  Comptroller.

14        Q.    At the time, 2014, 2015, towards the

15  end of Kim's employment, who was the food and

16  beverage director?

17        A.    Geno Matesi.

18        Q.    For the record, your race is Caucasian;

19  right?

20        A.    Correct.

21        Q.    What was Geno Matesi's race?

22        A.    Caucasian.

23        Q.    Who was your rooms director?

24        A.    Leon Scott.

25        Q.    And what's his race?

36

```
 1   director was she under?
 2        A.    Well, she worked directly for me.
 3        Q.    Okay.
 4        A.    And also helped Geno Matesi and helped
 5   Leon Scott.
 6        Q.    Who was her -- who was her direct
 7   supervisor or were all three of you her direct
 8   supervisor?
 9        A.    Me.  I was her direct supervisor.  I
10   would -- yes.
11   
```

Collins, Kimberly v
Charleston Place, LLC

Paul Stracey
July 26, 2016

136

1      Q.    Do you know when she was hired?

2      A.    I think a good six years before me or

3  even more than that.

4      Q.    She was there when you got there?

5      A.    Yes.

6      Q.    Do you know her history with the

7  company, what her positions were before you got

8  there?

9      A.    Yes.  I think so.  Worked in the rooms

10  department and when I came, she was in the office

11  upstairs, yes.

12      Q.    You obviously wouldn't have anything to

13  do with her hiring because you weren't there yet.

14      A.    Right.

15      Q.    Do you know in 2014, 2015 what Kim's

16  position was?

17      A.    Executive secretary.

18      Q.    We talked about that earlier.  Her

19  chain of command, she would report directly to you.

20      A.    Yes.

21      Q.    I think you said she did duties for

22  Leon?

23      A.    Yes.

24      Q.    Who was the other person?

25      A.    Geno, food and beverage -- Geno shares

138

1   Q. Ever give her a written warning?

2   A. No.

3   Q. Ever give her a documented verbal

4 warning?

5   A. No.

6   Q. Did you ever give her a written

7 performance evaluation?

8   A. Yes.

9   Q. How would you rate her on those?

10   A. Very good.

11   Q. Let me just -- we can knock out a bunch

12 of these at once.  I am going to show you the

13 evaluations that I have.

14   A. Yeah.

15   Q. At least that I think I have.  These

16 would be -- let's see.

17    I am going to show you Plaintiff's

18 Exhibits 16 through 20 and represent to you that

19 these are all employment evaluations for Kim.

20    (PLF. EXH. 16, Copy of Performance

21 Appraisal Report Effective Date 7/1/03, Bates

22 stamped DEF 000139 through 000140, was marked for

23 identification.)

24    (PLF. EXH. 17, Copy of Performance

25 Appraisal Report Effective Date 7/1/04, Bates

```
 1    stamped DEF 000136 through 000138, was marked for

 2    identification.)

 3            (PLF. EXH. 18, Copy of Performance

 4    Appraisal Report Effective Date 7/1/2005, Bates

 5    stamped DEF 000134 through 000135, was marked for

 6    identification.)

 7            (PLF. EXH. 19, Copy of Performance

 8    Appraisal Report Effective Date 7/1/2006, Bates

 9    stamped DEF 0000131 through 000133, was marked for

10    identification.)

11            (PLF. EXH. 20, Copy of Performance

12    Appraisal Report Effective Date 7/1/2007, Bates

13    stamped DEF 000128 through 000130, was marked for

14    identification.)

15    BY MR. POTTS:

16         Q.    Let me have you look at the first one

17    first, and this is Plaintiffs' 16.  It's an

18    evaluation effective 7/1/03.  That's a while ago.

19    Did you sign this anywhere?

20         A.    Yes.

21         Q.    Okay.  And you signed it as what, the

22    division head?

23         A.    Evaluated by.

24         Q.    Okay.  And who would have been the

25    author of this evaluation?
```

140

1       A.   Me, I guess.  I don't know why

2   Jonathan's signature is on there.

3       Q.   How would you characterize this

4   evaluation?

5       A.   Good.  Excellent.

6       Q.   Okay.

7       A.   Yeah.

8       Q.   Let me show you Plaintiff's

9   Exhibit No. 17.  That's an evaluation for Kimberly

10  Collins dated effective date 7/1/04, a year later.

11  Do you recognize this document?

12      A.   Yes.

13      Q.   Did you sign this document?

14      A.   I did.

15      Q.   And who would have been the author of

16  this evaluation, Plaintiff's 17?

17      A.   Me.

18      Q.   How would you characterize this

19  evaluation?

