# Exhibit G

```
            UNITED STATES DISTRICT COURT
             DISTRICT OF SOUTH CAROLINA
                  CHARLESTON DIVISION


KIMBERLY COLLINS,

            Plaintiff,

     vs.            C.A. NO.: 2:15-cv-4465-PMD-BM

CHARLESTON PLACE, LLC, d/b/a BELMOND CHARLESTON
PLACE,

            Defendant.


DEPOSITION OF:    CAROL ETHERIDGE

DATE:             July 27, 2016

TIME:             10:08 AM


LOCATION:         HITCHCOCK & POTTS
                  31 Broad Street, 2nd Floor
                  Charleston, SC



TAKEN BY:         Counsel for the Plaintiff

REPORTED BY:      JANE MESSINEO, Registered
                  Professional Reporter, CSR-NJ


       A. WILLIAM ROBERTS, JR., & ASSOCIATES

            Fast, Accurate & Friendly

 Charleston, SC    Hilton Head, SC   Myrtle Beach, SC
 (843) 722-8414    (843) 785-3263    (843) 839-3376


  Columbia, SC     Greenville, SC    Charlotte, NC
 (803) 731-5224    (864) 234-7030    (704) 573-3919
```

```
 1   aware when someone is terminated from the hotel,
 2   Belmond Charleston?
 3        A.   Yes.  The policy requires that I am
 4   informed.  I may not always know, but I am
 5   informed.
 6        Q.   Are you aware of discipline, written
 7   warnings, final written warnings?
 8        A.   No.
 9        Q.   Are you aware -- do you have any
10   knowledge of anyone being disciplined at Belmond
11   Charleston for being disrespectful or rude to a
12   supervisor?
13        A.   Yes.
14        Q.   Who are you aware of that was
15   disciplined for that?
16        A.   ███████████████
17        Q.   And who is she?
18        A.   I don't remember her job title.  She
19   worked in housekeeping in an entry-level position.
20        Q.   Okay.  Do you know her race per chance?
21        A.   She was African-American.
22        Q.   What did she do that you are aware of?
23        A.   She was disrespectful, aggressive,
24   showing -- displaying aggressive behavior towards
25   several managers.
```

```
 1         Q.    Do you know who?
 2         A.    Rhonda Millard, I believe is the name.
 3         Q.    Rhonda Millard I understand is white or
 4   Caucasian; correct?
 5         A.    Yes.
 6         Q.    Okay.  And how is it that you know
 7   about that incident?
 8         A.    I remembered it because ▓▓▓▓▓'s
 9   mother worked at the hotel and I was embarrassed
10   for her mother, frankly.
11         Q.    Do you know -- do you know what she
12   did, ▓▓▓▓▓▓▓▓▓▓, how she manifested being
13   disrespectful?
14         A.    She was angry, she was loud.  She was
15   aggressive and it's inappropriate behavior.
16         Q.    Did you know about the facts, did you
17   know what she did, in other words, did you know if
18   she was cussing or threatening or --
19         A.    I don't know.
20         Q.    And she was -- her discipline was what?
21         A.    Termination.
22         Q.    And who made the decision to terminate
23   her?
24         A.    Jennifer and Paul.
25         Q.    Are you aware of any other instances
```

| | |
|---|---|
| Collins, Kimberly v<br>Charleston Place, LLC | Carol Etheridge<br>July 27, 2016 |

133

```
 1   feelings of your customers?
 2        A.   No.
 3        Q.   Did you see hotel security when you
 4   watched the video?
 5        A.   No.
 6        Q.   I am going to show you what's been
 7   marked as Plaintiff's Exhibit 25 in a prior
 8   deposition.
 9        A.   Okay.
10        Q.   Do you recognize this document?
11        A.   Yes.
12        Q.   This is an e-mail from Leon Scott to
13   you and others; right?
14        A.   Yes.
15        Q.   And it's dated April 13, 2015 at
16   1:46 p.m.; right?
17        A.   Yes.
18        Q.   And he's indicating that: Black Lives
19   Matter protesters entered the lobby very loudly.
20   They went into the Palmetto Cafe yelling: Black
21   lives matter and handing out flyers. His last
22   sentence says: The particular group is well guided
23   and respectful, just loud and disruptive.
24             Do you see where I read that from?
25        A.   Yes.
```

```
 1        Q.   Would you agree or disagree with that
 2   statement?
 3        A.   I would agree.
 4        Q.   When he says the particular group is
 5   well guided, would you consider that to be a
 6   political opinion?
 7        A.   No.
 8        Q.   Okay.  Did you receive this,
 9   Plaintiff's Exhibit 25?
10        A.   Yes, uh-huh.
11        Q.   Yes?
12        A.   Yes.
13        Q.   Before you went or after you got back?
14        A.   After I got back.
15        Q.   Okay.  Twenty-six is just kind of the
16   same thing, so we are not going to look at that.
17             Okay.  So we can agree that at some
18   point on Monday, April 13, 2015, you are in the
19   cafeteria at the Belmond hotel along with Shawn
20   Etheridge and Leon; right?
21        A.   Shawn Crawford.
22        Q.   Shawn Crawford and Leon, right.  Thank
23   you.
24        A.   Yes.
25        Q.   The three of you are sitting -- seated
```

