# Exhibit I

```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF SOUTH CAROLINA
                     CHARLESTON DIVISION


     KIMBERLY COLLINS,

               Plaintiff,

          vs.           C.A. NO.: 2:15-cv-4465-PMD-BM

     CHARLESTON PLACE, LLC, d/b/a BELMOND CHARLESTON
     PLACE,

               Defendant.


     DEPOSITION OF:    LEON SCOTT

     DATE:             July 26, 2016

     TIME:             2:48 PM


     LOCATION:         HITCHCOCK & POTTS
                       31 Broad Street, 2nd Floor
                       Charleston, SC


     TAKEN BY:         Counsel for the Plaintiff

     REPORTED BY:      JANE MESSINEO, Registered
                       Professional Reporter, CSR-NJ


            A. WILLIAM ROBERTS, JR., & ASSOCIATES

                  Fast, Accurate & Friendly

     Charleston, SC     Hilton Head, SC    Myrtle Beach, SC
     (843) 722-8414     (843) 785-3263     (843) 839-3376


      Columbia, SC      Greenville, SC     Charlotte, NC
     (803) 731-5224     (864) 234-7030     (704) 573-3919
```

AWR   A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO
scheduledepo.com

1  white police officer, fairly soon after the
2  incident?
3         A.    I think two days, something like that.
4  Yeah.
5         Q.    Y'all didn't have any issues with that
6  in the Urban League, as an African-American, did
7  you?
8         A.    With?
9         Q.    The quick arrest.
10        A.    No.  No.  Not at all.
11        Q.    Okay.  I am sure you heard the
12 allegations of comping and Al Sharpton.  Did you
13 have the authority to comp guests?
14        A.    Yes.
15        Q.    Absolute authority?
16        A.    Absolute authority.
17        Q.    You do it and that's it, nobody can say
18 anything to you?
19        A.    Correct.  I've never been questioned
20 about me comping a room, ever, from Paul, from
21 anyone.
22        Q.    That's just in your discretion?
23        A.    Yeah.
24        Q.    Did you comp Al Sharpton?
25 Understanding that you have that right.

1    A.   Yeah, I did.  The City of Charleston
2  called.  He was here for the MOJA event and asked
3  me if I would accommodate him, I want to say for
4  two nights.  As I have for many other people City
5  of Charleston calls.
6    Q.   Sure.
7    A.   And he stayed -- the other two times he
8  stayed, he paid rack rate.  He paid the going rate.
9    Q.   Okay.
10   A.   I didn't have anything to do with that.
11   Q.   The time you comped him, was that in
12 2014?
13   A.   I don't remember.
14   Q.   He came again with regards to the
15 Walter Scott shooting; right?
16   A.   I don't think he stayed with us,
17 though.
18   Q.   I thought I saw something he stayed
19 with you, but he paid?
20   A.   He might have.  I don't recall.  He
21 might have.  I -- I -- the time I had him and it
22 was for his -- for the City of Charleston.  But if
23 he did stay at the hotel during that, he paid, if
24 he was here at the Walter Scott.  I didn't know if
25 he stayed at the hotel during Walter Scott, but if

1 he did, he would have paid.
2     Q.    If he would have asked you to comp him,
3 you would have comped him?
4     A.    Of course not.  No, no.  Of course not.
5 I would not have.  I didn't know him like that.
6 The City of Charleston --
7     Q.    Let me restate it a little slower.  If
8 Al Sharpton would have come or if he did come for
9 the Walter Scott shooting and stayed at the
10 Belmond, would you have comped him?
11     A.    No.
12     Q.    Why not if you comped him before?
13     A.    Because the favor, I was actually doing
14 it for the City of Charleston.
15     Q.    Oh.
16     A.    Who you recall was one of the folks why
17 we exist right now, Mayor Riley and all of his
18 efforts.  Let me just say this, too, is that it's
19 during Spoleto, during Wine and Food, major city
20 events, we always accommodate, you know, actors,
21 actresses, main players who, you know, and so
22 forth.  So it's -- it's whenever we -- we grant it
23 to him every time.  We may not have availability.
24 But if we do, we always honor their request.
25     Q.    Did you become aware that, after that

