## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| KIMBERLY COLLINS, | ) | Civil Action No.: 2:15-cv-4465-PMD-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S RESPONSE TO** |
| vs. | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| CHARLESTON PLACE, LLC, | ) | |
| d/b/a BELMOND CHARLESTON PLACE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Kimberly Collins ("Collins" or "plaintiff"), by and through undersigned counsel, files the foregoing Response to Defendant's Motion for Summary Judgment:

## I. NATURE OF CASE

Plaintiff, a Caucasian female, was fired from her longtime job at the defendant because of her race and because she expressed her political opinions at work. As such, the plaintiff's Complaint contains the following three (3) claims: (1) wrongful termination in violation of public policy; (2) violation of Title VII (reverse race discrimination); and (3) violation of 42 U.S.C. § 1981 (reverse race discrimination). Defendant now moves for Summary Judgment on all of plaintiff's claims. Otherwise, this case implicates important political and social issues - issues which are currently at the forefront of public debate in our nation.

## II. STATEMENT OF FACTS

### (i)     Collins' job at defendant and her chain of command.

Collins is a Caucasian female. She was hired by defendant thirty (30) years ago, in 1987, as a Front Desk Clerk. In or around 1989, defendant promoted Collins to the position of Executive Secretary to the Director of Food and Beverage. In or around 1995, Collins was given additional duties as the Executive Secretary to defendant's Controller. In or around 1995, when the hotel was changing ownership, Collins was again given additional duties - this time as Executive Secretary to

the Interim General Manager ("GM").  Also in or around 1995, defendant hired a new General Manager, Paul Stracey ("Stracey") who is Caucasian. At that point Collins became the Executive Secretary to the GM, Stracey, and continued her duties as the Executive Secretary to the Director of Food and Beverage and the Controller.

By 2007, Collins was given the additional job of being the Executive Secretary to the Director of Rooms, Leon Scott ("Scott"), who is African-American.  Thus, from in or around 2007 until the date of termination, Collins was the Executive Secretary to:  the GM, Stracey; the Director of Food and Beverage, Gino Matesi ("Matesi"), who is Caucasian; the Director of Rooms, Scott; and the Controller. Most of Collins' work (about 60-70%) from in or around 2007 until the end of her employment was for Stracey.  (Ex. 1, Plf. Aff.).

In her position, Collins made decisions as a management team would.  (Ex. 6, Plf. depo. p. 80). For example, she had authority to provide refunds or free stays to guests who raised complaints. When other employees such as Mikey Bakst ("Bakst"), the Manager at the hotel's restaurant, introduced a new employee to Collins, he would tell them that Collins "runs the hotel."  (Ex. 1, Plf. Aff. para 13).  Otherwise, no other employee at the hotel did what Collins did.  She was the only Executive Secretary to four Directors at defendant.  *Id.*

As to the chain of command relevant to this case, Stracey, as the GM, was the highest ranking employee on site for the defendant.  (Ex. 2, P. Stracey depo. p. 30).  The whole hotel was under him. (Ex. 2, P. Stracey depo. p. 32).  Collins reported directly to Stracey.  (Ex. 2, P. Stracey depo. pp. 35-36, 136).  And, so did approximately nine (9) Directors, including Scott; Matesi; the Director of Security, Shawn Crawford ("Crawford") who is African-American; and the Director of Human Resources, Jennifer Casselli ("Casselli") who is Caucasian.  (Ex. 2, P, Stracey depo. pp. 32-34).  At the time of the incidents referred to herein, the Regional Director of Human Resources, Carol Etheridge ("Etheridge"), who is African-American, worked out of an office across the street from the hotel.  (Ex.

3, C. Etheridge depo., pp. 17, 38).  Etheridge provides certain human resource guidance to three (3) hotels across the country, including Charleston Place, one reservation center, and the corporate offices.  Etheridge reports to Ingrid Eras-Magdalena ("Eras-Magdalena") who works out of London and is Caucasian, but married to an African-American.  (Ex. 3, C. Etheridge depo. pp. 17-18, 20; Ex. 4, J. Casselli depo. p. 93).  For his part, Stracey reports to the COO, Filip Boyen ("Boyen"), who is Caucasian and works out of London.  (Ex. 2, P. Stracey depo. pp. 24, 31).

By all accounts, Collins was an exemplary employee at defendant.  She worked at defendant for almost thirty (30) years.  She was never disciplined the entire time she worked there; and, her employment evaluations were always excellent.  (Ex. 2, P. Stracey depo. pp. 137-148).  Stracey testified that, prior to the incident involving Collins' termination, she was performing her job duties to his expectations.  (Ex. 2, P. Stracey depo. p. 148).  Etheridge describes Collins as a "good employee."  (Ex. 3, C. Etheridge depo. pp. 121-122).  Casselli testified that she "loved" Collins; that Collins was a "great employee" and that Collins was "absolutely" performing her job duties at defendant to defendant's expectations up until the time of discharge.  (Ex. 4, J. Casselli depo. pp. 60, 64).  And, Scott testified that Collins "did a great job."  (Ex. 5, L. Scott depo. pp. 84-85).

**(ii)    Race issues at Charleston Place.**

In or around the 1990's, the North Charleston Interdenominational Ministers Alliance with the Reverend Edward McClain staged a protest at defendant, alleging defendant underpaid its African-American employees and that it did not place African-Americans in supervisory positions.  (Ex. 5, L. Scott depo. pp. 109-110).  As part of these protests, the black community accused Etheridge of not being "black enough."  (Ex. 3, C. Etheridge depo. pp. 146-148).  According to Etheridge, the black community questioned her decisions as a management employee at defendant in regard to treatment of African-American employees.  (*Id.* at p. 147).  This upset Etheridge. (Ex. 6, Plf. depo. p. 92).

At the same time, Scott is a member of the Urban League.  Indeed, he served two (2) 6-year terms as the Chair of the Trident Urban League.  (Ex. 5, L. Scott depo. pp. 8, 89).  According to Scott,

the hotel is a "huge" supporter of the Urban League; there would not be an Urban League without the hotel; and the hotel has given a lot of money to the Urban League.  The hotel even donates an evening a year to the Urban League for an equal opportunity dinner.  (Ex. 5, L. Scott depo. pp. 87-89).  The mission of the Urban League movement is to enable African-Americans to secure economic self-reliance, parity, power, and civil rights.  Scott is married to Rita Scott, who at all relevant times was the General Manager at Live 5 WCSC television station.  (Ex. 5, L. Scott depo. p. 6).

According to Stracey, when Scott's father passed away, Scott began to believe he had not been true to himself as an African-American, and that management at defendant was not being culturally sensitive enough to African-American employees. (Ex. 2, P. Stracey depo. pp. 50-51).  According to Casselli, Scott started to bring race up a lot in the summer of 2014.  (Ex. 4, J. Casselli depo. p. 57).  Indeed, around this time Scott became militant in the workplace with regard to labeling Caucasian employees as racist and in regard to accusing Caucasian employees of race discrimination.  To this end, he repeatedly told Collins that defendant considered him the black "token" supervisor at the hotel - which was not true.  (Ex. 1, Plf. Aff. para. 14).

In 2014, Scott sent an email to Casselli stating that employees at the hotel did not come to her with complaints; that they did not trust her; and that they did not feel comfortable with her - all because she is white.  In fact, there was no basis for making such an irresponsible remark to the hotel's Human Resource Director.  Casselli thought the email was untrue and rude.  Accordingly, Casselli made her own complaint of race discrimination by advising Stracey and defendant's Compliance Officer, Ann Robertson ("Robertson"), who is Caucasian, about Scott's email.  (Ex. 4. J. Casselli depo. pp. 38-41, 58).  Scott was not disciplined over the email.  (Ex. 4, J. Casselli depo. p. 45).

Around the same time, Scott accused Stracey of race discrimination.  Casselli became aware of the allegations when Stracey showed her emails and text messages from Scott to Stracey accusing Stracey of being racist.  (Ex. 4, J. Casselli depo. p. 46). Scott also complained to Casselli that a

4

Caucasian Executive Housekeeper that worked under him, Rhonda Millard ("Millard"), was racist. (Ex. 4, J. Casselli depo. pp. 47-48; Ex. 5, L. Scott depo. p. 33). Millard was a long-time employee at defendant, having been hired back in 1988. In her position as an Executive Housekeeper, she had supervisory duties over the housekeepers, a majority of whom were minorities.

Millard reported directly to Scott, who, in turn, reported to Stracey. Scott had given Millard exemplary performance reviews over the years. And, to Stracey's observation, Millard was always professional with her employees and had close relations with African-Americans. Indeed, no one in housekeeping ever complained to Stracey that Millard was engaging in race discrimination. (Ex. 2, P. Stracey depo. pp. 67-70).

