IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| KIMBERLY COLLINS,       ) | Civil Action No.  2:15-4465-PMD-BM |
|      ) | |
| Plaintiff,     ) | |
|      ) | |
| v.      ) | **REPORT AND RECOMMENDATION** |
|      ) | |
| CHARLESTON PLACE, LLC,    ) | |
| d/b/a BELMOND CHARLESTON PLACE, ) | |
|      ) | |
| Defendant.    ) | |
| _____) | |

Plaintiff, a former employee of the Defendant, asserts claims against the Defendant for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., and 42 U.S.C. § 1981.  Plaintiff also asserts a state law claim for wrongful termination in violation of public policy.

The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on January 13, 2017.  After receiving an extension of time to respond, Plaintiff filed a memorandum in opposition to the Defendant's motion on February 23, 2017, following which the Defendant filed a reply memorandum on March 2, 2017.  The Defendant's motion is now before the Court for disposition.[1]

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C.  The Defendant has filed a motion for summary judgment.  As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.



**Background and Evidence**[2]

Plaintiff, a white female, was initially hired by the Defendant in 1987 as a Front Desk Clerk. Plaintiff was promoted to Executive Secretary to the Director of Food and Beverage in or around 1989, and was given additional duties as Executive Director to the Defendant's Controller in 1995. When Defendant changed ownership in or around 1995, Plaintiff was given additional duties as Executive Secretary to the Interim General Manager. During this same time period, the Defendant hired Paul Stracey (Caucasian) as General Manager. Plaintiff then became Executive Secretary to the General Manager, while continuing her duties as Executive Secretary to the Director of Food and Beverage and to Filipe Da Costa, the Controller.[3] By 2007, Plaintiff was given the additional job of being the Executive Secretary to the Director of Rooms, Leon Scott (African American). Thereafter, from that time period until her termination, Plaintiff was the Executive Secretary to the General Manager (Stracey), the Director of Food and Beverage, Geno Matesi (Caucasian), the Director of Rooms (Scott), and the Controller (Da Costa), although approximately 60% - 70% of Plaintiff's work was for Stracey. See Plaintiff's Affidavit, ¶¶ 5-6, 9-12; Stracey Deposition, p. 32.

On or about April 4, 2015, Walter Scott[4], an African American, was shot and killed in North Charleston by a Caucasian North Charleston Police Officer. See Etheridge Deposition, p.

---

[2]The facts and evidence are considered and discussed herein in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

[3]Plaintiff also received some additional duties or assignments in 2000 and 2001 and handled those specific additional duties for several years, until approximately 2006 or 2007. See Plaintiff's Affidavit, ¶¶ 7-8.

[4]For clarity purposes, all references in this Report and Recommendation to Walter Scott will include his full name, while references to "Scott" will be referring to Leon Scott.



123.  Carol Etheridge (African American), the Defendant's regional human resources director,[5] testified that she went to a press conference about the shooting during the workday because she has a black son and the tone in the city was alarming to her.  See Etheridge Deposition, pp. 17, 123-124.  Leon Scott was also at the press conference.  See Etheridge Deposition, p. 124.

Subsequent to the shooting, the group Black Lives Matter decided to stage a protest in the restaurant at the Defendant's Charleston Place Hotel.  Jennifer Casselli (Caucasian), a Human Resources employee, testified that the protestors entered the restaurant and circled the tables where customers were sitting while chanting.  See Casselli Deposition, p. 70.  Etheridge testified that the Black Lives Matter group's protest in the hotel's restaurant was loud, but orderly.  See Etheridge Deposition, p. 132.  Casselli testified that she did have concerns for the customers of the hotel during the protest, but that Matesi (the Food and Beverage Director) had handled the matter quickly.  See Casselli Deposition, p. 70.[6]

Plaintiff testified that she was in her office on the second floor of the hotel when she heard the protestors enter the lobby on the floor below.  See Plaintiff Deposition, p. 19.  Plaintiff testified that after the protest, Matesi came up to her very agitated about the protest.  See Plaintiff Deposition, p. 20.  Plaintiff testified that the hotel was sold out and it was an extremely busy day, and that Matesi told her that he had tried to remove the protestors, but that they would not leave.  See Plaintiff Deposition, pp. 20-21.  Plaintiff testified that she later read an email from Scott which described the protestors as "well guided and respectful", and that she disagreed with Scott's

---

[5]Etheridge in turn reported to Ingrid Eras-Magdalena (who is Caucasian and married to an African American male), the Defendant's global Vice President for Human Resources, who was located in London.  See Etheridge Deposition, p. 17; Casselli Deposition, p. 93

[6]Matesi apparently called 911, following which the protestors left.

3



description of the event and called Scott to talk about it.  He told her to come down to the employees' cafeteria.  See Plaintiff Deposition, pp. 24-25.  Plaintiff testified that when she arrived in the cafeteria, Scott was sitting at a table with Etheridge and Shawn Crawford (African American), Director of Security, and who was on the executive committee. See Plaintiff Deposition, pp. 25-26; Plaintiff Affidavit, ¶ 13; Crawford Affidavit, ¶ 2.

Plaintiff testified that she told Scott that she did not know if his email was a good idea because two letters had been sent out to different meeting planners and/or conventions that were threatening to cancel their reservations with the hotel due to potential protests, and that she was concerned about his email in light of those letters. See Plaintiff Deposition, p. 28.  Plaintiff testified that even though she and Etheridge were friends, that Etheridge then leaned over to her and said "[w]ell, I guess you shouldn't have sent out those letters." See Plaintiff Deposition, pp. 29, 33. Plaintiff also testified that Etheridge aggressively accused her of not being on her side in the 1990s when protesters were outside the hotel protesting racial issues. See Plaintiff Deposition, p. 92.  As the conversation continued, Plaintiff asked Scott why he would "comp" a room for Al Sharpton when Walter Scott's family did not want him there. See Plaintiff Deposition, pp. 39-40, 69.  Plaintiff also testified that she stated that the country had not been more divided in its history than in the past seven years, referencing President Obama's terms. See Plaintiff Deposition, pp. 39-40.

Plaintiff described her demeanor as calm, not yelling and pacing, adding that she would not do that, and that she was shocked at the other meeting participants' demeanor towards her. Plaintiff testified that she had only come down to speak to Scott as a friend because she was concerned about his job due to his email, denied raising her voice or putting her finger in Etheridge's face, and that she was not disrespectful toward them in any way. See Plaintiff Deposition, pp. 41, 43-



44.  Plaintiff testified that when Scott told her "[l]et's stop talking about this and talk about this later", she left the cafeteria.  <u>See</u> Plaintiff Deposition, p. 42.  Plaintiff testified that she then went and got the mail, and that when she walked back past the cafeteria and saw the three of them still talking, she waved to Scott, but that he did not wave back, which she thought was odd because they were friends.  <u>See</u> Plaintiff Deposition, pp. 44-45.

Plaintiff testified that she then went to speak to Matesi and told him what had transpired.  <u>See</u> Plaintiff Deposition, p. 45.  Plaintiff testified that she felt that Scott's email condoned the protests, which was the opposite of what had been represented by the hotel in certain letters sent to event planners who had concerns about the potential of protests occurring.  <u>See</u> Plaintiff Deposition, p. 55.  Plaintiff also testified that she told Matesi that Etheridge was very aggressive, upset, and kind of ugly in the way she had spoken to the Plaintiff, and that Scott was also agitated, which surprised her.  <u>See</u> Plaintiff Deposition, p. 47.  Plaintiff testified that she was not aware of any other employees or cafeteria staff in the cafeteria when this event occurred, and denied that she told Matesi that she was concerned that she was going to get fired.  <u>See</u> Plaintiff Deposition, pp. 45-46, 50. General Manager Stracey was out of town that day, but Plaintiff testified that Matesi told her that he had spoken with Stracey on the telephone and that he had told Matesi to relay to Plaintiff not to worry about anything.  <u>See</u> Plaintiff Deposition, p. 71.