20      A.   Very good.  Excellent.

21      Q.   And you put a little note on the back;

22  right?

23      A.   Yep.

24      Q.   That's your handwriting?

25      A.   Yes.

```
 1          Q.    You prepared that; right?

 2          A.    Yes.

 3          Q.    Okay.  I show you Plaintiff's

 4    Exhibit No. 18 which should be 7/1, July 1 '05

 5    evaluation for Kimberly Collins.  Do you recognize

 6    that?

 7          A.    Yes, I do.

 8          Q.    Did you sign this?

 9          A.    I did.

10          Q.    Who is the author of this?

11          A.    Me.

12          Q.    How would you characterize this

13    evaluation?

14          A.    Very good.

15          Q.    Okay.  I show you Plaintiff's Exhibit,

16    I think I am on 18, effective date 7/1/06.  Do you

17    recognize this document?

18          A.    Yes.

19          Q.    This is another evaluation for Kimberly

20    Collins for the year 7/1/06; right?

21          A.    Yes.

22          Q.    And did you sign this?

23          A.    I did.

24          Q.    Who was the author of this?

25          A.    Me.
```

Collins, Kimberly v
Charleston Place, LLC

Paul Stracey
July 26, 2016

142

1      Q.    How would you characterize this
2   evaluation?
3      A.    Good.
4      Q.    And, again, you have a little note on
5   the back that's appreciative; right?
6      A.    Yes.
7      Q.    Did you mean what you wrote there?
8      A.    Yes.  There had been a couple of
9   office -- little bit of office discord that year I
10  believe.  That's why we had a few more
11  satisfactories there, I think, but still good.  You
12  know.
13     Q.    You say in your letter:  As always,
14  your attention to detail, quality and quantity of
15  work is exemplary.  With the different office
16  dynamics, I have no worries or concerns at all.
17  Was that true?
18     A.    Yes.
19     Q.    I think I am on Plaintiff's Exhibit 19
20  now or what am I on?  I don't want to lose track.
21     A.    That was 19.
22     Q.    That was 19, okay.  Plaintiff's
23  Exhibit 20 --
24     A.    You had one in the middle.  There's
25  probably -- I've got a 7/1/2007.

Collins, Kimberly v                                                  Paul Stracey
Charleston Place, LLC                                                July 26, 2016

143

1          Q.    That's what I'm looking at.

2          A.    Okay.

3          Q.    Should be Exhibit 20; right?

4          A.    No.  I have 20 as the next one.

5          Q.    Right.  That's what I have as the next

6    one.  What do you have there, one I didn't mark?

7          A.    I think so.

8          Q.    Okay.  So this would be -- that's the

9    same one.  What do you have right there as No. 20?

10         A.    Here you go.

11         Q.    Yep.  You are right.  Thank you for

12   pointing that out to me.  I am going a little too

13   fast here.

14               So let me show you 20 which is

15   performance evaluation for Kimberly Collins dated

16   July 1, 2007 and ask you if you recognize that

17   document.

18         A.    I do.

19         Q.    Performance evaluation for Ms. Collins;

20   right?

21         A.    Yes.

22         Q.    Did you sign it?

23         A.    I don't on this, but I did sign the

24   note on the back of it.  You can see that.  So yes,

25   I prepared it.

Collins, Kimberly v                                      Paul Stracey
Charleston Place, LLC                                    July 26, 2016

144

1        Q.    You made a note:  Very good year,

2    Kimberly.  Thank you.

3        A.    Yes.  Correct.

4        Q.    How would you characterize this

5    evaluation?

6        A.    Good.

7        Q.    You were the author of it?

8        A.    Yes.

9        Q.    Up at the top it says:  5 percent.  Was

10   Kim getting regular raises with these good

11   evaluations?

12       A.    Yes.

13       Q.    And who would make those decisions to

14   give her a raise?

15       A.    It's a hotel-wide process, you know.

16   You get somewhere between 4 and 5 percent in the

17   good days.  This is prior to the economic

18   meltdowns.

19       Q.    Were those cost-of-living or merit

20   raises?