2:15-cv-04465-PMD   Date Filed 01/13/17   Entry Number 25-8   Page 7 of 15

Collins, Kimberly v
Charleston Place, LLC

Carol Etheridge
July 27, 2016

143

1    A.   I don't understand.  How do you point a
2 finger?
3    Q.   There's a lot of ways to do it.
4    A.   Oh.
5    Q.   There's a lot of ways to do it.  I
6 mean, I guess the primary way, if you were watching
7 the convention last night, Bill Clinton pointed his
8 finger, he did this.  What do you call that, index
9 finger and stick it out?
10   A.   Yeah.
11   Q.   So -- so that's what Kim was doing, was
12 she had her finger --
13   A.   When she made that statement, she did,
14 yeah.
15   Q.   When she made which statement?
16   A.   And, you, Ms. Regional HR director, I
17 have been meaning to tell -- talk to you about your
18 diversity training.
19   Q.   Okay.  While she said that, she had her
20 finger pointing towards you?
21   A.   Yes, yes.
22   Q.   Okay.  Obviously, she wasn't bent over
23 and the finger was in your face.
24   A.   No.
25   Q.   She -- she -- the finger -- where was

1  is the GM.  I'll have to let Paul deal with it.
2  Because I said to Leon:  I don't need to apply my
3  authority to know that I have it.  I choose not to
4  be involved in it because it would have been a
5  racial -- it would have ended up being racially
6  motivated because it was -- she was directing her
7  comments to me.
8        Q.   Do you feel that most of Kim's comments
9  were directed towards you or Leon?
10       A.   I don't know about most of them.  I am
11 talking about the you, Miss Regional HR director.
12       Q.   During the conversation in the
13 cafeteria, did Kim ever disclose that she was
14 frightened by the protesters?
15       A.   No.
16       Q.   So did you ever talk to Paul Stracey
17 about what happened and tell him your side of the
18 story?
19       A.   Paul didn't ask me for details.  Paul
20 asked whether I -- what I thought -- whether she
21 was over the top, was she loud, was she aggressive.
22 And my answers were yes.
23       Q.   Just so -- so we have a time frame
24 here, from what we talked about yesterday, the
25 evidence is that Paul got back from Russia that

2:15-cv-04465-PMD    Date Filed 01/13/17    Entry Number 25-8    Page 9 of 15

Collins, Kimberly v  
Charleston Place, LLC

Carol Etheridge  
July 27, 2016

152

1  Tuesday night, so it would have been the night
2  after the cafeteria and the protest incident.
3         Do you recall that being the case?
4     A.   I don't know when he returned.  I know
5  he was out of the country for the GMs' conference.
6  I don't know when he came back, so I would have
7  spoken to him on Wednesday.  He wasn't -- I didn't
8  speak to him on Tuesday.
9     Q.   Let me show you what's been marked as
10 Plaintiff's Exhibit 27 in a prior deposition.  That
11 is an e-mail from Leon Scott to Jennifer Casselli
12 and you dated April 14, Tuesday, April 14, 2015 at
13 9:16 a.m. and ask you if you received this.
14    A.   Yes.
15    Q.   Did you receive it on or about April
16 14, 2015?
17    A.   I would have to say yes.
18    Q.   Did you respond to this e-mail?
19    A.   I don't recall.
20    Q.   In this e-mail he says that -- I am not
21 going to read the whole thing, but one of the
22 things he says is:  An effort to question me and my
23 authority in front of African-American associates
24 did not fair well for her.  Questioning my
25 authority, who I may comp rooms to, I'm sure you

1  gave that Al guy a free room, parentheses, Al
2  Sharpton, who paid a thousand dollars per suite.
3  Did you hear Kim make any remarks about Al
4  Sharpton?
5      A.   Yes, yes, I did.
6      Q.   In the cafeteria?
7      A.   Yes.
8      Q.   Did you hear her make the remarks about
9  whether or not he was comped or questioning Leon
10 about whether he was comped?
11     A.   There was a question, yes.
12     Q.   Did you hear her make a comment about
13 why doesn't Al Sharpton pay $4 million in back
14 taxes?
15     A.   I don't know that she said why doesn't
16 he pay his back taxes. There was a reference to
17 him owing back taxes. I don't know how it was
18 framed.
19     Q.   He says that Kim says: If he, Walter
20 Scott, didn't bolt, he wouldn't have gotten shot.
21          Did Kim say that?
22     A.   Yes.
23     Q.   She says: The police were only doing
24 their job. Do you recall her saying that?
25     A.   Yes.