Collins, Kimberly v					Leon Scott
Charleston Place, LLC					July 26, 2016

103

1      A.    Kim showed up at the lunchroom.
2      Q.    She showed up unannounced?
3      A.    Which is normal.
4      Q.    Right.
5      A.    Yeah.
6      Q.    Right.  It's a lunchroom for everybody.
7      A.    Yeah.
8            MR. GEDDIE:  For employees.
9            THE WITNESS:  For employees.  I'm
10   sorry.
11   BY MR. POTTS:
12     Q.    For everybody that's an employee.
13     A.    Yeah.
14     Q.    And it closes at two.
15     A.    Yes.
16     Q.    All right.  Tell, tell me what happened
17   in your words.
18     A.    Okay.  And I don't remember if Carol --
19   I believe Carol was already sitting there.  And I
20   believe Shawn may have and I joined them.  And --
21   and I don't remember what the topic of discussion
22   was.  It was -- I'm sure it had something to do
23   with either the Walter shooting -- I am not sure.
24   But Kimberly came and was visibly upset.  And --
25   and the first time that I have really heard her,

A. WILLIAM ROBERTS, JR., & ASSOCIATES (800) 743-DEPO        Page 103
scheduledepo.com

1  you know, kind of really be -- it was pretty -- it
2  was -- it was -- I don't know if you call it anger
3  or hatred, unprofessional. I thought it was pretty
4  horrendous. But as she -- she said something to
5  the effect of -- and, again, I don't care about the
6  content, but what I had a problem with and what I
7  would have any problem with, is the tone that it
8  was.
9           I don't care -- people can voice their
10 opinion. But, you know, I had a problem with the
11 tone and I guess -- and during that time -- I don't
12 know if Kimberly remembers, but I tried to do --
13 because I could see that it was -- it was loud.
14 And so I did sort of like, you know, deal with this
15 later, let's talk about this later, and I tried to
16 get her to calm down and it didn't work.
17      Q.   You have been in management for a long
18 time, haven't you?
19      A.   Yes.
20      Q.   And you have been in the -- where,
21 manager of the Urban League.
22      A.   Yes.
23      Q.   Can you understand at least how
24 something like a protest would be emotional to
25 somebody?

107

1  conversation was held, you know, I don't -- I can't
2  speak how the others felt.  But, you know, I mean,
3  obviously I didn't feel good about it.  I am just
4  getting blasted and -- and, you know, whether I
5  agreed with the content or not, I mean, you know --
6  I don't know how they felt.  I know how I felt.
7  So.
8         Q.   Okay.  So during the conversation that
9  happened or whatever happened in the cafeteria, do
10 you recall any of the things, as we sit here today,
11 that Kim said?
12        A.   I remember, and it may not be the exact
13 words, but:  I am speaking on behalf of the white
14 people, and she said that -- something like:  If he
15 had listened to the police, it would have never
16 happened.  And, you know, I can't remember -- but
17 it was -- it was -- you know, it was a -- negative.
18        Q.   Did she seem like upset when she was
19 saying it?  You know how sometimes someone's voice
20 would quiver or their hands would shake?
21        A.   Angry.
22        Q.   Did Kim, when she was saying whatever
23 she was saying in the cafeteria, do you have any
24 evidence that she used profanity?
25        A.   I don't think that there was profanity.

2:15-cv-04465-PMD   Date Filed 01/13/17   Entry Number 25-10   Page 9 of 14

Collins, Kimberly v
Charleston Place, LLC

Leon Scott
July 26, 2016

108

```
1    Q.   Did she strike anybody?
2    A.   No.  It was all verbal.
3    Q.   She put her finger in your face?
4    A.   No.
5    Q.   Was she yelling?
6    A.   Yes.
7    Q.   She was yelling?
8    A.   Yes.
9    Q.   Let me ask you this.  Might be
10   splitting hairs, but was she -- was her voice
11   raised or was she yelling?
12   A.   She was yelling.
13   Q.   Okay.  Was it just Kim giving a
14   monologue on her -- or was there a dialogue?  Were
15   you guys arguing back with her?
16   A.   No, there wasn't -- we weren't -- there
17   was no dialogue.  It was -- it was -- I think
18   Kimberly expressing how she felt.
19   Q.   Okay.
20   A.   But there was no dialogue.  We
21   weren't -- certainly weren't sharing how we felt.
22   Q.   You weren't sticking up for your side
23   saying now, wait a minute.  You know, police have
24   been doing this for years to us.  There's a whole
25   different side of this story.  You guys were not
```

110

1    the hotel.  It was the Ministerial Alliance
2    complaining that African-Americans did not -- they
3    said one of the signs said do not make decisions.
4    And are in roles that only pay, you know, only
5    roles that pay, you know, poor wages and never
6    opportunities for -- to get ahead, and it was that.
7    It was the Ministerial Alliance, Reverend McLean
8    and that whole group.
9         Q.   Okay.
10        A.   And the extent to it was they put some
11   notes on cars or something like that.
12        Q.   Do you recall Carol bringing that up in
13   the meeting in the cafeteria that you had?
14        A.   No.  Now, could have said it before I
15   got there or could have said it after I left, but I
16   don't recall her talking about that.
17        Q.   At some point, Leon, at some point, you
18   looked at Kim and told her look, enough is enough.
19        A.   Yeah.
20        Q.   And she left.
21        A.   I don't -- I remember saying to her:
22   We can do this later, we did do this later and we
23   do this later.
24        Q.   And she wasn't leaving.
25        A.   What she did is she got up, and I don't