Despite the above, Scott insisted on making complaints accusing Millard of discriminating against African-Americans. Specifically, Scott complained that Millard discriminated against minority employees under her in housekeeping and that she discriminated against him directly by not being respectful and by going through Stracey instead of him on work-related matters. Scott further complained that Stracey was engaging in race discrimination by supporting Millard's conduct in not respecting him or recognizing him in the chain of command. (Ex. 2, P. Stracey depo. pp. 51, 65).

Stracey believed Scott's complaints in this regard were "out of the blue," "overblown," and "excessive." (Ex. 2, P. Stracey depo. p. 68). Nevertheless, an investigation ensued on or about March 14, 2014. At its conclusion, Casselli sent correspondence to Millard stating, among other things, that there "was not sufficient evidence of any wrongdoing to warrant excessive disciplinary action." (Ex. 4, J. Casselli depo. pp. 152-156 and exhibit 23 thereto). Likewise, Etheridge, an African-American, concluded the issues in housekeeping had to do with lack of management skills, not race discrimination by Millard. (Ex. 3, C. Etheridge depo. p. 62). Nevertheless, Scott continued with his complaints against Millard. On or about November 11, 2014, defendant fired Millard after approximately twenty-seven (27) years of employment at defendant. (Ex. 4, J. Casselli depo. pp. 159-

160 and exhibit 24 thereto). Stracey disagreed with Millard's termination, as he felt letting Millard go because of race discrimination did not make any sense to him. (Ex. 2, P. Stracey depo. p. 70). Despite his disagreement with the action, Stracey was forced to terminate Millard. *Id.* According to Stracey, Millard's termination stemmed from Scott's complaints. (Ex. 2, P. Stracey depo. p. 70). In fact, Scott recommended Millard's termination. (Ex. 4, J. Casselli depo. p. 200).

Sometime in the summer or early fall of 2014, Scott made another racial complaint to the defendant against Stracey. According to Scott, Stracey directed Scott and another African-American employee named Sandra Manigault to start working the evening shift. Scott flat out refused to work the night shift, and reported the incident. (Ex. 5, L. Scott depo. pp. 36-42). According to Scott, in reporting the matter he "very well could have" framed his complaint in terms of race. (Ex. 5, L. Scott depo. pp. 43, 54). Stracey remembers the complaint involved Scott's allegation that Millard did not respect Scott's role as an African-American Manager, and that Stracey was engaging in discriminatory conduct by supporting Millard. (Ex. 2, P. Stracey depo. pp. 64-65).

In all events, an investigation ensued and was concluded by an email sent from Eras-Magdalena to, among others, Scott, Stracey and the COO Boyen. (Ex. 2, P. Stracey depo. pp. 47-50, 55-56). The email correspondence admonished Scott and Stracey to mend their professional relationship. To facilitate the process, defendant required both employees to attend counseling through a coach. The email further admonished both employees that their behavior had been "entirely unbefitting of…senior manager[s]" at defendant. The fourth paragraph of the letter advised Scott and Stracey in clear terms that defendant's "core values do not tolerate any discrimination based upon race…." Finally, the letter directed Stracey, Scott, Etheridge and Casselli to implement, among other things, a "robust Diversity & Inclusion training program to be attended by all employees." The training was to be conducted by an external company which specialized in such matters. (Ex. 2, P. Stracey depo. pp. 47-49, 59-61 and exhibit 7 thereto). It also mandated that the hotel establish a diversity and inclusion

committee to review all discipline and terminations to combat racial disparity at the hotel.  (*Id.*; Ex. 3, C. Etheridge depo. p. 77).  Otherwise, in the course of the discipline, Stracey and Boyen had discussed racial tension at the hotel. (Ex. 3, C. Etheridge depo. pp. 56-57).  And, during the monthly coaching sessions Scott and Stracey attended, they talked about racial tensions in the country and between themselves.  (Ex. 2, P. Stracey depo. 103).

Thereafter, and as instructed, Etheridge, with input from others, selected an outside law firm to conduct the diversity and inclusion training at defendant.  The training took place in January of 2015, and was conducted by an African-American attorney.  (Ex. 3, C. Etheridge depo. pp. 76, 139).  According to plaintiff, the attorney providing the diversity training brought up controversial issues, such as the Ferguson, Missouri shooting.  Collins felt that the training was divisive and made her and others feel uncomfortable.  In her opinion, the diversity training made race relations worse at the hotel.  (Ex. 6, Plf. depo. pp. 34, 65).

**(iii)    The Walter Scott shooting and its impact on the hotel.**

On or about April 4, 2015, Walter Scott, an African-American, was shot and killed in North Charleston, South Carolina by a Caucasian North Charleston Police Officer, Michael Slager.  The incident received local, national and international media coverage.  (Ex. 2, P. Stracey depo. p. 149).  At the time, Stracey was in Europe and Russia on business.  *Id.*  Both Scott and Etheridge left work to attend Mayor Summey's press conference regarding the shooting.  Scott says he attended as a part of his duties with the Urban League.  Etheridge attended because she has an African-American son and she was alarmed at the tone in the city.  (Ex. 3, C. Etheridge depo. pp. 123-124; Ex. 5. L. Scott depo. p. 87).

In the wake of the shooting and ensuing media coverage and protests, guests or organizations with future reservations at the hotel began to express concern to the hotel that their stay would be disrupted by protests.  Indeed, at least two (2) Conference Service Managers at defendant, Barbara Thomas ("Thomas") and Ceil Phillips ("Phillips") expressed concern to Collins that at least two (2)

specific large group customers were considering cancelling their reservations with defendant because of the protests. To this end, Thomas and Phillips asked Collins to help them prepare letters to these customers assuring them that their stay at the hotel would not be disrupted. (Ex. 6, Plf. depo. pp. 32-33).

As such, Collins prepared two letters to the large groups advising them that no other groups had cancelled their reservations due to such concerns and reminding the groups that the incident occurred in North Charleston, not downtown Charleston where the hotel was located. Collins signed Stracey's name to the letters, with his approval, and sent them to the groups. (Ex. 2, P. Stracey depo. pp. 159-161, and exhibit 24 thereto; Ex. 6, Plf. depo. pp. 29, 32-33). Stracey had no issues with these letters being sent. (Ex. 2, P. Stracey depo. pp 160-161).

On or about Monday, April 13, 2015, during lunch time, Black Lives Matter staged a protest at the hotel. In doing so, more than twelve (12) persons loudly entered the lobby, making their way to the Palmetto Café in the hotel where they continued the protest by yelling "black lives matter," along with the names of African-Americans who had been killed by police officers throughout the country. They also passed out flyers. The protest was loud and disruptive. (Ex. 3, C. Etheridge depo. p. 132; Ex. 4, J. Casselli depo. pp. 70-71; Ex. 6, Plf. depo. pp. 20-21).

Approximately twenty (20) minutes after the protest, Scott sent an email to Etheridge, Crawford, Matesi, Casselli and others describing the protest. He ended the email by stating his opinion that, "This group is well guided and respectful. Just loud and disruptive." Matesi forwarded the email to Collins. (Ex. 2, P. Stracey depo., exhibit 25 thereto; Ex. 5, L. Scott depo. pp. 96, 99, 101-102 and exhibit 25 to P. Stracey depo).

Collins heard the protestors come into the lobby. (Ex. 6, Plf. depo. p. 20). When she received the email, she disagreed with Scott's characterization of the protestors as "well guided and respectful." (Ex. 6, Plf. depo. p. 24). She also thought the email conflicted with the letters she just sent

to the large groups with reservations, assuring them they would have a peaceful stay at the hotel. Collins thought Scott's email made it seem like he was condoning the protests. (Ex. 6, Plf. depo. pp. 53-55). Collins was good friends with Scott, and she knew Scott and Stracey had just been disciplined by the corporate office for their issues. As a friend, she was concerned for Scott's job and wanted to tell him about her letters to the large groups, in case he did not know. (Ex. 6, Plf. depo. pp. 53-56).