Etheridge disputes Plaintiff's version of events.[7]  She testified that Plaintiff pointed

---

[7]While the evidence about what transpired in the cafeteria has been considered in the light most favorable to the Plaintiff, there is no evidence in the record to dispute that the information relayed to Stracey (the decision maker in this case) from Etheridge, Scott, and Crawford corresponded with *their* version of the encounter, as well as with Matesi's version of his conversation with the Plaintiff.  Therefore, these other individuals' testimony is relevant to show what the information was that Stracey, the decisionmaker in this case, actually had before him to consider when he made the

(continued...)



her finger at her and said "[a]nd, you, Ms. Regional HR director,[8] I have been meaning to tell - - talk to you about your diversity training." See Etheridge Deposition, p. 143. Etheridge testified that although Plaintiff did not use profanity and did not touch her, she did speak in a raised voice. See Etheridge Deposition, p. 144. Etheridge also testified that Plaintiff said that the white employees were offended by a recent diversity training[9] and that the attorney who delivered it was a racist. See Etheridge Deposition, p. 139. Etheridge testified she told the Plaintiff that she understood what protestors could do, that she had been the victim of one, and that there were even a few members of the black community who thought she wasn't "black enough." See Etheridge Deposition, p. 147. Etheridge testified that while she did not care about Plaintiff's opinions, that they should be confined to the kitchen table at home, not stated in a cafeteria where employees are eating in a diverse environment, and that she did not need to hear it. See Etheridge Deposition, p. 155. Etheridge further elaborated that her concern was not over what Plaintiff had said, that it was her tone and that Plaintiff had directed her comments towards her. See Etheridge Deposition, p. 155.

Scott testified that he also did not care about Plaintiff voicing her opinion, but that it was the tone she had used, which was loud and inappropriate. See Scott Deposition, p. 104. Scott testified that although Plaintiff did not use profanity, put her finger in his face, or strike anyone, that she yelled at the group and seemed angry. See Scott Deposition, p. 107. Scott recalled Plaintiff

---

[7](...continued)
decision to terminate Plaintiff's employment. See also discussion, infra.

[8]Plaintiff denies Etheridge's allegation that she called Etheridge - "Miss Regional HR Manager". See Plaintiff Deposition, p. 33.

[9]The Defendant had had an outside firm conduct a diversity and inclusion training session in January 2015. See Etheridge Deposition, p. 76.



saying something like "I am speaking on behalf of the white people, and she said that – something like: If he (referring to Walter Scott) had listened to the police, it would never have happened. And, you know, I can't remember – but it was – it was – you know, it was a – negative." See Scott Deposition, p. 107. Scott testified that Plaintiff was expressing her opinion, but that they were not having a dialogue back and forth, nor did he hear Etheridge mention anything to Plaintiff about an earlier protest where Plaintiff did not take up for her. See Scott Deposition, pp. 108-109. Scott also testified that he told Plaintiff that they could do this later. See Scott Deposition, p. 110.

After the meeting/incident at issue, Scott emailed Casselli and Etheridge about the incident. See Scott Deposition, p. 115. Scott's email said that Plaintiff had questioned his authority in front of other workers and that what Plaintiff had said was offensive and wrong, and that her comments were despicable, distasteful, embarrassing, and hurtful to those associates who heard her. See Defendant's Exhibit J. Scott testified that Plaintiff had questioned his authority to comp rooms for Al Sharpton in front of other African American employees and had said that Obama had messed up the whole country, to which Etheridge had responded that not everyone thought that way. See Scott Deposition, pp. 118-119. Scott did not say anything in his email about Plaintiff yelling or raising her voice, he only discussed the content of what she had said. See Scott Deposition, p. 119. Scott also recommended in this email that Plaintiff be suspended for three days while the incident was investigated, although he testified that he would not have recommended that Plaintiff be fired, because she was not his employee. See Scott Deposition, p. 114.

Crawford attests to basically the same version of the incident as Scott and Etheridge, including that Plaintiff was disrespectful, yelling, and very angry. See Crawford Affidavit, ¶¶ 3-10. Crawford attests that he did not say anything during the exchange, and that Scott and Etheridge both



remained calm.  <u>See</u> Crawford Affidavit, ¶ 10.

When Stracey returned from his trip, he spoke to Etheridge first and she told him that Plaintiff "came in and was very visibly agitated and upset and was very aggressive towards them regarding the Walter Scott issue, the Black Lives Matter protest, was exceptionally – what's the word, was very insubordinate, out of control almost, venomous I think were the words she used, and wagging her finger in the face and that sort of thing."  <u>See</u> Stracey Deposition, p. 175.  Stracey also testified that he spoke to Crawford and Scott, and that they relayed the same information to him.  <u>See</u> Stracey Deposition, p. 175.  Stracey also spoke to Matesi, who told him about Plaintiff coming into his office after the incident, very upset, and telling him that she was going to get fired.  Stracey testified that (according to Matesi) Plaintiff told Matesi the same version of what had happened as the others had recounted to Stracey.  <u>See</u> Stracey Deposition, p. 178; <u>see also</u> Matesi Affidavit.

Stacey testified that in making a decision on what to do, he relied on the information from Matesi because he was not involved in the conversation directly and that Matesi's information had come directly from the Plaintiff.  <u>See</u> Stracey Deposition, pp. 189, 201.  Stracey testified that he told Plaintiff that she could not act like that in a hostile, insubordinate way in a public area to people who were her superiors, and suspended her.  <u>See</u> Stracey Deposition, pp. 180, 185.  Stacey testified that he specifically recalled telling the Plaintiff that she could not speak to Etheridge, who was the HR director for all of North America, like that, and that that was not acceptable.  <u>See</u> Stracey Deposition, p. 188.  For her part, Plaintiff testified that when Stracey suspended her, he told her that he could not have her discussing or expressing her political opinions in the cafeteria with managers due to the environment in Charleston.  <u>See</u> Plaintiff Deposition, p. 80; <u>cf</u> Stracey Deposition, pp. 187-188.  Specifically, he could not have someone in his office speaking about those issues.  <u>See</u> Plaintiff

8



Deposition, p. 80.

      Plaintiff testified that Stracey subsequently called her on a Sunday night and told her that he was receiving pressure, and that he was going to have to let her go.  <u>See</u> Plaintiff Deposition, pp. 92-93.  Plaintiff testified that she was shocked, and told Stracey that she was surprised that he did not ask to hear her side of the story.  <u>See</u> Plaintiff Deposition, p. 94.  When she came in on Tuesday, Plaintiff testified that Stracey acknowledged that she had mentioned that he never got her side of the story, but then said, "[w]ell, I spoke with Etheridge, Scott, and Crawford as well as Matesi.  They all matched the story.  There's no reason to – to get your side of the story."  <u>See</u> Plaintiff Deposition, p. 96.  During that meeting, Plaintiff testified that Stracey seemed distraught, that they embraced, and both of them cried.  <u>See</u> Plaintiff Deposition, p. 119; Stracey Deposition, p. 197.  Plaintiff testified that, at that time, she did not believe that Stracey had made the decision to terminate her.  <u>See</u> Plaintiff Deposition, p. 119.  However, Stracey testified that no one put any pressure on him, and that he had made the decision to fire the Plaintiff.  <u>See</u> Stracey Deposition, pp. 185, 194, 201.