21       A.    Cost of living.

22       Q.    Show you Plaintiff's Exhibit 21.

23   Thanks for straightening me out on this.

24       A.    You bet.

25       Q.    This is the last evaluation I have on

```
 1    her by the way.  This is evaluation for Ms. Collins

 2    effective date 8/1/08.  Do you recognize this

 3    document?

 4                (PLF. EXH. 21, Copy of Performance

 5    Appraisal Report Effective Date 8/1/08, Bates

 6    stamped DEF 000126 through 000127, was marked for

 7    identification.)

 8                THE WITNESS:  Yes.

 9    BY MR. POTTS:

10         Q.   Did you sign it?

11         A.   I did.

12         Q.   Were you the author of it?

13         A.   I did.

14         Q.   Number one under job knowledge, it

15    says:  Awesome.

16         A.   Yep.

17         Q.   Exclamation mark; right?

18         A.   Yes.

19         Q.   This is a good evaluation; right?

20         A.   Absolutely.

21         Q.   And let's see.  Let me show you

22    Plaintiff's Exhibit No. 22.

23                (PLF. EXH. 22, Copy of letter dated

24    January 26, 2009, Bates stamped Plf. Collins 0326,

25    was marked for identification.)
```

1    BY MR. POTTS:

2         Q.    This is dated January 6, 2009 where it

3    looks like Kim is being nominated as an associate

4    of the quarter and ask you if you recognize that

5    document.

6         A.    Yes.

7         Q.    What is it?

8         A.    It's a -- what happens is an employee

9    is nominated by their peers and by the management

10   team and Kimberly in 2009 won the employee of the

11   quarter.

12        Q.    Does that have meaning?  Was she really

13   the employee of the quarter?  Was she doing a good

14   job?

15        A.    According to her peers and managers,

16   yes.

17        Q.    All right.  Did you have anything to do

18   with the decision to give her that nomination?

19        A.    I don't vote on it, no.

20        Q.    I think I just said something that

21   wasn't right.  I have one more evaluation.

22             (PLF. EXH. 23, Copy of Performance

23   Appraisal Report Effective Date 8/1/2009, Bates

24   stamped DEF 000124 through 00125, was marked for

25   identification.)

Collins, Kimberly v                                              Paul Stracey
Charleston Place, LLC                                           July 26, 2016

147

```
 1  BY MR. POTTS:
 2        Q.   I have a 2009 -- show you what's been
 3  marked as Plaintiff's Exhibit 22.  That really is
 4  the last evaluation I have.
 5        A.   Yes.
 6        Q.   This is an evaluation for Kimberly
 7  Collins dated 8/1/09.  Do you recognize this
 8  document?
 9        A.   Yes.
10        Q.   Did you sign it?
11        A.   Yes.
12        Q.   Were you the author of it?
13        A.   Yes.
14        Q.   How would you characterize it?
15        A.   Another good one.
16        Q.   Okay.  Who also is signing these?  It
17  looks like you are, Kim is --
18        A.   And --
19        Q.   -- Carol?
20        A.   That's Jennifer Casselli.
21        Q.   Oh, okay.  So when I asked you before,
22  let me ask you again now that we have been through
23  it, do you know why -- I have no other evaluations
24  other than that one?
25        A.   We turned to an electronic evaluation.
```

154

1  whoever it is, can make that guest's stay better.

2  They can buy him dinner.  They can comp the room if

3  they wish.

4      Q.   Sure.

5      A.   So we have procedures for that in that

6  if you are the front desk, for instance, and you

7  comp a room, you fill out a little form and it goes

8  on.  There's no permission given.  It's an

9  after-the-fact thing.

10         The executive committee can comp a

11 room, especially those that do it more often --

12 that's usually more often would be the director of

13 sales because he has people coming and checking the

14 hotel.

15     Q.   Sure.

16     A.   And Leon Scott, front office manager,

17 is going to, by the very nature of his job, be the

18 person that does most of the comps there.

19     Q.   So Leon Scott had authority to comp?

20     A.   Absolutely.  Still does.

21     Q.   Okay.  Gotcha.  I'm sure you have read

22 the allegations in the complaint, but there's an

23 allegation that in 2014, Al Sharpton came to town

24 and that Leon Scott comped him.  First off, do you

25 know whether that's true, whether that happened?

Collins, Kimberly v                                          Paul Stracey
Charleston Place, LLC                                        July 26, 2016

172

1          Q.    What did you think when you read it?

2          A.    Upset.  Disappointment.  You know.  I

3    wish -- wish I had been able to help in some way.

4    You know.

5          Q.    So the way you found out about the

6    conversation is by this e-mail?  What you've got in

7    front of you right now.

8          A.    I think so.

9          Q.    Plaintiff's Exhibit 26?

10         A.    I think so.

11         Q.    That was your first knowledge of the

12   incident?

13         A.    Certainly detailed version.  I don't

14   know if Geno e-mailed and sent me -- there may have

15   been a conversation -- I would say yes, this.