1  Q. She makes comments about: Obama messed
2  up the whole country. Do you recall her saying
3  that?
4  A. No. I recall her saying the country
5  has never been more divided than it is -- than it
6  has been over the last seven and a half years. And
7  I remember saying to Shawn: What happened seven
8  and a half years ago? And she said: When that man
9  was elected.
10  Q. Okay. Leon says: I suggest we suspend
11  her pending the investigation.
12  Do you see that?
13  A. Yes.
14  Q. Did he have the authority to say that?
15  A. He has the authority to say it, yes.
16  Q. Does he have authority to do it?
17  A. No, he doesn't have the authority to do
18  it.
19  Q. Were you offended by the words that Kim
20  was saying regarding the president, Al Sharpton,
21  how the guy wouldn't have gotten shot if he
22  wouldn't have ran?
23  A. Offended? Concerned by it. I don't
24  know Al Sharpton. I don't have a political -- it
25  doesn't matter to me what was said. It's the tone,

1  the aggressive nature that was troublesome in that
2  setting.  I don't care about your opinions.  They
3  ought to be confined to your kitchen table.  Not in
4  a cafeteria where employees are eating in a diverse
5  environment and where I'm sitting there.  I don't
6  need to hear it.
7        Q.   These are clearly opinions that you
8  disagree with?
9        MS. NELSON:  Object to form.
10 BY MR. POTTS:
11       Q.   Aren't they?
12       A.   No.  I disagree.
13       Q.   You disagree -- what do you agree with
14 that she said?
15       A.   Well, I just said, sir, was the tone in
16 which she said it is what was troublesome for me.
17 It doesn't matter what she says.  It's not the
18 first time that she's made disparaging or
19 inappropriate comments about President Obama.  I
20 don't give a hoot, but it's the tone in which she
21 was delivering them, especially when it was
22 directed towards me.
23       Q.   By --
24       A.   That's what I said.
25       Q.   I understand what you said.

1  Q.  If someone points to you and asks you
2  the wrong question, does it matter how close they
3  are to you?  Is it just the gesture of pointing
4  that makes you upset?
5  A.  And the tone, and the tone.  The tone
6  of the questions.  The tone of the question
7  certainly changes the interpretation of that
8  pointing.
9  Q.  Okay.  Are you aware that Paul Stracey
10 suspended Kim?
11 A.  Yes.
12 Q.  How did you become aware of that?
13 A.  That's standard procedure.  So at some
14 point, I don't know when or where, he told me that
15 he would have to suspend her pending further
16 investigation after the two o'clock department head
17 meeting.
18 Q.  Did he tell you why he was suspending
19 her?
20 A.  That's standard procedure.  To conduct
21 further investigation.  That's what we do.
22 Q.  But did he say why, what she did wrong?
23 A.  Because of her behavior in the
24 cafeteria.
25 Q.  Did you respond, did you say anything?

```
 1          A.   No.  Because it is a given that that's
 2   what we do.
 3          Q.   Was there an investigation done?
 4          A.   I don't know what Paul did.  I didn't
 5   have an involvement at that point.
 6          Q.   Did you ever give anybody a statement,
 7   either verbal or written, as to what happened in
 8   the cafeteria that day with Kim?
 9          A.   Ann.
10          Q.   Anybody else?
11          A.   I would have had to talk -- share with
12   Paul my -- my role in it.
13          Q.   Do you know who made the decision to
14   suspend Kim?
15          A.   Paul made the decision.
16          Q.   Did you have any input into that
17   decision?
18          A.   My input was as it is in other
19   terminations:  Paul, you've got to be able to do
20   what you would do with anyone else.  And I said:
21   For instance, if it were an African-American
22   employee pacing in the cafeteria, aggressive in
23   their behavior, making comments about the white
24   officer and his role, what would you have done?
25          Q.   What did he say?
```

# CERTIFICATE OF REPORTER

I, Jane Messineo, Court Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 27th day of July, 2016 at Charleston, Charleston County, South Carolina.

_____
Jane Messineo, RPR, CSR-NJ
My Commission expires
February 18, 2025