1  it in that tone.  I mean, I certainly wouldn't have
2  yelled at anybody about how I felt about it,
3  whether it was -- whether I agreed about how it was
4  handled or not.  And there were discussions.  I
5  mean, obviously the discussion amongst all the
6  employees about what happened.  This is big in
7  Charleston, South Carolina.  So yeah, there were
8  people, but not like that.  I mean, I never got --
9  you know, anybody that was raising their voice or
10 screaming.
11       Q.   Who, if you know, is the one that told
12 Mr. Stracey about this incident?
13       A.   You know, I don't know, but I am
14 guessing maybe Geno.
15       Q.   Okay.  After this happened in the
16 cafeteria, did you and the other people at the
17 table get together and talk about what had just
18 happened, you and Mr. Crawford, Shawn Crawford?
19       A.   No.
20       Q.   Who is the other?
21       A.   Carol Etheridge.
22       Q.   Did you and --
23       A.   Get together and discuss, no.
24       Q.   You did not?
25       A.   Nope.  I think -- I don't know.  I

Collins, Kimberly v  
Charleston Place, LLC

Leon Scott  
July 26, 2016

113

1  think we said what the hell happened or something
2  like that when she left, but that was the extent of
3  any conversation.
4        Q.   Sure.  Did you complain to anybody up
5  in management before what had happened in the
6  cafeteria?
7        A.   No.  I never shared that.
8        Q.   Did Carol or Shawn?
9        A.   I believe Carol.
10       Q.   Were you ever interviewed about what
11 had happened?
12       A.   Interviewed?  I wasn't -- I was asked
13 what happened.  So I guess that could be, you know,
14 what did I see and --
15       Q.   Did you give a written statement?
16       A.   No.
17       Q.   You realize that Kim was fired shortly
18 after that incident; correct?
19       A.   Correct.
20       Q.   Do you know why Kim was fired?
21       A.   My understanding, it was because of --
22 I mean, it was insubordination.
23       Q.   Okay.  Who made the decision to fire
24 Kim?
25       A.   Paul.

1    Q.   Did you have any input into that?

2    A.   I don't know what role I would play in
3    that.  It wasn't my recommendation.  Nor was I
4    asked for my recommendation.

5    Q.   That would be your role, if you said
6    hey, I think she should be fired.

7        MR. GEDDIE:  That's not what he said.

8        THE WITNESS:  I am saying that wasn't
9    for me to do.  I don't do that.  I don't -- I
10   submit what I have if I have an employee, this is
11   what -- this is what I think, but Kim's not my
12   employee.

13   BY MR. POTTS:

14   Q.   Do you know if anybody else had input
15   into Kim's termination other than Paul Stracey?

16   A.   I don't know.  I don't know.

17   Q.   Your testimony is you did not.

18   A.   Correct.

19   Q.   Okay.  I understand that.  Given that,
20   do you think that what Kim did in the cafeteria
21   that day was a terminable offense?

22   A.   Let me say this.  If it were anybody
23   else, they would be terminated, yes.

24   Q.   And is it your testimony that you
25   believe that that's a terminable offense because of

Collins, Kimberly v
Charleston Place, LLC

Leon Scott
July 26, 2016

115

```
 1   how she -- how she stated the message rather than
 2   the message?
 3        A.   No.  Didn't have anything to do with
 4   the message.  If she had the same message in a
 5   professional tone, I think it would have been all
 6   right.
 7        Q.   Okay.
 8        A.   But it was -- it was the -- it was the
 9   tone.
10        Q.   Okay.  I show you Plaintiff's
11   Exhibit 27, 4/14, an e-mail I believe you prepared.
12   Take a moment to read that to yourself.
13        A.   Okay.
14        Q.   Do you recognize -- what is that,
15   Plaintiff's 27?
16        A.   Yes.
17        Q.   Do you recognize Plaintiff's 27?
18        A.   Yes.
19        Q.   Did you prepare that e-mail?
20        A.   Yes.
21        Q.   Did you prepare that on or about April
22   14, 2015?
23        A.   Correct.
24        Q.   And did you send it to Jennifer
25   Casselli and Carol Etheridge?
```