After Collins read the email, she called Scott. Scott was in the cafeteria when he answered Collins' call. In response, Scott invited Collins to the cafeteria to talk. (Ex. 6, Plf. depo. pp. 24-27). Collins arrived in the cafeteria around 2:00 p.m., just when the cafeteria was closing. (*Id.* at p. 25). When she got there, Scott, Etheridge and Crawford (all African-Americans) were seated at the table. There were no other employees around. (Ex. 6, Plf. depo. p. 50). Collins sat down next to Scott and calmly advised him that she did not think it was a good idea for him to send an email stating that the Black Lives Matter protestors were well guided and respectful, when she had just sent letters to meeting planners or convention groups assuring them their stay at the hotel would be peaceful. However, before Collins could say anything else, Etheridge interrupted her, stating in an aggressive and rude manner, "Well I guess you shouldn't have sent out those letters [to the meeting planners]." (Ex. 6, Plf. depo. pp. 28-29, 61). Otherwise, Etheridge and Scott became very defensive and aggravated when Collins brought up Scott's email. Collins did not know why they got so defensive - she was shocked and "blindsided" by the groups' demeanor toward her. (Ex. 6, Plf. depo. p. 41). Still emotional from dealing with an unexpected and disruptive protest at the hotel, and responding to what had now become a hostile group, Collins stood up from her seat and made the following remarks:

> ❖ That she did not understand why she should not have sent the letters to the large groups, given the potential loss of revenue to the defendant in the event they cancelled reservations. (Ex. 6, Plf. depo. p. 30);

❖ That she did not understand why they and the protestors were so upset. That this was not a situation like the one in Ferguson, Missouri; that here the North Charleston Police Officer who shot [Walter] Scott was swiftly arrested, charged with murder, and put behind bars and that she was in agreement with how the North Charleston Police Department handled the matter. (Ex. 6, Plf. depo. pp. 40-41, 63);

❖ That the United States had not been more racially divided than it had the past seven (7) years since President Obama was elected. (Ex. 6, Plf. depo. pp. 39-40). Etheridge responded that not all people feel that way. (Ex. 2, P. Stracey depo., exhibit 27 thereto);

❖ That the diversity training which Etheridge arranged only made race relations worse at the hotel; that the attorney providing the training brought up Ferguson, Missouri; that Ferguson had nothing to do with Charleston Place employees; and that after the speaker brought Ferguson up in the training, the whole dynamic of the table changed; it became uncomfortable and race relations changed for the worse after that in the room. (Ex. 6, Plf. depo. p. 65);

❖ That it was courageous for the three African-American jurors in the Ferguson, Missouri case to vote against prosecuting a white police officer who shot a black person. (Ex. 7, Plf. Aff. para. 18); and

❖ She asked Scott why he "comped" Al Sharpton for his stay at the hotel in the aftermath of the shooting when the family did not want him there, as it would take away from the funeral. (Ex. 6, Plf. depo. pp. 35, 69.

During the conversation, Etheridge aggressively accused Collins of not supporting her in the past when the protestors singled Etheridge out as not being "black enough." Collins reminded Etheridge that she (Collins) had supported her. (Ex. 6, Plf. depo. p. 92). At some point, Scott suggested they all stop talking about the issue and, instead, talk about it later. At that point Collins left the cafeteria. (Ex. 6, Plf. depo. pp. 42-43). After leaving the cafeteria, Collins met with Matesi and told him about the emotional conversation in the lunchroom. (Ex. 6, Plf. depo. pp. 45-47).

During the exchange, Collins was not "out of control;" she was not pacing or walking away from the table and returning; she was not disrespectful; and, she did not "lose her cool" or act like a bully. (Ex. 6, Plf. depo. pp. 43-44, 49). She also never pointed her finger at Etheridge or addressed her

as "You, Miss Regional HR Director, I've been meaning to talk to you." She was friends with Etheridge and would never talk to her that way. (Ex. 6, Plf. depo. pp. 28, 33).

**(iv)    Plaintiff's suspension and termination.**

On or about Tuesday, April 14, 2015, Scott sent an email to Casselli and Etheridge which was then forwarded to Stracey. The email stated in pertinent part, "I don't know if we have any option. **What she said** was not only offensive and wrong. It was intended to hurt and have full impact on those that heard." (Emphasis supplied.)

The email went on to describe Collins' remarks about Al Sharpton, President Obama and the diversity training at the hotel. The last paragraph of the email stated: **What she said** was despicable, distasteful, embarrassing and hurtful to those associates that heard her….I suggest we suspend her pending investigation….(Emphasis supplied). (Ex. 5, L. Scott depo. pp. 115-120 and exhibit 27 to P. Stracey deposition). That same day, Matesi told Collins he had spoken to Stracey (who was still away on business) about the incident and that Collins had nothing to worry about. (Ex. 6, Plf. depo. pp. 71-72).

Stracey confirms he found out about the cafeteria incident on his way back from Russia when he received Scott's email on Tuesday, April 14, 2015. Stracey's first day back at work was Wednesday, April 15, 2015. (Ex. 2, P. Stracey depo. pp. 169-171). On that day Stracey talked to Scott, Etheridge, Crawford and Matesi about the incident. (Ex. 2, P. Stracey depo. pp. 172-173, 178). He also sought advice from Etheridge that day on what to do. (Ex. 2, P. Stracey depo. pp. 179, 185).

On or about that same day (Wednesday, April 15, 2015), Stracey met with Collins and suspended her from work. In suspending Collins, Stracey told her words to the effect that he was suspending her for what she said in the cafeteria because he could not have anyone from his office expressing political opinions due to racial relations in the Charleston area. (Ex. 6, Plf. depo. pp. 71, 80, 95; Ex. 7. Plf. Aff. para. 20). He ended the meeting by telling Collins to take the rest of the week off; let the matter calm down; and that they would talk on Monday. (Ex. 6, Plf. depo. p. 95). On or about

Sunday, April 19, 2015, Stracey made the decision to terminate Collins. (Ex. 2, P. Stracey depo. p. 194). In making the decision, Stracey asked for advice from Etheridge, among others. *(Id.* at 194). That same day (Sunday, April 19, 2015), Stracey called Collins at home and told her things were not going well; he was going to have to let her go; and that he was receiving pressure to fire her. During the conversation, Collins told Stracey that he never asked her for her side of the story. (Ex. 6, Plf. depo. pp. 92-94). In all events, Collins did not give her side of the story to Stracey that evening - or ever for that matter - as Stracey appeared to have already made up his mind and Collins had planned to see him the next day. (Ex. 6, Plf. depo. p. 94).

On Monday, April 20, 2015 Collins called in sick. In doing so, she spoke to Stracey. According to Stracey, during the call Collins gave him her side of the story involving the exchange in the cafeteria. (Ex. 2, P. Stracey depo. pp. 191-193). Collins denies she provided her side of the story to Stracey. Nevertheless, the fact that Stracey admitted he made the decision to fire Collins on Sunday (April 19, 2015) shows he made the decision without ever getting plaintiff's side of the story as, by his own testimony, the first time he received Collins' side of the story was Monday, April 20, 2015.

During the investigation, Scott told Stracey that he wanted Collins fired. (Ex. 2, P. Stracey depo. p. 201). And, as stated, Stracey sought advice from Etheridge in deciding how to discipline Collins. (Ex. 2, P. Stracey depo. pp. 179, 189).

When Collins returned to work Tuesday, April 21, 2015, Stracey fired her, telling her the matter was out of his hands and that he had spoken to Matesi, Scott, Etheridge, and Crawford, so there was no reason to get Collins' side of the story. (Ex. 6, Plf. depo. pp. 96, 118-119). Stracey further told Collins she was being fired for what she said in the cafeteria. (Ex. 7. Plf. Aff. para. 21). Otherwise, Collins' termination was not reviewed by the executive diversity committee. (Ex. 4, J. Casselli depo. p. 234). For her part, Casselli was not involved in the investigation into Collins' termination. Casselli found this to be unusual. (Ex. 4, J. Casselli depo. pp. 101-102).

On or about June 10, 2015, counsel for plaintiff sent a demand letter to the defendant. (Ex. 9, demand letter). In or around July of 2015 (after receiving plaintiff's demand) defendant conducted an investigation into plaintiff's claims. (Ex. 3, C. Etheridge depo. pp. 168-169).

**(v)     Comparator evidence.**

Defendant states it fired Collins "because of her unprofessional and unacceptable workplace behavior towards three members of management on April 13, 2015" in the cafeteria. (Ex. 8, Defs. Ans. to Plf. First Interrogs. #13). Defendant essentially says Collins was overly aggressive or insubordinate in delivering her message on the day in question. (Ex. 2, P. Stracey depo. p. 180). Of course, Collins adamantly denies she delivered her message in a rude or insubordinate fashion. Collins contends (and compelling evidence supports her contention) that she was fired for what she said, not how she said it (and because of her race). Nevertheless, there is strong evidence that when African-Americans engaged in the same alleged conduct as plaintiff, they were treated more favorably. This evidence involves the following comparators:

**(1)     Leon Scott (African-American)**

(a) In 2014, Stracey (Scott's direct supervisor) directed Scott and another employee, Sandra Manigault, to start working the evening shift. Scott flat out refused the directive, telling Stracey "No, no, no, no no. This isn't going to work" and "We are not doing this." When Stracey reiterated the order to Scott, Scott said "I don't have to do any of this" and threatened to resign. Scott never did work the evening shift, and his blatant insubordination went entirely unpunished. (Ex. 5, L. Scott depo. pp. 36-43; Ex. 2., P. Stracey depo. p. 109).