      After exhausting her required administrative remedies, Plaintiff filed this lawsuit alleging her termination was a result of race discrimination in violation of Title VII and § 1981, and the public policy of South Carolina.

### <u>Discussion</u>

      The Defendant has moved for summary judgment on all of Plaintiff's claims.  Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Rule 56, Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the



pleadings is appropriate. <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991).

Once the moving party makes this showing, however, to avoid summary judgment the opposing party

must respond to the motion with specific facts showing there is a genuine issue for trial. <u>Baber v.</u>

<u>Hosp. Corp. of Am.</u>, 977 F.2d 872, 874-75 (4th Cir. 1992).

## I.

### (Disparate Treatment Claims)

Plaintiff asserts a disparate treatment race discrimination claim in violation of Title

VII and 42 U.S.C. § 1981, based on her assertion that she was subjected to race discrimination when

she was terminated. Plaintiff's claim requires proof of intentional discrimination, either by direct

evidence or by the structured procedures set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792 (1973).[10]

Plaintiff has not offered any direct evidence of race discrimination,[11] and the

Defendant argues that Plaintiff has failed to present sufficient circumstantial evidence to create a

---

[10]While <u>McDonnell Douglas</u> is a Title VII case, the standards applicable to lawsuits under §
1981 are basically the same as the standards applicable to lawsuits under Title VII, with the same
caselaw being used to evaluate a claim under either statute. <u>See</u> <u>Ross v. Kansas City Power & Light</u>
<u>Co.</u>, 293 F.3d 1041, 1050 (8th Cir. 2002)["In analyzing a claim . . . under section 1981, we apply the
same standards as in a similar Title VII claim."]; <u>Long v. First Union Corp. of Virginia</u>, 894 F.Supp.
933, 945 (E.D.Va. 1995); <u>Kim v. Nash Finch Co.</u>, 123 F.3d 1046, 1063 (8th Cir. 1997). Further,
although a § 1981 claim is contractual in nature, it is not necessary for Plaintiff to have had an actual
employment contract with the Defendant to pursue a § 1981 claim. <u>See</u> <u>Sellers v. South Carolina</u>
<u>Autism Soc., Inc.</u>, 861 F.Supp.2d 692, 695–698 (D.S.C.2012) [Concluding that "at-will employment
in South Carolina is contractual in nature and may support a claim under Section 1981."].

[11]Direct evidence of discrimination is evidence which, if believed, would prove the existence
of a fact without any inferences or presumptions. <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 56
F.3d 542, 548-549 (4th Cir. 1995), <u>rev'd on other grounds</u>, 517 U.S. 308 (1996); <u>Black's Law</u>
<u>Dictionary</u>, 460 (6th Ed. 1990) (citing <u>State v. McClure</u>, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974));
<u>see</u> <u>Williams v. General Motors Corp</u>, 656 F.2d 120, 130 (5th Cir. 1981), <u>cert. denied</u>, 455 U.S. 943
(1982).



genuine issue of fact as to whether the employment decision at issue occurred because of her race under the McDonnell Douglas proof scheme to survive summary judgment.[12]  After careful review and consideration of the arguments of the parties and evidence presented, the undersigned is constrained to agree.

The United States Supreme Court articulated a three-part formula for analyzing discrimination cases in McDonnell Douglas.  First, Plaintiff must establish a prima facie case of discrimination.  If a prima facie case is established, a rebuttable presumption is created that the Defendant unlawfully discriminated against her.  Second, once this presumption has been established, the burden of production shifts to the Defendant to show a legitimate, non-discriminatory reason for its actions.  Third, if the Defendant shows a legitimate, non-discriminatory reason for its actions, the burden is then on the Plaintiff to come forward with evidence that the Defendant's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the Defendant were really based on Plaintiff's race.  McDonnell Douglas Corp., 411 U.S. at 802-805; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-256 (1981); Conkwright v.

---

[12]Plaintiff's claim could also have been considered under a so-called "mixed-motive" analysis, even though Plaintiff has presented only circumstantial, or in-direct, evidence of discrimination.  See Hill v. Lockheed Martin, 354 F.3d 277, 284-285 (4th Cir. 2004); Mereish v. Walker, 359 F.3d 330, 339-340 (4th Cir. 2004);  cf. Taylor v. Virginia Union Univ., 193 F.3d 219, 232 (4th Cir. 1999) [en banc].  However, neither party has argued for consideration of Plaintiff's claim under a "mixed-motive" analysis.  Therefore, the undersigned has only evaluated Plaintiff's claim using the McDonnell Douglas analysis.  See Hashem-Younes v. Danou Enters., Inc., 311 Fed.Appx. 777, 779 (6th Cir. 2009)[Affirming district court's application of McDonnell Douglas/Burdine framework where the Plaintiff failed to raise a mixed-motive claim in her complaint or in her response to the Defendant's motion for summary judgment motion, and the record was "utterly silent as to mixed motives"];  Hopes v. Roche, No. 04-2963, 2005 WL 1812820 at * 6 n. 2 (D.Md. Aug. 2, 2005) (citing Nagy v. Baltimore Life Ins. Co., 49 F.Supp.2d 822, 836 n. 13 (D.Md. 1999) [declining to engage in "mixed-motive" analysis where parties have not argued a mixed-motive theory.]); cf Kaszynski v. Thompson, 83 Fed. Appx. 526, 528 (4th Cir. Dec. 19, 2003)[declining to apply mixed motive analysis when raised for the first time on appeal].



Westinghouse Elec. Corp., 933 F.2d 231, 234-235 (4th Cir. 1991). Despite these shifting burdens of production, however, Plaintiff retains the ultimate burden of persuasion on the issue of discrimination throughout. Texas Dep't of Community Affairs, 450 U.S. at 252-253; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

In order to meet the first prong of the McDonnell Douglas formula and establish a prima facie case of race discrimination, Plaintiff must show (1) that she is a member of a protected class; (2) that she was performing her job satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that other employees who were not members of her protected class were treated more favorably, or there is some other evidence giving rise to an inference of unlawful discrimination. See generally, Austen v. HCA Health Services of Virginia, Inc., No. 00-2359, 2001 WL 242203 at **1 (4th Cir. Mar. 12, 2001); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995), cert. denied, 516 U.S. 870 (1995). See also Gilbert v. Penn-Wheeling Closure Corp., 917 F.Supp. 1119, 1125 (N.D.W.Va. 1996). It is undisputed for purposes of summary judgment that Plaintiff is a member of a protected class[13] and that she suffered adverse employment actions (suspension and

_____

[13]When a Plaintiff is a member of a majority class, as is the case here, some courts have held that they must also set out additional background circumstances to show that the Defendant discriminates against the majority in order to prevail on their claim. Farr v. St. Francis Hosp. and Health Centers, 570 F.3d 829, 833 (7th Cir. 2009); Wilson v. Ohio, 178 Fed.Appx. 457, 464-465 (6th Cir. 2006)[In adapting the McDonnell Douglas test to cases of reverse discrimination, the Plaintiff must demonstrate "background circumstances [to] support the suspicion that the Defendant is the unusual employer who discriminates against the majority."] (quoting Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985)). However, it has not yet been definitively decided whether this heightened burden standard is applicable in the Fourth Circuit. See Benson v. Savannah River Nuclear Solutions, LLC, No. 11-2621, 2013 WL 5350805 at * 8 n. 7 (D.S.C. Sept. 20, 2013); Weeks v. Union Camp Corp., Nos. 98-2814 and 98-2815, 2000 WL 277771, at n. 13 (4th Cir. 2000); McNaught v. Virginia Community College System, 933 F.Supp.2d 818-819 (E.D.Va. 2013)[Noting that "[t]he Fourth Circuit has not taken a position officially on this issue and, in fact, repeatedly has refused to do so."]. In any event, for the reasons set forth and discussed herein, the undersigned finds
(continued...)



termination). However, Defendant argues that the evidence does not show that Plaintiff was satisfactorily performing her job, or that she was subjected to any adverse employment action under circumstances giving rise to an inference of unlawful discrimination.