16         Q.    So -- so then what did you do?

17         A.    Well, I came in a little later on that

18   Wednesday, jet-lagged a bit and everything.  Had

19   conversations with maybe Carol actually at the

20   time.

21         Q.    With who?

22         A.    Carol.  Carol Etheridge.  She's the HR

23   director, senior HR director, and was in the room

24   and was part of the whole situation.  So I thought

25   I'd go to the top and speak to her and ask her to

173

```
 1    give her point of view, and then we talked to Shawn
 2    and got points of view from Leon and everybody
 3    else.
 4         Q.   Okay.
 5         A.   About the situation.
 6         Q.   Let me call your attention back to
 7    Plaintiff's 26.  Is it 26 or 27?  It's 27.
 8    Twenty-seven.  I'm sorry.  Let me call your
 9    attention back to Plaintiff's Exhibit 27.  Yes,
10    yes.
11              Almost the last sentence, Leon is
12    saying:  I suggest we suspend her pending
13    investigation.  Do you see where he says that from?
14         A.   Uh-huh, yep.
15         Q.   Did he have the authority to suspend --
16         A.   No.
17         Q.   -- Kim?
18         A.   No.
19         Q.   He did not?
20         A.   No.  He can suggest it, but he can't do
21    it.
22         Q.   He certainly recommended it here?
23         A.   Well, I suppose he could.  He could in
24    my absence.  He could in my absence.
25         Q.   Okay.
```

175

1   exactly how we communicated.

2       Q.    Was it just the two of you at that

3   point?

4       A.    To start with I think, yeah.

5       Q.    Were you taking any notes during the

6   meeting?

7       A.    Carol had everything, you know, I

8   relied on her.  So I didn't take -- no, I didn't

9   write down notes.

10      Q.    Did Carol have notes?

11      A.    I think so.

12      Q.    What did Carol say to you?

13      A.    That Kimberly -- sorry.  She, Leon and

14  Shawn were in the cafeteria and Kimberly came in

15  and was very visibly agitated and upset and was

16  very aggressive towards them regarding the Walter

17  Scott issue, the Black Lives Matter protest, was

18  exceptionally -- what's the word, was very

19  insubordinate, out of control almost, venomous I

20  think were the words she used, and wagging her

21  finger in the face and that sort of thing.

22      Q.    That's what Carol Etheridge said?

23      A.    Correct.

24      Q.    You have been in management a long

25  time.  What's your definition of insubordination?

Collins, Kimberly v
Charleston Place, LLC

Paul Stracey
July 26, 2016

176

1      A.   Definition of insubordination?  I mean,

2   you are insubordinate to your superiors, so that

3   would be disrespectful behavior towards a superior.

4      Q.   That's how you define insubordination?

5      A.   It's a way of defining it, yes.

6      Q.   Okay.  Anything else happen or come out

7   of your conversation with Carol Etheridge?

8      A.   No.

9      Q.   And so what did you do next?  And,

10  again, this would be Wednesday --

11     A.   I mean, I -- so Wednesday, I didn't do

12  anything -- Thursday, I think I possibly talked to

13  Shawn.  I possibly talked to head office maybe I

14  potentially spoke to.  I don't remember who I spoke

15  to that day.  I might have spoke to Ingrid.

16     Q.   Okay.  Let's stay on track.  I just

17  want to know what you know.  I want to know what

18  you remember.

19     A.   Okay.

20     Q.   If you don't remember, you tell me.

21     A.   Okay.

22     Q.   So what we've got so far, first day

23  back, it's Wednesday.

24     A.   Right.

25     Q.   April 15.  You are saying that that

Collins, Kimberly v                                                        Paul Stracey
Charleston Place, LLC                                                      July 26, 2016

177

1    would have been the day you would have talked to
2    Carol Etheridge and interviewed her about the
3    incident; right?
4         A.    Right.
5         Q.    Okay.  I have it that on that same day,
6    April 15, 2015, is when you would have met with Kim
7    and told her that she was suspended for the week.
8         A.    No.  It was a little later.  It was the
9    day or the day after.  It wasn't the day I got
10   back.
11        Q.    The day you got back was Tuesday;
12   right?
13        A.    The day I came to work was Wednesday.
14        Q.    So you think you suspended -- when do
15   you think you suspended Kim?
16        A.    I would think Thursday or Friday.
17        Q.    Okay.
18        A.    Maybe -- possibly -- definitely not
19   Wednesday.  It was maybe Thursday.
20        Q.    Let me ask it this way, then.  Who
21   else, if anybody else, did you talk to about the
22   incident before Kim was suspended?
23        A.    Shawn Crawford.
24        Q.    Okay.
25        A.    And Leon Scott.  A little bit to Geno.