(b) On or about October 11, 2014, Scott sent a rambling, insubordinate email to Stracey, bemoaning that he has an "Uncle Tom" reputation among his associates at defendant; that Millard would not recognize him as her boss; and that "It's 2014. A simple diversity class is not a fix." When Stracey reminded Scott that Scott had been a supporter of Millard and that he had given her good evaluations in the past, Scott shot back with another rambling email, stating in part, "…What a sucker

I was but never again.  Your bullying ME is over.  I will be bullied by no one."  Stracey forwarded the email to Casselli and Robertson, stating "After this last **insubordinate** rant I don't think it is wise to try and reason with Leon over the Yolanda case."  (Emphasis supplied).  Casselli testified that Scott's emails to Stracey were "unreasonable" and "unprofessional."  (Ex. 4, J. Casselli depo. pp. 224-225).  Again, Scott was not disciplined for the incident.  (Ex. 4, J. Casselli depo. pp. 220-224 and exhibit 33 thereto).

(c)  On or about November 4, 2014, Scott told Mickey Bakst ("Bakst") the Restaurant Manager at defendant, that he (Scott) was going to take the whole place down and that he was going to start with Paul Stracey.  (Ex. 2, P. Stracey depo. pp. 116-117).  When Bakst relayed the threat to Stracey, Stracey filed a Speak up Report against Scott.  In the report, Stracey states:

> He said (Leon Scott) they have no idea what I can do.  He said he was from a place no one knew and he had watched someone get killed when he was 5 and he did bad things and still can.  **He hated Paul Stracey and would not stop until he was gone.**

(Ex. 4. J. Casselli depo., pp. 225-228 and exhibit 34 thereto).

Incredibly, Scott was not disciplined for his threat of violence against his direct supervisor.  (Ex. 4, J. Casselli depo. p. 228).

(d)  On or about December 24, 2015, Stracey learned from an employee Annette Sandford-Lopez ("Sandford-Lopez") that Scott had a gun on the work premises.  Possessing a firearm on the premises is a terminable offense.  (Ex. 2, P. Stracey depo. p. 124 and exhibit 10 thereto, pp. 79-82 of handbook).  Stracey reported the matter to Casselli, and Casselli filed a Speak up Report against Scott in regard to the incident.  Casselli's Speak up Report states, "Leon is carrying and showed a manager a weapon that he had on his hip at work in the hotel…."  She further indicated that the incident occurred about a week ago but that she just became aware of it.  (Ex. 4, J. Casselli depo. pp. 164-175, and exhibit 25 thereto).  That same day (December 24, 2015) Robertson instructed Casselli to speak with the witness, Sandford-Lopez, and to then question Scott.  When Casselli spoke to Sandford-

Lopez, Sandford-Lopez confirmed that she saw Scott with a gun. (Ex. 4, J. Casselli depo. pp. 181-182). When Casselli confronted Scott, he denied he had a gun at work, but he did say he recently obtained a concealed weapon permit. (Ex. 4, J. Casselli depo. pp. 177-178). Thereafter, an investigation took place. (Ex. 3, C. Etheridge depo. p. 106; Ex. 4, J. Casselli depo. pp. 182-184). Etheridge and Robertson conducted the investigation. In the course of the investigation, Sandford-Lopez confirmed to Etheridge that she saw a gun on Scott. Sandford-Lopez also provided a written statement which, in pertinent part, stated that Scott told her he recently obtained his weapons permit and then lifted his jacket away from his body to show a gun that was attached to his beltline…." (Ex. 3, C. Etheridge depo. pp. 96-104; Ex. 4, J. Casselli depo. pp. 184-188 and exhibit 27 thereto). Moreover, a bellboy, Robert Asten, also stated that Leon spoke and kidded about having a gun at work. (Ex. 3, C. Etheridge depo. pp. 104-105). Throughout the investigation, Scott continued to deny he had a gun at work but offered a multitude of excuses for why he would need one. By this time, Collins and Millard had both been fired and Scott had recommended termination for both of the employees. In attempting to defend himself from charges that he had a gun at work, Scott claimed he feared for his safety and referenced both Collins and Millard in a bizarre email string to Casselli dated December 28, 2015 at 8:48 a.m. In the email, Scott speaks about Collins' young son's Facebook page and falsely equates plaintiff's son to Dylann Roof. In the same email, he speaks about Millard having "Russian connections" and an "armed family." (Ex. 4, J. Casselli depo. pp. 193-200 and exhibit 28 thereto). In another email dated the same day at 11:32 a.m., Scott talks about constantly looking over his shoulder at work; parking at different locations at work; and how "any Russian accents get my attention." *Id.* at 201. In deposition, Scott testified he felt threatened because of his role in the Urban League and because of the Dylann Roof shootings. (Ex. 5, L. Scott depo. pp. 76-77). Before these emails (and before being accused of having a gun at work) Scott never complained to Stracey or Casselli that he felt threatened at work. (Ex. 2, P. Stracey depo. pp. 128-129; Ex. 4, J. Casselli depo. p. 196).

Despite the seriousness of the allegations, Scott was not suspended during the investigation and, instead, was allowed to work.  (Ex. 5, L. Scott depo. p. 70).  Ultimately, Stracey gave Scott a written warning for (1) possessing a weapon at work and for (2) lying during the investigation. Stracey-with good reason-did not believe Scott.  Stracey believed Scott really did have a handgun at work.  (Ex. 2, P. Stracey depo. pp. 121-124 and exhibit 13 thereto).  The decision to provide Scott with a written warning instead of termination was made by Stracey, Etheridge, Robertson and in-house counsel, Rich Levine.  (Ex. 2, P. Stracey depo. p. 131).

(e)  In 2014 Scott sent an inappropriate email to Casselli telling her people at the hotel did not feel comfortable with her or trust her because she is white.  Casselli found this email to be false and rude.  Scott was not disciplined for sending it, despite the fact that Casselli complained.  (Ex. 4, J. Casselli depo. pp. 39-45).

### (2)  African-American Employee "X"

Employee X is an African-American hired in February of 1997 as a server in the defendant's Palmetto Café.  She reported to Mike Barto ("Barto"), the Palmetto Café Manager.  Barto reported to Matesi and Matesi reported to Stracey.  (Ex. 4, J. Casselli depo. pp. 116-118).  On or about May 17, 2011, Employee X was suspended for three (3) days because some of her coworkers complained to Matesi and Casselli that she was creating a hostile and unpleasant work environment by being rude and condescending to them.  According to the written discipline, some of the employees "have even stated that they called off work in order to avoid working a shift with you."  The suspension notice further stated that "According to your employment file, this would be your **third** written documentation within one year and, therefore, we must suspend you for 3 consecutive days. Any further violations of any company policy will result in the termination of your employment." (Emphasis supplied).  The discipline notice was signed by Casselli, but Stracey, Casselli and Matesi made the decision to give Employee X the final warning and suspension.  (Ex. 4, J. Casselli depo. pp. 123-125 and exhibit 12 thereto).  Then, on or about April 16, 2015, defendant terminated Employee X

because on April 15, 2015 she "engaged in an argument with a coworker that, according to witnesses, became aggressive. This argument ended with an employee walking off the job in order to remove themselves from the situation." The termination notice states "You were previously placed on suspension with a final warning in 2011 for the same infraction." Again, Casselli signed the termination notice, and Stracey, Casselli and Matesi made the decision to terminate Employee X. (Ex. 4, J. Casselli depo. pp. 119-123, 129-131 and exhibits 11 and 13 thereto). Etheridge and Scott had input into the decision. (Ex. 4, J. Casselli depo. pp. 122-123).

Defendant uses Employee X as a comparator for the proposition that it did not discriminate against plaintiff, since it fired Employee X (an African-American) around the same time it fired Collins for a similar offense. (Def. brief, p. 16). By making this argument, defendant is now estopped from arguing Employee X is not a comparator for, in its brief, defendant says she is. (*See* Def. brief, p. 16). At the same time, defendant wholly ignores the fact that, unlike Collins, Employee X received two (2) written warnings and then a final written warning and suspension before her termination.

### (3) Caucasian Employee "Y"

Employee Y, who is Caucasian, was a pastry cook at defendant. He reported to Chris Ryan ("Ryan"), the Executive Pastry Chef. Ryan reported to Matesi and Matesi reported to Stracey. On or about September 25, 2013, Employee Y was terminated for having a handgun at work. Casselli signed the termination notice, but the termination decision was made by Stracey, Casselli and Matesi. (Ex. 4, J. Casselli depo. pp. 131-145, and exhibits 14, 15, 16, 17 and 18 thereto). As with Scott, there was an investigation prior to Employee Y's termination. However, unlike Scott, Employee Y was sent home and not allowed to work while the investigation was pending. (Ex. 4, J. Casselli depo., pp. 141-142). And, unlike Scott, Employee Y did **not** have any prior discipline in his file. (Ex. 4, J. Casselli depo. p. 142).