**Satisfactory job performance**. With respect to whether the Plaintiff was satisfactorily performing her job, Defendant contends that the evidence shows that Plaintiff engaged in inappropriate and insubordinate confrontational behavior toward three higher ranking employees (including members of the Executive Committee, one of whom was one of her own supervisors, as well as the Regional Head of Human Resources Department) in the employee cafeteria on April 13, 2015, thereby justifying her dismissal. However, under the facts of this case, the question of whether or not Plaintiff was adequately performing her job (at least for purposes of establishing a prima facie case) relates to Plaintiff's job performance up to the time of the incident that led to her dismissal, not to whether the dismissal itself (based on decisions and findings made at that time) was justified. Cf. Obico v. Mission Creek Sr. Community, No. 11-3932, 2013 WL 622937 at * 5 (N.D.Cal. Feb. 15, 2013)[Finding that sufficient evidence existed that, up until the time of incident (which resulted in the Plaintiff's termination), Plaintiff performed his job satisfactorily]; Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc., 921 F.Supp.2d 470, 485 (D.Md. 2013)[Finding that Plaintiff was adequately performing her job for purposes of her prima facie case where she had consistently received strong performance evaluations up until the events culminating in her termination.]; see Ennis v. National Ass'n of Business and Educational Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995)[The exact standard to be used in establishing a prima facie case is flexible depending on the factual

---

[13](...continued)
that Plaintiff's claim fails even without being considered under this heightened standard.



situation and the claim alleged].

Here, Defendant does not dispute that, prior to the time of her dismissal and during the overall course of her many years of employment, Plaintiff had received good performance evaluations and salary increases as well as promotions. See Etheridge Deposition, p. 122; See Casselli Deposition, pp. 60-61; Plaintiff Deposition, p. 79; Stracey Deposition, pp. 138-147. In fact, Stracey stated that he would rate Plaintiff's performance as being "very good." See Stracey Deposition, p. 138. Therefore, at least for purposes of her McDonnell Douglas prima facie case, the evidence before the Court is sufficient to show that Plaintiff was satisfactorily performing her job up to the time of the events which culminated in her dismissal to avoid summary judgment. Cf. Chytka v. Wright Tree Service, Inc., 925 F.Supp.2d 1147, 1167 (D.Colo. 2013)[Finding that Plaintiff was adequately performing her job for purposes of her prima facie case where, prior to her discharge, she had never received any notice of poor performance or was otherwise not performing in a satisfactorily manner.]; Curry v. Pulliam, 234 F.Supp.2d 921, 931 (S.D.Ind. 2002)[Where court proceeded to discussion beyond prima facie case when evidence of Plaintiff not performing his job satisfactorily (because of alleged harassment of co-worker) was also same essential issue that would be considered at the pretext level]; see also Boyd v. Presbyterian Hosp., 160 F.Supp.2d 522, 535 (S.D.N.Y. 2001)["The second prong of a prima facie case, satisfactory job performance, is a fairly low threshold to meet."].

**Inference of discrimination in the action taken**. Turning then to consideration of the fourth prong of Plaintiff's prima facie case (i.e., whether other employees who were not members of Plaintiff's protected class were treated more favorably, or whether there is some other evidence giving rise to an inference of unlawful discrimination), Plaintiff does not dispute that following her



termination she was replaced in her job by another Caucasian. See Court Docket No. 25-5 (Defendant's Answer to Int. 15); Plaintiff's Deposition, p. 86. Defendant argues that since Plaintiff was replaced by someone within her protected class, this fact *alone* evidences that no race discrimination occurred under the applicable caselaw and entitles it to summary judgment. Cf. Miles v. Dell, Inc., 429 F.3d 480, 488 (4th Cir. 2005)[Holding that the fact that Plaintiff was replaced by someone within the same protected class "ordinarily gives rise to an inference that the Defendant did not fire Plaintiff because of her protected status."]. Although there are exceptions to this general rule, such as when a defendant hires someone within a plaintiff's protected class in order "to disguise its act of discrimination toward the plaintiff"; Miles, 429 F.3d at 488 (quoting Brown v. McLean, 159 F.3d 898, 905, 906 (4th Cir. 1998)); Plaintiff has produced no such evidence here. Baber, 977 F.2d at 874-875 [where the Defendant has produced evidence to show that summary judgment is appropriate, to avoid summary judgment the plaintiff must respond with specific facts showing that there is a genuine issue for trial].

Moreover, even assuming arguendo that this fact is not itself fatal to Plaintiff establishing her prima facie case, she has nonetheless also otherwise failed to establish the fourth prong of her prima facie case. The evidence shows that in response to previous complaints of racial disparity or tension at the hotel, an employee diversity committee was formed consisting of Casselli, Scott, Matesi, and Etheridge, and that all written or final warnings, suspensions or terminations were to be presented to this committee. See Etheridge Deposition, p. 77. In this case, the evidence shows that Stracey spoke with three of the four members of the diversity committee prior to making his decisions (everyone but Casselli), but that Stracey alone made the decision to both suspend and



terminate the Plaintiff.[14]  See Stracey Deposition, pp. 172-173, 175-178, 185, 197, 201; Etheridge Deposition, p. 159.  Casselli (with Human Resources) confirms that although the Defendant had a progressive discipline policy, an employee could go straight to termination depending on the severity of the infraction.  See Casselli Deposition, p. 20.

Therefore, since Stracey is the one who the evidence shows made the decision to terminate the Plaintiff, it is important to consider what information he had before him at the time he made his decision, and whether the facts and circumstances give rise to an inference of unlawful race discrimination in the making of this decision.  The evidence shows that Stracey talked to Eras-Magdalena (the Defendant's Vice President for Human Resources) and Ann Robertson (Caucasian), the Compliance Officer, during the course of his investigation.  Even though Etheridge was the Regional Human Resources Director, she was not involved in the investigation other than telling Stracey her version of what had occurred during the confrontation.[15]  See Casselli Deposition, pp. 93, 102.  It is undisputed in the evidence that Stracey had also been told what had happened by Scott and Crawford (both of whom were present during the event), as well as by Matesi, who told Stracey that he was relaying what happened as it had been told to him by the Plaintiff, and which was consistent with the versions given to Stracey by the other participants.  See Stracey Deposition, pp. 178, 180, 183-184, 189-190; see also Matesi Affidavit.  All of this information provided to Stracey was that Plaintiff had been loud, rude and insubordinate to higher ranking officials, at least one of whom

---

[14]Although Scott testified that he recommended that Plaintiff be suspended (apparently prior to Stracey's return from out of town), Scott did not have the authority to suspend the Plaintiff.  See Stracey Deposition, p. 173.

[15]Etheridge testified that she also gave a statement to Robertson in July 2015, after the Plaintiff had already been fired.  See Etheridge Deposition, p. 168.



(Scott) she directly worked for, while at work and in a public place.