1        Q.    What did Shawn say about the incident,

2    if you recall?

3        A.    He said:  Yeah.  It was Kimberly, you

4    know -- he agreed with everything that Carol said.

5    You know.

6        Q.    Were you taking notes when you spoke to

7    Shawn?

8        A.    No.

9        Q.    Was he taking notes?

10       A.    Nope.

11       Q.    What did Leon say when you interviewed

12   him?

13       A.    Exactly the same as what Carol said.

14       Q.    And what did Geno say?

15       A.    He said after the situation had

16   happened, Kimberly came to his office and was very,

17   very upset and said:  I am going to get fired.  And

18   she recounted every single thing to him that Carol

19   and the others had recounted to me verbatim.

20       Q.    Now, Geno wasn't there during the

21   conversation --

22       A.    No.  Kimberly came and sought him out

23   in his office and said:  I am going to get fired

24   and this is what I have done.

25       Q.    Geno was telling you.

180

1    afternoon, like 2:30, three?

2        A.    Yes, I believe it was.

3        Q.    What did you say to her?

4        A.    I said:  We have this situation and

5    didn't look good and that sort of thing.

6        Q.    Did you say to her words to the effect

7    of it's not your place to say what you said in the

8    cafeteria?

9        A.    I said to her that she cannot act like

10   that in that hostile, insubordinate way to people

11   like Carol Etheridge who are her superiors.

12       Q.    Did Kim have a response?

13       A.    She didn't say much.

14       Q.    During the time -- during the meeting

15   where you suspended Kim, did you tell her that

16   words to the effect of look, if you would have just

17   told Leon that you were concerned about the letter

18   that he sent out, that would have been enough.  I

19   wouldn't have done anything.  It's what you said

20   after that?

21       A.    It's not so much what she said.  It's

22   how she said it and how she attacked three people

23   who are superior -- high-ranking managers in a

24   hotel in a public area.  It's -- that's the issue.

25   It's the aggressiveness and the insubordination and

1    the way they described it is a very venomous

2    attack.

3           Q.    Did you hear any allegations that the

4    conversation was started over the letter -- let me

5    have these so I can get the right -- did it come to

6    your attention that the conversation began in some

7    shape or form over Plaintiff's Exhibits 24 and 25

8    where Kim had said to Leon:  Hey, you shouldn't

9    have sent Plaintiff's Exhibit 25 out because we

10   just sent this Plaintiff's 24 out telling people

11   everything was going to be fine and that letter

12   kind of conflicts with it?  Did you come to find

13   out that that type of conversation or content

14   occurred?

15          A.    No.  I don't know specifically that.

16          Q.    Okay.  At that point when you were

17   suspending Kim, you had not asked for her side of

18   the story yet, had you?

19          A.    I had.

20          Q.    You had?

21          A.    Yeah.  I mean, I sat her down and said

22   she could have said anything she wanted to say.

23          Q.    You told her that?

24          A.    Yes.  We had an amazing -- we do.  She

25   could have said anything she wanted for as long as

Collins, Kimberly v
Charleston Place, LLC

Paul Stracey
July 26, 2016

182

1    she wanted to.

2        Q.    So during the time you suspended her,

3    your testimony is you gave Kim an opportunity to

4    tell her side of the story?

5        A.    I mean, I wouldn't have stopped her.  I

6    didn't say okay, so now you tell me -- I didn't

7    specifically say that.  But anybody that's having a

8    conversation would obviously say, oh, that's not

9    true or that's whatever.

10       Q.    You testified you felt that Kim was a

11   good employee.

12       A.    Correct.

13       Q.    Y'all got along?

14       A.    Correct.

15       Q.    Did you ever know her to behave

16   aggressively, how she allegedly acted on this

17   occasion?

18       A.    I never seen anything that aggressive,

19   no.

20       Q.    Have you ever been in the midst of a

21   protest or Black Lives Matter protest?

22       A.    I have been in protests, union protests

23   and things like that, but not specifically Black

24   Lives Matter one.

25       Q.    Have you seen them on TV?

183

1     A.   Yes.

2     Q.   Can we agree that sometimes they can be

3  emotionally charged?

4     A.   Yeah.

5     Q.   I mean, did you consider, in suspending

6  and eventually terminating Kim, that she had been

7  upset by the protest in terms of just looking out

8  for the hotel and herself as a human being and

9  reacted in a way that -- because she was emotional?

10     A.   Well, I mean, clearly she was

11 emotional, but, you know, you can't -- you know,

12 professional executive secretary, you can't -- you

13 know, go off on three managers in that way.  I

14 mean, it just is totally unacceptable.