**(4) Scott/Etheridge (African-American)**

Both Scott and Etheridge expressed their political opinions in aggressive ways, but were not fired or even disciplined.  In describing the protest in his April 13, 2015 email, Scott opined "This particular group is well guided and respectful."  Coming from the Chair of the Urban League, this certainly does express a political opinion.  As for Etheridge, plaintiff testified that Etheridge instigated the incident in the cafeteria by aggressively telling plaintiff that plaintiff should not have sent the emails to the large group customers.  Moreover, during the exchange in the cafeteria on April 13, 2015, Etheridge engaged Collins in dialogue by telling her not all people view the President the same way Collins did and by accusing Collins of not being supportive of her in past racial protests at the hotel.

### III.  LEGAL ARGUMENT

**(a)     Summary Judgment standard.**

The court is familiar with the appropriate standard to use on Summary Judgment.  Suffice to say,  in determining whether there is a genuine issue for trial, the court does **not** weigh the evidence to make a truth determination; rather, the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law.  *Stewart v. MTR Gaming Grp., Inc.*, 581 F.Appx. 245, 247 (4th Cir. 2014).

**(b)     The elements for establishing a prima facie case of race discrimination under Title VII and 42 U.S.C. § 1981.**

Collins establishes each and every element of her prima facie race discrimination claims under both Title VII and 42 U.S.C. § 1981.  As an initial point, the elements of a prima facie race discrimination claim are the same under Title VII and § 1981.  *Lewis v. Cent. Piedmont Cmty. Coll.*, 689 F.2d 1207, 1209 n.3 (4th Cir. 1982).  One way to establish a prima facie case for race discrimination under the above statutes is to establish the following elements:  (1) that plaintiff is a member of a protected class; (2) her job performance was satisfactory; (3) she was fired; and (4) other employees

who are not members of the protected class were retained under apparently similar circumstances. *Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124, 133 (4th Cir. 2002). The Fourth Circuit, and district courts within this Circuit, have repeatedly held that the plaintiff's burden in proving these elements is not onerous, but instead, "relatively modest" or "relatively easy."  *Bryant v. Aiken Reg'l Med. Ctrs., Inc.,* 333 F.3d 536, 545 (4th Cir. 2003) (describing the plaintiff's burden in satisfying the elements of a prima facie race discrimination case as "relatively modest"); *Wesley v. Arlington County,* 354 Fed.Appx. 775, 778-779 (4th Cir. 2009) (describing plaintiff's burden in this regard as "not onerous," "relatively modest" and a "relatively easy test.")  *Ugbo v. Alliance Legal Corp., P.L.L.C.,* 2016 U.S. Dist. LEXIS 178143 (E.D.Va. 2016) (same).

**(c)**     **Collins easily establishes the first and second elements of her prima facie case.**

Title VII and 42 U.S.C. § 1981 protect Caucasians as well as minorities. *McDonald v. Santa Fe Transp. Co.,* 427 U.S. 273 (1976); *Lucas v. Dole,* 835 F.2d 532, 533-534 (4th Cir. 1987) (acknowledging that Title VII protects whites as well as minorities).  Thus, plaintiff has established the first element of her prima facie case.

Defendant attempts to add an element to plaintiff's prima facie case that simply does not exist in the Fourth Circuit.  To this end, defendant argues that, besides showing membership in a protected group, a white plaintiff has to show "background circumstances" that support the suspicion that defendant is that unusual employer who discriminates against the majority.  (Defs. brief p. 11). Defendant argues that plaintiff cannot do this.  Defendant is wrong. To this point, the Fourth Circuit does not impose this heightened standard on reverse discrimination plaintiffs.  *Lucas,* 835 F.2d at 533-534 n.9.  In *Lucas,* a reverse race discrimination case, the Fourth Circuit expressly declined to decide whether a higher burden applied because it ruled that the burden already imposed upon discrimination plaintiffs in the Fourth Circuit was similar enough to the heightened burden that the D.C. Circuit imposed upon plaintiffs.  Thus, the plaintiff in *Lucas* was not required to show further

evidence of "background circumstances." *Id.* There is simply no other Fourth Circuit precedence which says otherwise.

Indeed, the Second, Third, Fifth and Eleventh Circuits have all ruled that there is not an extra or heightened burden on a plaintiff in a reverse race discrimination case. *McGuiness v. Lincoln Hall,* 263 F.3d 49, 53 (2nd Cir. 2001); *Iadimarco v. Runyon,* 190 F.3d 151, 160 (3rd Cir. 1999); *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 426 (5th Cir. 2000); *Bass v. Bd. of Cnty Comm'rs,* 256 F.3d 1095, 1103 (11th Cir. 2001) *overruled on other grounds by Crawford v. Carroll,* 529 F.3d 961 (11th Cir. 2008). And, the Sixth Circuit expressed "serious misgivings" about imposing a more onerous standard for plaintiffs who are white. *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796 n.7 (6th Cir. 1994). As the New Mexico Court of Appeals recently observed, "courts seem to be trending away from imposing a heightened burden on reverse discrimination plaintiffs." *Gracia v. Hatch Valley Pub. Sch.,* 369 P.3d 1, 9 (N.M. Ct.App. 2015).

Here, Collins is Caucasian; she is a member of a protected class, as defined by our Supreme Court; and thus, under the above authority, she satisfies the first element of her prima facie case. Even if the heightened standard did apply, Collins would still satisfy the burden, as there is plenty of background evidence that there was internal and external pressure on defendant to favor minorities. Etheridge had been singled out in past protests for not being "black enough." Scott was Chair of the Urban League for two six-year terms. The Urban League had close ties to defendant. Scott's wife was General Manager at a local television station. With this general backing, Scott repeatedly lodged dubious racial complaints against Caucasians. By the time he got to Collins, Scott had lodged race complaints against Stracey, Casselli, and Millard. Scott's complaints cost Millard and Collins their jobs. His complaint against his boss resulted in severe disruption at the hotel and culminated in a divisive diversity training class. And, when Scott accused Casselli of being a racist, she complained to management. All of this, coupled with the Walter Scott shooting and the Black Lives Matter protests

in the hotel and elsewhere, provide more than enough background evidence that defendant had a motive to discriminate against its white employees. *See Mastro v. Potomac Elec. Power Co.,* 447 F.3d 843, 853 (D.C. Cir. 2006) (holding that burden for demonstrating "background circumstances"…is minimal; not onerous; and not intended to be an additional hurdle for white plaintiffs and finding that pressure on management from a judicial decree coupled with defendant's reluctance to impose discipline on African-American employees was sufficient background circumstances); *Harding v. Gray,* 9 F.3d 150, 153 (D.C. Cir. 1993) (background circumstances shown where more qualified white applicant is denied promotion in favor of a minority applicant with lesser qualifications); *Bishopp v. District of Columbia,* 788 F.2d 781, 787 (D.C. Cir. 1986) (background circumstances shown where, among other things, there was evidence of political pressure on the defendant to promote a minority employee because of race); *Bass,* 256 F.3d at 1106-1107 (evidence of pressure in the County to hire minorities over non-minorities is evidence of discriminatory intent); *Rudin v. Lincoln Land Cmty. College,* 420 F.3d 712, 722 (7th Cir. 2005) (statement by decision-maker that he was under administrative pressure to recommend a minority candidate for the position and that he had nothing to do with the decision provides strong basis for drawing an inference of intentional discrimination); *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321 (11th Cir. 2011) (disciplining white employees more harshly than African-American employees after white employee committed a race-based mass shooting at defendant is evidence of discrimination).

Defendant next argues Collins cannot establish the second element of her prima facie case-that she was performing her job in a manner that met defendant's legitimate expectations. This argument fails.

Virtually every witness who testified for the defendant described Collins as an outstanding, above-average employee. Her performance evaluations were all good ones and corroborate the above testimony. Moreover, until the incident in the cafeteria, **Collins had not been disciplined at**

**defendant in nearly 30 years of employment.** Collins testified that during the incident in the cafeteria, she was appropriate and composed.  She denies that she was aggressive, insubordinate, or disrespectful in any way.   The three African-American employees who were involved in the discussion with Collins in the cafeteria all testified that during the exchange Collins did not use profanity or call anyone names.   There is absolutely no evidence that Collins disregarded any directives or was insubordinate in the traditional sense.  The day after the incident, Scott sent an email describing the events.  Even a cursory reading of the email shows that Scott was complaining about **what** Collins said - not how she said it.   Collins further testified that, during her suspension and termination, Stracey told her she was being punished for what she said-not for how she said it.  And, the investigation where the three African-Americans came up with allegations of insubordination against Collins occurred in July of 2015-only <u>after</u> plaintiff was terminated and after defendant received a demand letter from plaintiff's counsel. Given the light burden plaintiff has at the prima facie stage, she has certainly created an issue of fact as to whether she was performing her job at a satisfactory level.  More importantly, Collins has produced strong comparator evidence which creates issues of fact on the second prong of plaintiff's prima facie case-whether plaintiff was performing her job in a satisfactory fashion.  *Young v. CareAlliance Health Services,* 2014 U.S. Dist. LEXIS 137140 at *10-11 (D.S.C. 2014).  To this point, if the comparators were treated more favorably than Collins in committing similar offenses, then defendant's job expectations for plaintiff were not legitimate.  *Id.* at *11 (citing *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 515-516 (4th Cir. 2006).