Further, although Plaintiff was hired by someone else, before Stracey started working at the Charleston hotel, she had worked for Stracey for approximately twenty (20) years and there is no dispute but that they had a good relationship. See Casselli Deposition, p. 58; Plaintiff Deposition, p. 9; Stracey Deposition, pp. 32, 136; Plaintiff's Affidavit. Plaintiff even testified that both she and Stracey cried and embraced when they met for him to terminate her; see Plaintiff Deposition, p. 119; Stracey Deposition, p. 197; and there is no evidence in the record to give rise to any inference that Stracey, who is himself Caucasian, had any racial bias towards Caucasians in general or towards the Plaintiff. Cf. Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1471 (11th Cir. 1991) ["[I]t is difficult for a plaintiff to establish discrimination when the allegedly discriminatory decision-makers are within the same protected class as the plaintiff."]. Rather, the only accusations of racial bias in the record against Stracey were made by Scott, who had alleged at an earlier time that Stracey had discriminated against African Americans, not Caucasians. See, discussion, infra.

In an effort to show that other employees outside of her protected class were treated more favorably than her, thereby giving rise to an inference of unlawful race discrimination, Plaintiff lists various employees with whom (she contends) she was similarly situated and who Plaintiff alleges engaged in comparable conduct but were not subjected to the same treatment as her. Plaintiff specifically references an African-American Employee X, Scott, and the conduct of Scott and Etheridge during the same encounter which resulted in her termination.[16] However, the mere fact that

---

[16]Plaintiff has also presented evidence concerning an Employee Y, a Caucasian, who was terminated. However, that evidence is not presented as comparator evidence but rather to show that Scott was treated more favorably than Employee Y. See discussion, infra; see also Bradley v. U.S. Foods, Inc., No. 14-1772, 2015 WL 5158731, at *20 (D.S.C. Sept. 2, 2015)(quoting Lightner v. City
(continued...)



Plaintiff was terminated while these other employees were not is not in and of itself evidence of unlawful discrimination, because (as is discussed below) the misconduct they were accused of was not of the same nature and/or did not involve the same level of employees. Smith v. Sunbelt Rentals, Inc., 356 Fed.Appx. 272 at ** 6-7 (11th Cir. Dec. 10, 2009)[To survive summary judgment, Plaintiff must show that he and the alleged comparable employee are "similarly situated in all relevant respects"]; Robinson v. United Parcel Services, Inc., No. 06-2601, 2007 WL 3484743 at * 4 (N.D.Ga. Nov. 14, 2007)[Proper comparator for purposes of a wrongful termination claim is one who is similarly situated in all relevant respects]; Shivers v. S.C. Dept. of Corrections, No. 09-3357, 2011 WL 4549261, * 7 (D.S.C. Sept. 30, 2011)[Noting that to be similarly situated employees had to have been "engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"] (internal citations omitted).

## (Employee X)

Employee X was an African American server in the hotel's restaurant. See Casselli Deposition, p. 116. Employee X reported to Mike Barto, the restaurant's manager, who reported to Matesi, who reported to Stracey. See Casselli Deposition, p. 118. Employee X was terminated on April 16, 2015, which would have been between the time Plaintiff was suspended and her termination. See Casselli Deposition, p. 120. The termination letter stated that "on the previous Sunday you engaged in an argument with a coworker that according to witnesses became aggressive." See Casselli Deposition, p. 121. The decision to terminate Employee X was made by Casselli, Stracey, and Matesi, while Scott also had input because of the diversity inclusion and it went through

---

[16](...continued)
of Wilmington, N.C., 545 F.3d 260, 264–5 (4th Cir. 2008)[noting comparator must be "of another race ..."]).

18



the committee which had been formed because of the previous conflict between Scott and Stracey. See Casselli Deposition, p. 122. Casselli testified that she also ran the decision by Etheridge. See Casselli Deposition, pp. 122-123. Employee X's termination letter noted that she had previously been placed on suspension with a final warning in 2011 for the same infraction. See Casselli Deposition, p. 121; Casselli Deposition Exhibit 11.

        Plaintiff asserts that the way Employee X was treated shows discrimination because she engaged in similar conduct as did the Plaintiff but was not terminated until her second offense, while Plaintiff was terminated for a first offense. However, the evidence does not show comparable conduct by these two employees. See Casselli Deposition, p. 123. At the time of her suspension, Employee X's coworkers had expressed to Casselli and Matesi that the way she spoke to them created a hostile and unpleasant work environment. See Casselli Deposition, pp. 124-125. Employee X's conduct towards her co-workers was described as rude and condescending, and some of them would even call off of work in order to avoid working a shift with her. See Casselli Deposition, p. 125. Casselli testified that she, Matesi, and Stracey made the decision to suspend Employee X for this conduct. According to a letter to Employee X dated May 17, 2011, that was her third written documentation within one year, so the letter said that "we must suspend you."[17] See Casselli Deposition, p. 125; Casselli Deposition Exhibit 12.

        However, Casselli testified that while Employee X's supervisor described Employee X as not "the most pleasant person to work around, [that there was] nothing [she had ever done] that warranted any sort of documentation", and that he had never reported or complained that she had

---

        [17]The other two referenced written documentations were unrelated offenses relating to violations of the hotel's gratuity and vacation policies. See Casselli Deposition Exhibit 12.



been rude to him or that her tone with him was bad.  See Casselli Deposition, p. 130.  Significantly, there is no evidence that Employee X was ever insubordinate to her supervisor or spoke inappropriately to any of her supervisors or superiors, as was the case with the Plaintiff.  In fact, one of the complaints from Employee X's co-workers was that Employee X knew how to behave when management was around and acted totally different when management was not present.  See Court Docket No. 28-12, p. 5.[18]  Accordingly, there is no evidence to show that Employee X was ever insubordinate to or engaged in any conduct directed at her superiors or supervisor comparable to the allegations concerning the Plaintiff's conduct here.

Therefore, Plaintiff has not shown that the circumstances surrounding Employee X's suspension and termination are similar to her situation and facts in all material aspects, and this employee is therefore not a proper comparator for purposes of her discrimination claim.  Smith, 356 Fed.Appx. 272 at ** 6-7 [To survive summary judgment, Plaintiff must show that he and the alleged comparable employee are "similarly situated in all relevant respects"].

**(Scott)**

Although Plaintiff lists Scott as a comparator for purposes of her claims, Scott, of course, is a supervisor, and a supervisor and a subordinate are rarely similarly situated.  See generally Grant v. Miami-Dade Cty. Water & Sewer Dep't, 2015 WL 7434234, at *3 (11th Cir. Nov. 23, 2015)["The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." ](quotation marks and citation omitted); Crosby v. Computer Science Corp., 470 Fed.Appx. 307, 309 (5th Cir. 2012) [a plaintiff's supervisor is not

---

[18]Plaintiff's Deposition Exhibit 13 consists of various letters complaining about Employee X.



a "valid comparator"].  Scott is no exception to this general principle.

        Additionally, while the record includes evidence of numerous complaints that had been made by Scott over the years accusing other employees, including his supervisor, of discriminating against African Americans, those are not acts comparable to Plaintiff's conduct here. See Cole v. Lexington-Richland School Dist. 5, No. 09-1301, 2011 WL 441974, at * 3 (D.S.C. Feb. 8, 2011) [Finding that supervisor and subordinate can be treated as potential comparators where they both engaged in the same conduct].  In 2004, Scott sent Casselli an email stating that people in the hotel did not feel comfortable with her or trust her because of the color of her skin.  See Casselli Deposition, p. 39.  Casselli testified that she reported this email to Robertson and Stracey, and that she felt that she was being discriminated against.  See Casselli Deposition, pp. 38, 41-42.  Casselli testified that she is not personally aware whether an investigation of this incident was done or not, but concedes that she was told that an investigation was done, and that she believed the matter was handled as part of the resolution of the conflict between Scott and Stracey (discussed infra).  See Casselli Deposition, pp. 45-46.  In any event, Scott's email to Casselli did not involve any type of confrontation between the two, nor was Casselli Scott's supervisor.  As such, it was not the same type of conduct as Plaintiff's public confrontation with three of her superiors.  Shivers, 2011 WL 4549261, * 7 [Noting that to be similarly situated employees had to have been "engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"] (internal citations omitted).