15     Q.   How is it that you think she went after

16 any of the managers?

17     A.   Because they all told me.

18     Q.   In what regard?  Did she cuss at them,

19 did she spit on them, did she tell them they are

20 bad managers?

21     A.   Shook her finger at them, raised her

22 voice at them, wouldn't let it go, kept going and

23 going at it.  I mean, I'm sure you will be speaking

24 with them and they will give you the full account

25 of it.  I mean --

184

1      Q.   Did you try to figure out or did you

2  ever determine whether it was just Kim going down

3  and taking off on these people or whether they were

4  saying stuff back?

5      A.   Well, they were in the cafeteria.  Kim

6  went to find them in the cafeteria.  I don't know

7  who started it, who finished it.  But whatever --

8  whatever was said by the three witnesses, and Geno

9  said that she had instigated the conversation, more

10  of the conversation, and had acted in that way.

11      Q.   Do you know what they said back to her?

12      A.   I do not.  Well, I -- I know that they

13  probably disagreed with some of the things she was

14  saying.  You know.

15      Q.   Did you know whether they disagreed

16  with the same venom in which she was articulating

17  her speech?

18      A.   That is not the -- that was not the

19  testimony of any of them.

20      Q.   During the suspension meeting, were you

21  taking notes?

22      A.   No.

23      Q.   During the suspension meeting, I think

24  you might have answered this, but did you tell her

25  why she was being suspended?

Collins, Kimberly v                                          Paul Stracey
Charleston Place, LLC                                        July 26, 2016

185

1      A.    Yes.

2      Q.    What did you say to her?

3      A.    I said that:  There was a situation in

4   the cafeteria and inappropriate conduct towards

5   your superior people and you can't, you know, go

6   searching people out and have a huge public, you

7   know, insubordinate conversation with that type of

8   aggression.

9      Q.    And you told her she was suspended?

10      A.    Yes.

11      Q.    And who made the decision to suspend

12   Kimberly Collins?

13      A.    I did.

14      Q.    Anybody have input into that?

15      A.    Maybe Carol Etheridge a little bit in

16   my discussing it with her, but it was my decision.

17      Q.    During the suspension meeting, did Kim

18   express to you that she felt that she was going to

19   be terminated -- that she expressed a concern to

20   you that she felt she was going to be terminated?

21      A.    Possibly.

22      Q.    Do you recall?

23      A.    I don't remember.

24      Q.    Do you recall her saying words to the

25   effect of, you know, listen, Paul, I know how

1     Q.   During the suspension meeting, did you

2  say words to the effect of that -- that you can't

3  have someone in your office saying anything

4  controversial, especially with race relations not

5  being good in the Charleston area?

6     A.   I told her the way in which she

7  delivered the message was inappropriate and

8  unacceptable.

9     Q.   That -- I am not sure that answers my

10  question.  Did you tell her -- I understand what

11  you are saying.

12     A.   Right, right.

13     Q.   In addition to that, did you also say

14  that you can't have someone in your office or words

15  to these effect, effects, saying anything

16  controversial, especially about race relations

17  since they are not good in Charleston?

18     A.   I can't have someone representing the

19  office, you know, I can't have someone that is an

20  extension of our office as an executive secretary

21  walking around making, you know, having a -- you

22  know, judgments on behalf of my office.

23     Q.   Did you say that to --

24     A.   Yeah.

25     Q.   -- did you say that to Kim during the

188

1    suspension meeting?

2          A.    Yes, yes.

3          Q.    Did you specifically use the term or

4    say you can't have someone talking about

5    controversial race issues or race relations in the

6    office, in your office?

7          A.    I do not recall saying that.

8          Q.    What do you recall saying?

9          A.    I can specifically recall saying that

10   you cannot talk to people like Carol Etheridge who

11   are in that position.  I said:  She's -- for

12   goodness sake, she's the HR director of North

13   America.  You cannot speak to people like that.

14   It's not acceptable.

15         Q.    All right.  Okay.  During that period

16   of time, did you say anything about how she also

17   cannot talk about or she shouldn't be talking about

18   controversial race issues because of the race

19   situation in Charleston at the time?

20         A.    I don't recall saying that

21   specifically.

22         Q.    Did you say to her go home and take the

23   rest of the week off?

24         A.    I did tell her to go home, yes.

25         Q.    Did you tell her let's let this blow

1   over?

2        A.   I would have said let me inter -- you

3   know, investigate all this.  Let's let things calm

4   down.  Let's see what we are going to do.