In asserting the argument that Collins was not performing her job to defendant's legitimate expectations, defendant states that Stracey had the right to rely on Scott, Etheridge and Crawford in making the decision to fire plaintiff.  Nothing could be further from the truth.  At the time Stracey fired Collins (or at the time he was pressured to do so) he was aware that Scott had raised dubious complaints of race discrimination against Millard and that he was forced to fire Millard against his

will; he was aware that Scott had sent an inappropriate email to Casselli falsely telling her black employees do not trust her because she is white; he was aware that Scott had raised dubious allegations of race discrimination against him-allegations that disrupted the entire hotel and that resulted in divisive diversity training; he was aware Scott had threatened him with physical violence without being disciplined; he was aware that Employee X had engaged in conduct similar to plaintiff's alleged conduct and that she had first been given three (3) warnings and a suspension before being fired; he was aware Etheridge was accused of not being "black enough" by prior protestors; he was aware of the Walter Scott shooting and the Black Lives Matter protest; he was aware that Scott had been insubordinate and rude directly to him and others without being terminated; he never got Collins' side of the story; and, he was aware that Scott told him to fire plaintiff.  In general, he was aware the Scott and Etheridge were particularly sensitive to race-related issues.  Thus, Stracey had no right to rely on the information given to him by Scott, Etheridge and Crawford.  Even if Stracey had the right to rely on the information, the information from the three witnesses shows, at best, that plaintiff was over-emotional with her fellow employees.  Stracey certainly knew from his own experiences with Employee X and Scott that this behavior never gave rise to immediate termination at defendant before.

**(d)    Collins has established the fourth element of her prima facie case through the introduction of strong comparator evidence.**

Defendant argues that Collins cannot satisfy the fourth prong of her prima facie case because plaintiff cannot point to any similarly situated non-Caucasian employees that were treated more favorably.  This argument ignores serious and egregious comparator evidence in the record.

A showing that the employer treated a similarly situated employee differently is a common and especially effective method of establishing a prima facie case of discrimination .  *McGuiness*, 263 F.3d at 53. The similarly-situated analysis calls for a "flexible, common-sense" examination of all relevant factors.  *Coleman v. Donahoe*, 667, F.3d 835, 840 (7th Cir. 2012).  Similarly situated employees

must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way. *Id.* at 846. So long as the distinctions between the plaintiff and the proposed comparator are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied. *Id.* The Supreme Court has cautioned that precise equivalence between employees is not the ultimate question. *McDonald,* 427 U.S. at 283 n.11. The touchstone of the similarly-situated inquiry is simply whether the employees are comparable. *Id.* As one court put it, we are looking for comparators, not clones. *Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908, 916 (7th Cir. 2010). Otherwise, whether two employees are similarly situated ordinarily presents a question of fact for the jury. *Coleman,* 667 F.3d at 846-847; *George v. Leavitt,* 407 F.3d 405, 414-415 (D.C. Cir. 2005).

Generally, to be similarly situated the employees outside of the protected class must have dealt with the same decision maker, been subject to the same standards, and have engaged in the same conduct without mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it. *Taylor v. Millennium Corp.,* 2016 U.S. Dist. LEXIS 28174 at *19 (E.D. Va. 2016); *Surratt v. Apple Gold, Inc.,* 2012 U.S. Dist. LEXIS 178740 at *25 (W.D.N.C. 2012); *Cole v. Lexington-Richland Sch. Dist. 5,* 2010 U.S. Dist. LEXIS 141174 at *10 (D.S.C. 2010). In evaluating these factors, the court must consider the record as a whole, rather than examining one isolated piece of evidence out of context. *Cole,* 2010 U.S. Dist. LEXIS 141174 at *12 (citing *Edwards v. Newport News Shipbuilding & Dry Dock Co.,* 1998 U.S.App. LEXIS 30857 at *8 (4th Cir. 1998). Moreover, the comparator's conduct need only be of comparable seriousness to the plaintiff's conduct - it does not need to be an identical offense. *Id. at* *12 (citing *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir. 1993); *Blunt-Ferguson v. Agape Cnty. Hospice of the Pee-Dee, Inc.,* 2015 U.S. Dist. LEXIS 23097 at *16 (D.C.S. 2015). Likewise, the comparator need not hold an identical position to the plaintiff. *Taylor,* 2016 U.S. Dist. LEXIS 28174 at *19 (citing *Bateman v. Am. Airlines, Inc.,* 614 F.Supp.2d 660, 674 (E.D.Va. 2009).

**Scott as a comparator.**

Collins and Scott had the exact same direct supervisor.  They both directly reported to Stracey.  Likewise, they are alleged to have committed the exact same offense although, in reality, Scott's offenses were far more serious.  Collins was accused of acting in an unprofessional manner towards other employees (or, to be precise, management level employees). At the same time, Scott was rude and insubordinate to his supervisor, Stracey, when he refused to work the night shift as ordered; he was rude and unprofessional to Casselli when he sent her an email falsely alleging black employees did not like or trust her because she is white; and, he was unprofessional and insubordinate to Stracey when he threatened to take the defendant down, starting with Stracey.  Incredibly, Stracey did not discipline Scott in any fashion for these offenses.  And, Scott violated work rules when he was accused of bringing a firearm to work, then accused of lying about it during the investigation.  For this, Scott was only written up.  Finally, it is undisputed that Collins and Scott were subject to the exact same standards at defendant, specifically the work rules in defendant's Associate handbook.

Sensing the powerful comparison between Collins and Scott, defendant seizes on the only distinction it can.  Defendant tries to argue Collins and Scott are not comparators because they hold different positions - specifically, Scott holds a supervisory position and plaintiff does not.  This distinction, though, is artificial.  It ignores the facts and relevant law on comparator evidence.  To this end, courts are instructed to consider the record as a whole instead of examining an isolated piece of evidence out of context.  Here, Collins was the only one at defendant's hotel that held her particular position. This fact needs to be considered when evaluating which employees would be a valid comparator.  *See Taylor*, 2016 U.S. Dist. LEXIS 28174 at *19 (if any employee in a unique position was required to only use those in the same position as comparators, it would be virtually impossible for that employee to make out a prima facie case).  Indeed, courts have not hesitated to hold that employees in different positions, even employees in supervisory and non-supervisory positions,

make strong comparators. *White v. Duke Energy Ky., Inc.*, 603 Fed.Appx. 442, 448 (6th Cir. 2015) (holding that management employee plaintiff and non-management employee were valid comparators where policies invoked in terminating plaintiff did not make any meaningful distinctions between management and non-management employees); *Rodgers v. White,* 657 F.3d 511, 518 (7th Cir. 2011) (holding that plaintiff and plaintiff's direct supervisor were valid comparators and further stating that, when uneven discipline is the basis for a discrimination claim, title and rank are not dispositive, rather the most relevant similarities are between the employee's alleged misconduct, performance standards, and the disciplinary supervisor); *Coleman,* 667 F.3d at 848-849 (holding that plaintiff, a maintenance support clerk, and two maintenance mechanics were valid comparators, even though they had different job titles and duties and recognizing that, where the issue is misconduct (as opposed to performance), comparisons between employees with different positions is likely to be more useful); *Lathem v. Department of Children & Youth Servs.,* 172 F.3d 786, 793 (11th Cir. 1999) (holding that plaintiff, a part-time intake officer, and her direct supervisor, a unit director, were valid comparators and stating "The relevant  inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to the same employment policies"); *George v. Leavitt,* 407 F.3d at 414-415 (holding a probationary employee (plaintiff) is similarly situated to at-will, non-probationary employees); *Johnson v. United States Capitol Police Bd.,* 2005 U.S. Dist. LEXIS 13811 at *9-11 (D.D.C. 2005) (holding that plaintiff, an accountant in defendant's accounting section, was similarly situated to a purchasing agent in defendant's procurement section); *Cole,* 2010 U.S. Dist. LEXIS 141174 at *20-24 (holding that the plaintiff, a principal, is similarly situated to an assistance principal and to plaintiff's direct supervisor, the Chief Instructional Officer).