        On another occasion, Scott complained to Casselli that another employee, Rhonda Millard (Caucasian), was harassing or offending African American employees.  See Casselli Deposition, p. 48.  However, a report by Scott (or any employee) to Casselli in Human Resources that



they felt another employee was creating a racial hostile work environment is again not the same type of conduct Plaintiff is alleged to have engaged in.  Indeed, it would most likely be considered protected activity under the discrimination statutes.  Cf. Rodas v. Town of Farmington, 918 F.Supp.2d 183, 189 (W.D.N.Y. Jan.16, 2013) [" 'Protected activity' includes opposing employment practices that are prohibited under Title VII (such as discrimination based on race, color, religion, sex, or national origin), or making a charge of discrimination, or participating in any investigation, proceeding, or hearing arising under Title VII."];  Bowman v. Holopack Intern. Corp., No. 06–1648, 2007 WL 4481130 at * 14 (D.S.C. Dec.19, 2007) ["[T]he opposition clause encompasses informal protests, such as voicing complaints to superiors or protests using an employer's grievance procedures."].

Another incident cited by the Plaintiff arose when Stracey told Scott in 2014 that he was being moved to the evening shift, to which Scott objected.  See Scott Deposition, pp. 40-42.  Scott reported the matter to Etheridge (the Regional Human Resources Director).  Scott testified that he did not remember complaining that Stracey's request was based on race, although he may possibly have.  See Scott Deposition, pp. 42-43.  However, the evidence does show that Scott believed Stracey did not in general treat African-American employees fairly.  Casselli testified that Stracey had told her that Scott had accused him of race discrimination in a series of emails and text messages.  See Casselli Deposition, p. 46.  Even so, Scott's complaints regarding race discrimination (assuming that is what occurred for purposes of summary judgment) are again not similar to Plaintiff's conduct at the restaurant.  Plaintiff was not complaining that Scott or anyone else was discriminating against her on the basis of her race. While Plaintiff allegedly made statements regarding or pertaining to race during the confrontation, she was not complaining that she had been discriminated against.  Rather,



the basis for the investigation of the Plaintiff (and the purported reason for her termination) was that she had been loud, rude and insubordinate to her superiors in front of other hotel employees. In any event, it would have been illegal for the Defendant to have disciplined or terminated Scott for engaging in any protected activity involving claims of race discrimination. Rodas, 918 F.Supp.2d at 189; Bowman, 2007 WL 4481130 at * 14.

       The closest the evidence shows Scott to have come to engaging in the type of conduct that got Plaintiff fired is an email Scott sent to Stracey on October 11, 2014, in which Scott wrote that Stracey had "[u]sed me for twenty years justifying how you really felt. What a sucker I was but never again. Your bullying with ME is over. I will be bullied by no one." See Casselli Deposition Exhibit 33. This incident arose out of Scott's complaint that a white housekeeper (apparently Rhonda Millard) who worked for him was using her position as executive housekeeper to discriminate against African Americans, and that Stracey was supporting her and not doing anything about it. See Stracey Deposition, pp. 64-65. Stracey forwarded Scott's email to Robertson in Human Resources with a note describing the email as "this last insubordinate rant", and Casselli testified that Scott was disciplined at some point because of his relationship with Stracey. See Casselli Deposition, p. 44; Casselli Deposition Exhibit 33. However, it is undisputed that Scott's email went directly to Stracey. He did not make these comments to Stracey in front of anyone, nor did he engage or in a face-to-face confrontation with Stracey. Further, it was a complaint of race discrimination, and an exchange between Scott and Stracey in an email about whether Stracey had appropriately handled a report of racial discrimination cannot be considered the same type of conduct as Plaintiff's public confrontation in the employee restaurant with three of her superiors about whether an email Scott sent out concerning a protest could adversely effect bookings. Shivers, 2011 WL 4549261, * 7



[Noting that to be similarly situated employees had to have been "engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"] (internal citations omitted). Additionally, the record is clear that Stracey was himself disciplined because of his disputes with Scott. See Court Docket No. 28-5. Robinson, No. 2007 WL 3484743 at * 4 [Proper comparator for purposes of a wrongful termination claim is one who is similarly situated in all relevant respects].[19]

        In sum, although Plaintiff attempts to use Scott as a comparator as discussed herein, the fact is that it is undisputed that she was a subordinate who reported to Scott. Therefore, as the conduct of Scott pointed to by the Plaintiff was not comparable to hers, as her supervisor Scott is not a valid comparator in this case because they are not "similarly situated in all respects." Gilley v. Kelly & Picerne, Inc., No. 14-124, 2016 WL 814885, at *9 (M.D. Ala. Feb. 29, 2016)(quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)); see also Crosby., 470 Fed.Appx. 307, 309 [a plaintiff's supervisor is not a "valid comparator"]; Cole, 2011 WL 44194, at * 3 and n. 2 [Plaintiff has the burden of proffering sufficient evidence to raise a genuine issue of material fact as to whether a supervisor can be a valid comparator].

### (Employee Y)

        Plaintiff also contends that racial discrimination can be inferred from an incident where Scott was purportedly treated more favorably than a Caucasian employee regarding allegations

---

       [19]Plaintiff also references another time, where Stracey was told by a third party that Scott had told someone else that he hated Stracey and wanted him "gone", and that Stracey had in turn filed a "speak up" report complaining about Scott. See Stracey Deposition, pp. 116-117; Casselli Deposition, pp. 225-228, and attached Exhibit 34. This report would be consistent with the other evidence in the record that Scott and Stracey did not like each other (and for which both were admonished), but again does not involve the kind of insubordinate or confrontational conduct Plaintiff is alleged to have engaged in.



of having a firearm at work.

Employee Y, a Caucasian employee, worked as a pastry chef. His chain of command was from Chris Ryan (the executive pastry chef) to Matesi, who reported to Stracey. <u>See</u> Casselli Deposition, p. 132. In the summer of 2013, a co-worker of Employee Y picked up his jacket and commented on how heavy it was, to which Employee Y responded that that was because he had a gun in it. <u>See</u> Casselli Deposition, p. 135. Employee Y told her that he carried a gun to work and that he had a permit for it. <u>See</u> Casselli Deposition, p. 135. The co-worker then asked security what the rules were with respect to firearms, and she was told that no weapons were allowed on the premises, so she reported the incident to her supervisor, who reported it to Casselli. <u>See</u> Casselli Deposition, p. 135. A different co-worker also reported that Employee Y took out the handgun and was waving it around at work. <u>See</u> Casselli Deposition Exhibit 16. Although Employee Y did not have any prior offenses; <u>see</u> Casselli Deposition, p. 142; Employee Y was terminated by Matesi, Stracey, and Casselli on September 3, 2013, for a violation of company policy for having the gun on property. <u>See</u> Casselli Deposition, pp. 137-139.