5        Q.   Did you tell her the people were not

6   happy at the hotel?

7        A.   Well, I probably said the people that

8   she had the run-in with weren't happy.

9        Q.   Did you tell her that you promised that

10  you weren't going to fire her?  Did you promise her

11  you weren't going to fire her at the suspension

12  meeting?

13       A.   No.  No.

14       Q.   So what happened after you suspended

15  Kim?

16       A.   Did some more chatting with Carol

17  Etheridge.  I went and talked to Geno again.

18  Because, to me, Geno's -- was not involved in the

19  actual thing that happened.  What he told me came

20  from Kimberly's own -- came from Kimberly's own

21  admission.  So I talked at length with him about

22  the whole thing, and, to me, that made it seem

23  pretty cut-and-dry really.  The fact that it came

24  from Kimberly to somebody that wasn't involved

25  seemed like a pretty -- pretty strong case.

Collins, Kimberly v                                    Paul Stracey
Charleston Place, LLC                                  July 26, 2016

190

1         Q.    Did Geno call you when you landed

2    Tuesday night to tell you what happened?

3         A.    He may have done.  He may have done.

4         Q.    Do you know that he then called Kim and

5    said she didn't have anything to worry about?

6         A.    He may have done.

7         Q.    Did you get written statements from

8    anybody in regards to what happened in the

9    cafeteria?

10        A.    Carol will have it, have them.

11        Q.    Do you recall Sunday night, April 19,

12   2015 calling Kim on her cell phone?

13        A.    Yes.

14        Q.    Okay.  Was anybody else on the phone

15   besides you two?

16        A.    No.

17        Q.    What did you tell her?

18        A.    As I recall, I told her to come in,

19   like, ten o'clock or something like that rather

20   than come to work as normal.  Come in at a slightly

21   later time.

22        Q.    Okay.  Anything else discussed?

23        A.    Chatted a little bit more about the

24   whole situation.  I don't recall exactly what was

25   said.

Collins, Kimberly v
Charleston Place, LLC

Paul Stracey
July 26, 2016

191

1   Q. Do you recall telling her during that

2 telephone call on Sunday night, April 19, 2015,

3 that things were not going well due to pressure

4 that you were getting?

5   A. No.  What I said were things were not

6 going well because of all the people that have

7 complained.

8   Q. Did you tell her at any point in time

9 during that telephone call you were getting

10 pressure to terminate her?

11   A. No.  No.  I was -- I was -- there were

12 many people that I was talking to that were

13 involved that were trying to help me make the

14 decision.

15   Q. At any point during that telephone

16 call, did you tell her you were going to have to

17 fire her?

18   A. She would have -- I think she probably

19 would have guessed, because I didn't say -- it

20 wasn't come to work as normal.

21   Q. During that telephone call on that

22 Sunday night when you called Kim, did you tell her

23 that you were going to have to let her go, that

24 things were out of your control and out of your

25 hands?

1    A.    I think probably what I said, I don't

2    know for sure, but at that stage I would have had

3    no -- no other recourse based on the evidence that

4    I had and the testimony from people.  I wouldn't

5    have had an option.  It was, as far as I could see,

6    a done thing.

7        Q.    Did you call her and -- did she call

8    you Monday morning and say she was sick, can't come

9    in?

10       A.    Yes.  She said could she change the

11   meeting until Tuesday.  And we had a long

12   conversation again.

13       Q.    On Tuesday?

14       A.    Yeah.  At least a 15-minute

15   conversation Tuesday morning, because I spoke to

16   her in my car and it takes me 15 to 20 minutes to

17   get to work.  And I said, you know, she said:  I

18   never got to give my point of view and I said:

19   Well, tell me, you know.  What is it you haven't

20   told me?

21       Q.    Is this a telephone conversation on the

22   phone before y'all met at work?

23       A.    Yeah.

24       Q.    Okay.  So who called who?  She called

25   you or did you call her?

Collins, Kimberly v
Charleston Place, LLC

Paul Stracey
July 26, 2016

193

1      A.    She called me to say could she

2   change --

3      Q.    Oh, okay.

4      A.    No, no.  This was Monday morning.  She

5   called me, said could she change the appointment

6   until Tuesday.  And I said:  Yes.  And she had

7   mentioned that she didn't get enough chance to

8   explain, so I said:  You got me here.  Explain.

9      Q.    So on Monday, did she explain her side

10  of the story?

11     A.    Yes.  But it was exactly the same as it

12  was on Friday.

13     Q.    You were driving your car when she was

14  explaining?