     In analyzing the comparator evidence here, it is extra important to focus on the following:

- ❖    Review of the entire record as a whole; *Taylor;*

❖ That title and rank are not dispositive and that this is especially true in cases where the alleged offense is misconduct rather that performance; *Rodgers, Coleman;* and

❖ That in such cases, the most relevant focus is on whether the plaintiff and her comparators dealt with the same decision maker; whether they engaged in similar offenses; and whether they were subject to the same disciplinary policies; *White, Rodgers, Coleman, Lathem.*

Given the above, it is crystal clear that Collins and Scott are extremely strong comparators. They both reported to the exact same supervisor - Stracey. They were both subject to the same discipline policies in defendant's handbook, including policies on insubordination (Offense 3), furnishing false information (Offense 16), using abusive or threatening language (Offense 24), verbal altercations (Offense 25), handguns (Offense 27) and dishonesty (Offense 30). Indeed, the discipline given by Stracey to Scott for having a handgun at work and lying about it during the investigation states "The Hotel's Handbook provides a list of certain conduct which may result in disciplinary action, up to and including termination." The discipline goes on to site Offense 27 regarding handguns and Offense 30 regarding dishonesty. **Thus, there can be no dispute that plaintiff and Scott were subject to the very same work rules found in defendant's handbook.** Finally, Collins and Scott both engaged in the same alleged conduct - unprofessional and unacceptable workplace conduct - although Scott's behavior was far more serious, as he engaged in repeated instances of flat-out insubordination and unprofessional conduct, including threats of physical violence to his supervisor.

### Employee X

Defendant has already admitted in its brief that Employee X is a valid comparator. (Defs. brief, pp. 16-17). Otherwise, Collins and Employee X ultimately both reported to Stracey. It is true that Employee X reported to the Palmetto Café Manager, Matesi, and then to Stracey. (Ex. 4. J. Casselli depo. pp. 117-118). But, the presence of these intermediate managers is not relevant. *Cole,* 2010 U.S. Dist. 141174 *at* *12 (citing *Disher v. Weaver,* 308 F.Supp.2d 614, 621 (M.D.N.C. 2004) (lack of

common supervisor does not necessarily undermine plaintiff's case. Rather, the requirement has been interpreted broadly to include instances where employees have different immediate supervisors, but the same ultimate decision maker). Here, it is undisputed that Stracey was involved in Employee X's discipline and termination. (Ex. 4, J. Casselli depo. pp. 122-123). There is no dispute that Employee X and plaintiff were both subject to the same disciplinary polices in defendant's handbook. And, Employee X was written up, suspended, and ultimately fired for the same offenses Collins was charged with - she had an argument and became aggressive with other employees.

### Employee Y

Employee Y is a strong comparator to Scott. While he reported directly to the Executive Pastry Chef and then to Matesi, ultimately Employee Y and his intermediate supervisors all reported to Stracey. And, Stracey made the ultimate decision to terminate Employee Y for having a handgun at work. (Ex. 4, J. Casselli depo. pp. 132, 138). It is undisputed that Scott and Employee Y were subject to the discipline policy in defendant's handbook regarding handguns. And, Scott and Employee Y engaged in the exact same offense - having a handgun at work. As defendant is fond of pointing out, Stracey had every right to rely on the reports he received that Scott had a handgun at work. That Employee Y admitted the offense, when Scott allegedly lied about it, is not a distinguishing factor.

### Etheridge and Scott

As stated, they both expressed political opinions in regard to the protest at the hotel and in the cafeteria and were not disciplined or fired.

### (e)     Plaintiff has produced more than enough evidence to create a genuine issue of material fact on pretext.

Collins has produced compelling evidence of pretext and certainly enough to survive Summary Judgment. To this point, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000);

*Blount-Ferguson,* 2015 U.S. Dist. LEXIS 23097 at *18-20 (D.S.C. 2015).   Moreover, evidence used to establish a plaintiff's prima facie case can also be used as evidence to prove pretext.   *Reeves*, 530 U.S. at 143; *Rodgers,* 657 F.3d at 520; *Coleman,* 667 F.3d at 858.   Finally, plaintiff's strong comparator evidence is especially relevant to a showing of pretext. Valid comparator evidence is generally enough to create an issue of fact for the jury.   *Young,* 2014 U.S. Dist. LEXIS 137140 at *17-18 (D.S.C.) (citing *Laing v. Fed. Exp. Corp.,* 703 F.3d 713, 719 (4th Cir. 2013).   Here, plaintiff has produced extremely compelling comparator evidence in the form of Scott, Employee X, Employee Y and Etheridge.   (*See* Argument III(d) above).

More proof of pretext includes evidence that Collins never engaged in the conduct that resulted in her termination.   Defendant is quick to point out that plaintiff was fired for the way she delivered her message in the cafeteria-not the content of the message.   (Ex. 2, P. Stracey depo. p. 187; Ex. 5. L. Scott depo. pp. 104, 115; Ex. 3, C. Etheridge depo. p. 155). According to defendant, Collins had a disrespectful tone, she was pacing back and forth, pointing her finger and being aggressive in her behavior during the lunchroom conversation.   (Ex. 3. C. Etheridge depo. pp. 155, 159).   Yet Collins denies she was aggressive or unprofessional during the incident.   Instead, Collins testified that she was calm, not yelling, not pacing, and that she did not point her finger or raise her voice.   (Ex. 6. Plf. depo. pp. 41, 43).   In fact, Collins states she was shocked at Scott and Etheridge's demeanor during the exchange.   *Id.* Even Scott admits that Collins did not use profanity and did not point her finger at him. (Ex. 5, L. Scott depo. pp. 107-108).   Etheridge also admits Collins did not use profanity or touch her or strike her or even bend over and point her finger in her face during the incident.   (Ex. 3. C. Etheridge depo. pp. 143-144). Moreover, Scott's email to Casselli and Etheridge the day after the incident provides more evidence that Collins did not act aggressive or insubordinate in the lunchroom. Careful review of Scott's email shows he did not complain about Collins' behavior or how she delivered the message.   Instead, Scott's email complains about the content of the message or **what**

Collins said. To this end, in the email Scott states "**What she said** was not only offensive and wrong…" and "**What she said** was despicable, distasteful…." In forwarding the email to Stracey, Scott stated "Even I was surprised at **what she was spewing out**." Also, according to Collins, during her suspension and termination, Stracey did not bring up any allegation of aggressive behavior in the lunchroom. Instead, he told Collins she was being suspended and fired because, given race relations in the Charleston area, he could not have anyone in his office expressing political opinions to managers in the cafeteria. (Ex. 6, Plf. depo. pp. 80, 95; Ex. 7, Plf. Aff. para 21). For his part, Stracey admits that during plaintiff's suspension and termination he told her he could not have someone representing the office as an Executive Secretary walking around making judgments on behalf of the office. (Ex. 2, P. Stracey depo. pp. 187-188). Indeed, defendant did not raise allegations about plaintiff's **behavior** in the cafeteria until after it received plaintiff's demand letter in June of 2015 and then conducted its investigation the following month, July 2015. To this point, the evidence that defendant shifted its reason for terminating plaintiff from what she said in the cafeteria to how she said it is further evidence of pretext. *EEOC v. Sears Roebuck and Co.,* 243 F.3d 846, 853 (4th Cir. 2001) (an employer's offer of different and arguably inconsistent explanations for termination is evidence of pretext); *Dennis v. Columbia Colleton Med. Ctr. Inc.,* 290 F.3d 639, 647 (4th Cir. 2002) (an employer's inconsistent explanation for its employment decisions are probative of pretext). Furthermore, the fact that defendant did not get Collins' side of the story before terminating her is even more evidence of pretext. *Nemeth v. Citizens Fin. Group, Inc.,* 2011 U.S. Dist. LEXIS 68122 at *32 (E.D. Mich. 2011) (terminating 25-year employee with an untarnished employment history without hearing her side of the story is evidence of pretext); *Reese v. Barton Healthcare Sys.,* 693 F.Supp.2d 1170, 1184-1185 (E.D. Cal. 2010) (suspending plaintiff without getting her side of the story is evidence of pretext).