Etheridge testified that she was also aware of a complaint that Scott had brought a firearm to work, and that during an investigation of this incident, Scott was allowed to continue working and was not suspended. <u>See</u> Etheridge Deposition, pp. 96, 98, 106. However, the facts are different between his case and Employee Y's, in that Scott was never proven to have brought a gun to work. In December 2015, Scott was reported as having a gun on his hip or in his pocket at work in the hotel, telling and showing the gun (or at least where the gun was in his pocket) to Annette Sandford-Lopez (Caucasian), the hotel spa manager, while telling her that he had a concealed weapons permit. <u>See</u> Casselli Deposition, p. 170; Etheridge Deposition, p. 99. During a later



conversation with Stracey about his interest in getting a concealed weapon permit, Sandford-Lopez told Stracey about Scott telling her that he had a permit and showing her his gun. <u>See</u> Casselli Deposition, p. 171. Stracey reported the conversation to Casselli. <u>See</u> Casselli Deposition, p. 171. Casselli then spoke directly with Sandford-Lopez, who told her that she had seen the gun. <u>See</u> Casselli Deposition, pp. 181-182. Casselli testified that, because of the past history between Stracey and Scott, and because Scott was on the executive committee, she called Robertson about the situation. <u>See</u> Casselli Deposition, p. 173. However, Casselli testified that when she asked Scott about the report, he vehemently denied it, saying "I would never do that." <u>See</u> Casselli Deposition, p. 177. Casselli testified that Scott told her that while he did have his concealed weapons permit, he did not have a gun at work and would never do that. <u>See</u> Casselli Deposition, pp. 177-178. Casselli testified that she reported Scott's response to Robertson and that an investigation started the next day. <u>See</u> Casselli Deposition, p. 183.

  Casselli testified that Etheridge and Robertson conducted the investigation. <u>See</u> Casselli Deposition, p. 184. Scott testified that around the time of this incident he had felt threatened, which is why he had obtained a concealed weapons permit. <u>See</u> Scott Deposition, p. 77. Although Scott continued to deny the accusation that he had brought a gun to work, Stracey believed it to be credible enough to issue a warning letter. <u>See</u> Court Docket No. 28-5, pp. 11-12. Even so, it remained unproven whether the incident ever occurred, and in any event, as compared to Employee Y, Scott was not alleged to have waved his gun around, but rather only showed it on his hip (or where it was in his pocket) to another manager (according to the allegation) in the context of discussing his concealed weapon permit. Furthermore, and significantly for Plaintiff's claim, the conduct at issue as between Scott and Employee Y has nothing to do with what Plaintiff is alleged to have done,



which involves an allegation of insubordinate behavior by Plaintiff towards several superiors in a public place while at work. Shivers, 2011 WL 4549261, * 7 [Noting that to be similarly situated employees had to have been "engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"] (internal citations omitted).

Therefore, to the extent that Plaintiff has offered this comparison to show preferential treatment of African Americans over Caucasian employees, she has failed to establish that this incident is a basis on which to support her claim. Grant, 2015 WL 7434234, at *3 ["The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." ](quotation marks and citation omitted).

**(Scott, Etheridge)**

Plaintiff also argues that her conduct was similar to that of Scott and Etheridge (both African Americans) with respect to the encounter that gave rise to her termination, but that neither Scott nor Etheridge were terminated, again showing that she was treated disparately as a Caucasian. However, as previously discussed, Scott and Etheridge are both higher ranking superiors of the Plaintiff and are therefore not similarly situated to her. Gilley, 2016 WL 814885, at *9; Holifield, 115 F.3d at 1562; see also Crosby, 470 Fed.Appx. at 309. Further, Scott and Etheridge could not have been insubordinate to the Plaintiff for the simple fact that they were Plaintiff's superiors, not subordinates or even co-workers. Moreover, and significantly, there is also no evidence that Stracey was even aware of Plaintiff's allegations about statements made by Scott and/or Etheridge, or of any purported inappropriate conduct on their part. Cf Summers v. City of Dotham, Ala., 444 Fed. Appx. 346, 352 (11th Cir. 2011)["neither a court or a jury may impute knowledge to a decision maker who



has sworn he had no actual knowledge"] (quoting <u>Brochu v. City of Riviera Beach</u>, 304 F.3d 1144, 1156 (11th Cir. 2002)).

Additionally, although Plaintiff faults Stracey for not listening to her side of the story, there is no evidence that any failure by Stracey to get more information from the Plaintiff had anything to do with Stracey (a Caucasian) having a racial animus towards the Plaintiff or Caucasian employees in general. Rather, Stracey testified that he spoke to Matesi, who told him that Plaintiff had come into his office very upset, relayed the same information to Matesi about what had happened as the other participants had recounted to Stracey, and telling him that she was going to get fired. <u>See</u> Stracey Deposition, p. 178. Matesi confirms Stracey's testimony, attesting that Plaintiff came into his office "and said something to the effect of: 'I think I'm going to get fired. I got into it in the employee cafeteria with Leon [Scott], Carol [Etheridge], and Shawn [Crawford]." <u>See</u> Matesi Affidavit, ¶ 7. Matesi also attests that Plaintiff was visibly nervous about what she had done with respect to her interactions with Scott, Etheridge, and Crawford, and that she did not tell him that those three individuals had raised their voices to her during the interaction that day. <u>See</u> Matesi Affidavit, ¶ 9. Plaintiff has presented no evidence to dispute that this is what Stracey was told by Matesi.[20]

As such, Plaintiff has presented no evidence whatsoever to show that Stracey, the decision maker, had any information other than the version of events that was relayed to him by Matesi, Scott, Etheridge and Crawford at the time he made his decision. Indeed, Plaintiff herself

---

[20]To the extent Plaintiff alleges that she did tell Matesi about the rude actions of Scott and Etheridge, even assuming this assertion to be true for purposes of summary judgment, there is no evidence that Matesi then relayed any such information to Stracey, nor is there any evidence that Matesi himself had any racial animus that would have kept him from relaying that information to Stracey.



testified that she did not provide Stracey with any contrary version of what had happened. <u>See</u> Plaintiff's Deposition, p. 94; <u>see also</u> Stracey Deposition, pp. 180-182. Hence, although Plaintiff may sincerely believe it was wrong for Stracey to have made his decision the way he did, based on the facts the evidence shows he had before him at the time, even if he made the wrong decision (a conclusion this Court need not reach), that is not evidence of race discrimination. <u>Kariotis v. Navistar Intern. Transp. Corp.</u>, 131 F.3d 672, 680 (7th Cir. 1997) ["Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination. Thus, when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection."]; <u>Colbert v. Tapella</u>, 677 F.Supp.2d 289, 295 (D.D.C. 2010)(quoting <u>Hairsine v. James</u>, 517 F.Supp.2d 301, 308-309 (D.D.C. 2007)["[T]he scope of review in employment discrimination cases is more narrow than [Plaintiff] wishes because federal courts are not review boards for local employment decisions . . . . A personnel decision can be silly, it can be unfair, and it can be short-sighted without being illegal; Title VII protects discriminatory decisions, not wrong ones."]).

In sum, other than her own subjective speculation and conjecture, Plaintiff has failed to present any evidence to show that other employees who were not members of her protected class were treated more favorably than she was under similar circumstances. <u>Boden v. U.S. Amada Ltd.</u>, 978 F.Supp. 657, 659 (E.D.N.C. 1997) [former employee's own subjective belief and conclusory statements that he had been discriminated against are not sufficient to raise reasonable inference of unlawful discrimination]. Therefore, Plaintiff has failed to show that her treatment as compared to that of Scott or Etheridge, or any of her other alleged comparators, constituted race discimination.