15     A.    Uh-huh, uh-huh, uh-huh.

16     Q.    Yes?

17     A.    Yes.

18     Q.    So you wouldn't have any notes of that.

19     A.    No.

20     Q.    And that was Monday.

21     A.    Monday.

22     Q.    And you said fine.  You can come in

23  Tuesday.

24     A.    That's right.

25     Q.    Did you tell her come in Tuesday.

1       A.    Another chance.  She wanted to talk

2   again.  Talk again.  But, again, nothing new.

3       Q.    Okay.  Then she came to the office

4   Tuesday?

5       A.    Correct.

6       Q.    So what happened Tuesday?  Did you meet

7   with Kim at the premises?

8       A.    Yes.

9       Q.    Where?

10       A.    In the office.

11       Q.    Whose office?

12       A.    Mine.

13       Q.    Who all was there?

14       A.    I think it was just me and her, I

15   think.

16       Q.    Okay.

17       A.    Yes.  Just me and her.

18       Q.    Why wasn't HR there?

19       A.    They had helped prepare the separation

20   agreement.  It wasn't necessary.

21       Q.    What did you say to her?

22       A.    I said, you know, as best I could, and

23   I -- I -- sympathetic way:  I'm sorry.  But as you

24   do in these situations as little as possible and as

25   simple as possible, offer a separation agreement,

1  which she took.  Didn't take very long.  We both

2  cried.  And she left.

3          Q.    Sitting here today talking to me, can

4  you remember anything that you said to Kim Collins

5  in the termination meeting?

6          A.    Can I remember anything?

7          Q.    Yes.

8          A.    Just -- just:  I'm so sorry it's come

9  to this and we have to let you go, as little as

10  possible.

11          Q.    Did she say anything?

12          A.    I don't recall exactly.

13          Q.    Did you tell her why the decision was

14  made to fire her?

15          A.    It would have been all the same things.

16  It would have all been the same, you know -- I have

17  no option.  There's no choice here.  You know.  You

18  cannot do something like that as witnessed by all

19  those people.  It just isn't -- you can't -- you

20  can't be aggressive towards people in that way.

21          Q.    Did you say that to her in the

22  termination meeting --

23          A.    Yes.

24          Q.    -- or are you speculating now?

25          A.    Yes, yes, yes.

Collins, Kimberly v                                          Paul Stracey
Charleston Place, LLC                                        July 26, 2016

201

 1   the thing we want to do, fire you, but we have no

 2   choice based on what happened.

 3           Q.   You didn't feel that what she did was a

 4   terminable offense, did you?

 5           A.   After I had spoke to Geno, I most

 6   certainly did.

 7           Q.   Really?

 8           A.   Yeah.   It was Geno's testimony that

 9   really -- the fact that she came and said exactly

10   what all the others had said to me was the -- the

11   kicker.   The main thing.   Because it was totally

12   separate.   It wasn't corroborated.   It was exactly

13   verbatim what they had told me, he recounted to me

14   from Kimberly.

15           Q.   Leon Scott told you that he wanted Kim

16   fired, didn't he?

17           A.   He may have said that.   That doesn't

18   mean I am going to do it.

19           Q.   I understand that.   That's what he told

20   you, didn't he?

21           A.   He may have.   I don't know for sure.

22           Q.   Leon was putting some pressure on you

23   in some shape or form to fire Kim, wasn't he?

24           A.   No.   Leon did not put any pressure on

25   me.   I wouldn't let him put any pressure on me.

Collins, Kimberly v                                          Paul Stracey
Charleston Place, LLC                                        July 26, 2016

208

1              SIGNATURE OF DEPONENT (CONTINUED)

2    DEPOSITION DATE:  JULY 26, 2016
     REPORTER:  JANE MESSINEO
3    AWR JOB #:  160726JM
     CASE CAPTION:  KIMBERLY COLLINS VS. CHARLESTON
4    PLACE, LLC, D/B/A BELMOND CHARLESTON PLACE

5

6    PAGE    LINE          CHANGE              REASON

7

8

9

10

11

12    _____

13         PAUL STRACEY                    Date

14         I, Jane Messineo, Notary Public for the
     State of South Carolina at Large, do hereby certify
15   that the deponent was advised of his or her right
     to read and sign said deposition both verbally and
16   in writing.  If the deponent fails to execute and
     return foregoing Signature of Deponent pages within
17   the thirty (30) days allowed pursuant to the Rules
     of Civil Procedure, the original transcript may be
18   filed with the court.

19

20

21

22    _____

23         Jane Messineo, RPR, CSR-NJ
          My Commission expires
24        February 18, 2025

25