Finally, terminating plaintiff without following its own discipline policy, without going through its diversity committee, and without involving Casselli in the investigation, is evidence of

pretext.  Casselli testified that defendant follows a progressive discipline policy for all but the most serious offenses.  According to Casselli, an employee is required to receive a first written warning, a second written warning, and then a three-day suspension before termination.  Casselli felt she was required to follow this discipline policy.  Casselli also testified she is typically involved in investigations at the hotel and that it was unusual that she was not involved in plaintiff's.  (Ex. 4, J. Casselli depo. pp. 20-22, 28, 101-102).  Stracey testified to the mandatory nature of defendant's progressive discipline policy stating that he felt required to follow it, and that defendant had to have good cause to fire an employee.  (Ex. 2, P. Stracey depo. pp. 80-87).  Defendant certainly followed its discipline policies "to the T" in dealing with Employee X, an African-American.  Yet defendant fired plaintiff, a long-time employee of almost thirty (30) years with no prior discipline, on her first offense without a verbal warning, written warning or suspension and without going through its diversity program.  It also fired plaintiff without involving its Human Resource Director in the investigation leading up to the discharge.  *Mohammed v. Cent. Driving Mini Storage, Inc.,* 128 F.Supp. 3d 932, 952-953 (E.D. Va. 2015) (failure of defendant to follow formal or even informal progressive discipline is evidence of pretext); *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 355 fn. 29 (5th Cir. 2005) (even though internal progressive discipline policy is not mandatory and plaintiff is an employee at will, failure to follow discipline policy is still evidence of pretext where policy states it should be followed in most circumstances); *Goudeau v. Nat'l Oilwell Varaco, LP,*  793 F.3d 470, 477 (5th Cir. 2015) (when employer opts to have a disciplinary system that involves warnings, failure to follow that system may give rise to an inference of pretext).

**(f)     The same actor doctrine does not apply in this case.**

Defendant attempts to rely upon the same actor doctrine articulated in *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir. 1991) and, to a lesser extent, in *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310 (4th Cir. 1993). Defendant's reliance on this doctrine is, at best, entirely misplaced-at worst, frivolous.  *Proud* stands for the proposition that "in cases where the hirer and firer are the **same individual** and the

termination occurs within a **relatively short time** span following the hiring, a strong inference exists that discrimination was not a determining factor in the termination. In *Proud,* the plaintiff was hired and fired within a four (4) month time span by the same person for performance issues. In *Mitchell,* the plaintiff was fired four (4) months after applying for and receiving a transfer to a different position within the company. The person who interviewed and hired Mitchell into the new position was the same person that fired Mitchell-again, for performance.

Given the above, the *Proud* inference does not come close to applying in this case. Stracey did not hire Collins. Stracey was not even employed at defendant when Collins was hired. Yet, according to defendant, Stracey is the one that fired plaintiff. Thus, the hirer and firer were not the same and the *Proud* inference does not apply. Moreover, Collins was not hired and fired within four (4) months like the plaintiffs in *Proud* and *Mitchell*. **Plaintiff was employed at defendant for almost thirty (30) years.** So there was no hiring and firing or transfer and firing within a relatively short period of time. Defendant attempts to turn the *Proud* doctrine on its head and apply it to plaintiff's most recent performance evaluation (ten (10) months before her discharge) and her firing. No case in the Fourth Circuit has authorized such a strained or distorted version of the *Proud* inference. Perhaps most importantly, defendant's argument ignores the tremendous racial tension and strife at defendant and pressure on Stracey to get rid of Caucasian employees. It is not disputed that Stracey gave plaintiff a good evaluation some ten (10) months before her termination, as Collins was an excellent employee. However, after the evaluation, intervening external pressure (the Walter Scott shooting and the Black Lives Matter protest at the hotel) and internal pressure (from Scott and others) forced Stracey to take a discriminatory adverse action against plaintiff when he terminated her.

**(g)    Collins' state law claim for wrongful termination in violation of public policy should not be dismissed on Summary Judgment.**

An at-will employee has a cause of action in tort for wrongful termination where there is a retaliatory termination of the employee in violation of a clear mandate of public policy. *Barron v.*

*Labor Finders of SC,* 393 S.C. 609, 614, 713 S.E.2d 634, 637 (2011).  The public policy exception clearly applies in cases where either: (1) the employer requires the employee to violate the law, or (2) the reason for the employee's termination itself is a violation of criminal law.  *Id.*  However, the public policy claim is not limited to these situations.  An at-will employee may have a cause of action even if the discharge itself did not violate criminal law or the employer did not require the employee to violate the law.  *Barron,* 393 S.C. at 614-615, 713 S.E.2d at 637.

The determination of what constitutes public policy is a question of law for the courts to decide.  *Barron*, 393 S.C. at 617, 713 S.E.2d at 638.  Once a public policy is established by the court, the jury determines the factual question of whether the employee's termination was in violation of public policy.  *Id.*

Here, Collins invokes *S.C. Code. Ann.* § 16-17-560 as the source of public policy. That statute is found in Chapter 17 of Title 16 and is entitled "Offenses Against Public Policy."  The statute makes it a crime to "…discharge a citizen from employment…because of political opinions or the exercise of political rights and privileges guaranteed…by the constitution and laws of the United States or by the constitution and laws of this State."  Our Supreme Court has already held that this very statute expresses a clear mandate of public policy in this State and that violation of the statute gives rise to a cause of action for wrongful termination in violation of public policy.  *Culler v. Blue Ridge Elec. Coop.,* 309 S.C. 243, 422 S.E.2d 91 (1992) ("we believe [the] prohibition of retaliatory discharge in violation of a clear mandate of public policy of this State extends at least to legislatively defined "crimes against public policy.")  In *Culler,* the Supreme Court held that, if the plaintiff was discharged because he refused to contribute to a political action fund, he would have a cause of action for wrongful discharge in violation of public policy under *S.C. Code Ann.* § 16-17-560 (1976).

Thus, according to the ordinary meaning of the words in the statute, the reason for plaintiff's termination (firing plaintiff for expressing political opinions) is itself a violation of criminal law.

Based upon the above authority, this court can easily make the determination as a matter of law that *S.C. Code Ann.* § 16-17-560 constitutes a strong and clear mandate of public policy in this State, more specifically, that it is against the public policy of this State for an employer to terminate an employee for expressing political opinions in the workplace in an appropriate manner. With the public policy established, it now becomes a jury issue as to whether defendant violated the public policy in terminating plaintiff. There is certainly enough evidence on this point to create issues of fact.

To be sure, Collins was terminated for expressing her political opinions in the cafeteria. While the statute does not define "political opinions," *Black's Law Dictionary* defines the term "political" as:

> **Pertaining or relating to the policy or the administration of government, state or national. Pertaining to, or incidental to, the exercise of the functions vested in those charged with the conduct of government...** *Black's Law Dictionary*, 5th Ed. (1979).

Given this definition, it is clear that Collins was expressing her political opinions in the cafeteria when she made remarks about President Obama and race relations under his administration, the Walter Scott shooting, and how the North Charleston Police Department handled the situation, and the Ferguson, Missouri shootings, among other topics.

Defendant argues plaintiff was not fired for her speech, but for the disruptive way in which she expressed her opinions. However, as outlined in Argument III(e), there is plenty of evidence that plaintiff was not disruptive or unprofessional in delivering her message. Instead, there is compelling evidence that defendant fired plaintiff for **what** plaintiff said, not how she said it.

Defendant next argues that private employers are not constrained by First Amendment concerns-that employees at private companies have no First Amendment rights. Our state criminal laws say otherwise. The statute at issue is very clear that private employers cannot terminate employees for expressing political opinions or exercising their rights under the State or United States constitutions. Defendant also argues employers are required to enact workplace rules which encourage safe, productive and discrimination-free environments and that the criminal statute relied upon by plaintiff is at odds with such rules. That is not the case. The statute here does not protect

threatening or discriminatory behavior-only political expression.  This is not a case where Collins threatened anyone (like Scott allegedly did) or made racial remarks (again, like Scott allegedly did).  Collins did not threaten to punch anyone or say she hated African-Americans.  If an employee made hateful racial remarks or threatened violence, that speech would clearly not be protected under the statute.  Finally, defendant's reliance on *Dixon v. Coburg Dairy, Inc.,* 330 F.3d 250 (4th Cir. 2003) is entirely misplaced.  First, the decision is a federal case that was reversed.  *Dixon v Coburg Dairy, Inc.,* 2004 U.S.App. LEXIS 13783 (4th Cir. 2004).  Plus, defendant relies upon a concurring/dissenting opinion from the reversed decision.  Thus, the case defendant relies upon has absolutely no precedential value.  And, the plaintiff in *Coburg* never claimed he was fired for expressing "political opinions" as Collins does here.  Instead, he raised a First Amendment claim relying on the part of the statute forbidding termination for exercising political rights and privileges guaranteed by the constitutions.  *Dixon* 330 F.3d at 261.  Thus, the *Dixon* court analyzed the plaintiff's claim looking at an entirely different section of the criminal statute than the section at issue here.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, plaintiff respectfully asks the court to deny defendant's Motion for Summary Judgment in its entirety, and for such other relief as the court deems just and proper.

HITCHCOCK & POTTS

By:  <u>s/A. Christopher Potts</u>
Federal ID No.:  5517
31 Broad Street (P.O. Box 1113)
Charleston, SC 29401 (29402)
Telephone:  (843) 577-5000
Email:  hitchp@bellsouth.net
***Attorneys for the Plaintiff***

Charleston, South Carolina
February 23, 2017