**Lack of other circumstances giving rise to an inference of unlawful**

29



**discrimination**.  Nor has Plaintiff presented any *other* evidence with respect to her suspension or termination sufficient to give rise to an inference of unlawful discrimination.  Like the Plaintiff, Stracey is white.  Cf. Dungee v. Northeast Foods, Inc., 940 F.Supp. 682, 688 n. 3 (D.N.J. 1996) [that the decisionmaker is member of plaintiff's own protected class "weakens any possible inference of discrimination"]; Elrod, 939 F.2d at 1471 ["[I]t is difficult for a plaintiff to establish discrimination when the allegedly discriminatory decision-makers are within the same protected class as the plaintiff."].  Plaintiff has provided no evidence to demonstrate, or from which this Court could infer, a racial animus on the part of Stracey against her because of her race or against other Caucasians in general.  United States v. Crosby, 59 F.3d 1133, 1135 n. 4 (11th Cir. 1995) ["While we acknowledge that a...violation may occur even where a supervisor or decision-maker is of the same race as the alleged victim....we note that the district court found that there was no evidence that [the decision-maker] held members of his own race to a higher standard of conduct than members of another race."]; Nichols v. Caroline County Bd. of Educ., 123 F.Supp.2d 320, 327 (D.Md. 2000)[Plaintiff's contention that supervisors subjected him to adverse employment actions "because I am who I am" insufficient to establish [discriminatory] character to their disagreements and misunderstandings]; Gairola v. Virginia Dep't of General Services, 753 F.2d 1281, 1288, n. 4 (4th Cir. 1985) [a case should be dismissed "...when the only evidence in support of the plaintiff's...case is based on unfounded conjecture...that [his] disfavorable treatment was the result of discrimination...."]; Rucker v. Greenville Co. Sheriff Dep't., No. 10-1533, 2012 WL 951789, * 2 (D.S.C. March 20, 2012)[Conclusory allegations or denials, without more, are insufficient to preclude the granting of a summary judgment motion].  Nor, as discussed herein, supra, has Plaintiff presented evidence sufficient to create a material issue of fact that any similarly situation African American employees



engaged in comparable conduct to hers and were treated disparately.[21]

Hence, while Plaintiff obviously believes her suspension and/or discharge were not justified, she has failed to present evidence sufficient to establish an inference of racial discrimination with respect to her suspension or discharge, which is the evidence she must have to proceed with this lawsuit. These causes of action should therefore be dismissed. Boden, 978 F.Supp. at 659 [former employee's own subjective belief and conclusory statements that he had been discriminated against are not sufficient to raise reasonable inference of unlawful discrimination]; Sullivan v. River Valley School District, 197 F.3d 804, 815 (6th Cir.1999), *cert. denied,* 530 U.S. 1262 (2000) ["Without a showing that those other reasons were discriminatory, [Plaintiff] cannot establish a prima facie case for relief ...]; cf. Rudolph v. Hechinger, 884 F.Supp. 184, 188 (D.Md.1995) [The discrimination statutes do] not protect against unfair business decisions-only against decisions motivated by unlawful animus"], citing Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1257 (5th Cir.1977); Colbert, 677 F.Supp.2d at 295 (quoting Hairsine v. James, 517 F.Supp.2d at 308–309 ["[T]he scope of review in employment discrimination cases is more narrow than [Plaintiff] wishes because federal courts are not review boards for local employment decisions .... A personnel decision can be silly, it can be unfair, and it can be short-sighted without being illegal; Title VII protects discriminatory decisions, not wrong ones."] ).

---

[21]Plaintiff also makes an argument, both in her testimony and in her brief, that her termination may have been because of the political nature of her comments, rather than her behavior. See Plaintiff's Deposition, p. 80; cf. Stracey Deposition, pp. 187-188. However, even assuming arguendo that she *was* terminated for that reason, that would not support her claim in this lawsuit, as it would not establish that she was fired because of *racial* discrimination. Cf. Rudolph v. Hechinger, 884 F.Supp. 184, 188 (D.Md. 1995) ["Title VII (does) not protect against unfair business decisions - only against decisions motivated by unlawful animus"], citing Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1257 (5th Cir. 1977).



## II.

### (Remaining State Law Claim)

Plaintiff also raises a state law claim for a wrongful termination in violation of public policy.  The Defendant has addressed this state law claim in its brief and urges this Court to grant summary judgment on this claim.  However, if the Court adopts the recommendation set forth herein with regard to Plaintiff's federal claims, her pendant state law claim will be the only claim remaining in this lawsuit, and when federal claims presented in a case are dismissed, any remaining state law claims should ordinarily also be dismissed, without prejudice, in order to allow for state court resolution of such claims under the general doctrine developed in United Mine Workers v. Gibbs, 383 U.S. 715 (1966). See In Re Conklin, 946 F.2d 306, 324 (4th Cir. 1991); Nicol v. Imagematrix, Inc., 767 F.Supp. 744, 746, 749 (E.D.Va. 1991); Mills v. Leath, 709 F.Supp. 671, 675-676 (D.S.C. 1988) [noting that federal courts should generally decline to exercise pendent jurisdiction over remaining state law claim after dismissal of federal claims in a lawsuit]; Carnegie-Mellon v. Cohill, 484 U.S. 343 (1988); Taylor v. Waters, 81 F.3d 429, 437 (4th Cir. 1996). This doctrine recognizes the state court's role in determining whether summary judgment on a state law claim is warranted. Gibbs, 383 U.S. at 726 ["Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well"]; Carnegie-Mellon, 484 U.S. at 350, n. 7 ["[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state law claims."].

Dismissal of this remaining state law claim, without prejudice, will allow the Plaintiff to obtain a ruling as to the viability of this state law claim from a more appropriate forum.  Further,



if this claim was to survive summary judgment, it would be much more appropriate for it to be tried in state court. <u>Lee v. Singleton</u>, No. 11–2983, 2012 WL 1896062 at **18–20 (D.S.C. Jan.9, 2012) [dismissing and remanding unrelated state law claims where they were not related to a federal claim], *adopted by,* 2012 WL 1895998 (D.S.C. May 24, 2012); <u>see also</u> <u>Singh v. New York State Dep't of Taxation & Finance</u>, No. 06–299, 2011 WL 3273465 at ** 20–21 (W.D.N.Y. July 28, 2011), *adopted by,* 865 F.Supp.2d 344 (W.D.N.Y. Oct.25, 2011). Dismissal of this state law claim would also not prejudice the Plaintiff, as the parties could seek a fast track for resolution of these claims at the state level; <u>See</u> Rule 40(c), S.C.R.Civ.P.; and there are no statute of limitations problems because federal law provides for tolling of statutes of limitation for state claims during the period they were pending in federal court and for thirty days afterwards. <u>See</u> 28 U.S.C.A. § 1367(d); <u>Jinks v. Richland County</u>, 538 U.S. 456 (2003); <u>Hedges v. Musco, et al.</u>, 204 F.3d 109, 123–124 (3rd Cir.2000); <u>Beck v. Prupis</u>, 162 F.3d 1090, 1099–1100 (11th Cir.1998) ["a dismissal under section 1367 tolls the statute of limitations on the dismissed claims for 30 days"]; <u>cf.</u> <u>National Federation of Independent Business v. Sebelius</u>, 567 U.S. ___, ___, 132 S.Ct. 2566, 2592 (2012).[22]

### Conclusion

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **granted** with respect to Plaintiff's Title VII disparate treatment discrimination (Second Cause of Action) and § 1981 (Third Cause of Action) claims, and that those claims be **dismissed, with prejudice**. Plaintiff's remaining state law cause of action should then be **dismissed, without**

---

[22]A matter related to the interpretation of § 1367 is currently before the United States Supreme Court in <u>Artis v. District of Columbia</u>, No. 16-940, but the issue before the Supreme Court discusses how to calculate the grace period set forth in § 1367, not whether the initial 30 day filing period applies. <u>See</u> 2015 WL 10891465 (D.C. Aug. 2015).



**prejudice**, in order to allow Plaintiff to pursue this claim in state court, if she desires to do so.

The parties are referred to the Notice Page attached hereto.



_____
Bristow Marchant
United States Magistrate Judge

March 24, 2017
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

