IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| KIMBERLY COLLINS, | ) | Civil Action No.: 2:15-cv-4465-PMD-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S OBJECTIONS TO** |
| vs. | ) | **THE MAGISTRATE JUDGE'S** |
| | ) | **REPORT AND RECOMMENDATION** |
| CHARLESTON PLACE, LLC, | ) | |
| d/b/a BELMOND CHARLESTON PLACE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The plaintiff, by and through undersigned counsel, files the following objections to the Magistrate Judge's Report and Recommendation:

## I. BACKGROUND/NATURE OF CASE

Plaintiff, a Caucasian female, was fired from a job she held for twenty-eight (28) years, with no prior discipline, because of her race and because she expressed political opinions at work. In bringing suit, plaintiff asserted claims for violation of Title VII and violation of 42 U.S.C. § 1981, alleging she was fired because of her race (white). She also brought a claim for wrongful termination in violation of public policy, alleging she was fired for expressing political opinions at work.

The parties engaged in extensive discovery. At the conclusion of discovery, defendant filed a Motion for Summary Judgment, seeking to dismiss all of plaintiff's claims. Plaintiff filed an extensive Response Brief to defendant's Motion which plaintiff hereby incorporates herein.

On or about March 24, 2017 the Magistrate Judge issued a Report and Recommendation recommending that defendant's Motion be granted as to plaintiff's Title VII

1

and § 1981 reverse race discrimination claims and that those claims be dismissed with prejudice. The Magistrate Judge further recommended that plaintiff's state law claim be dismissed without prejudice in order to allow plaintiff to pursue that claim in State Court. For the reasons set forth below, the Report and Recommendation should be reversed.

The question facing triers of fact in discrimination cases is both sensitive and difficult in that there will seldom be eyewitness testimony of the employer's mental process. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 141 (2000). Thus, it is important to carefully analyze all of the plaintiff's circumstantial evidence in a discrimination case. As stated, plaintiff filed a detailed, exhaustive Response Brief detailing a wealth of strong circumstantial evidence which the Magistrate Judge either ignored or construed (inappropriately) in the defendant's favor. Without repeating those facts herein, the essence of plaintiff's claim involves the following:

❖ Collins worked at defendant for twenty-eight (28) years with absolutely no discipline. It is undisputed she was an exemplary employee;

❖ The defendant's Director of Rooms, Leon Scott ("Scott"), is African-American and also a long-time employee. He was Chair of the Urban League and, in or around 2014, he engaged in a campaign of accusing white employees of race discrimination. He also has a long history of being rude, insubordinate and flat out combative to his (and plaintiff's) supervisor, Paul Stracey ("Stracey"), the General Manager of the hotel, who is Caucasian. Scott's rudeness and insubordination to Stracey and others went unpunished except for a written warning when defendant accused him of bringing a gun to work then lying about it;

❖ On or about April 4, 2015, Walter Scott, an African-American, was shot and killed in North Charleston, South Carolina, by a Caucasian police officer, Michael Slager. The incident received local, national and international coverage and intensified debate about race relations everywhere-including within defendant's hotel;

❖ On or about April 13, 2015, Black Lives Matter staged a protest at defendant's hotel in Charleston, South Carolina.

The protest found its way into the Palmetto Café, a restaurant in defendant's hotel. By all accounts, the protest was loud. By some accounts it was aggressive and disruptive;

❖ After the protest Collins uttered the following words, in a passionate but appropriate manner, to three (3) African-Americans (one of which was Scott) in the employee cafeteria as it was closing:

   o That she did not understand why they and the protestors were so upset. That this was not a situation like the one in Ferguson, Missouri; that here the North Charleston Police Officer who shot [Walter] Scott was swiftly arrested, charged with murder, and put behind bars and that she was in agreement with how the North Charleston Police Department handled the matter. (Ex. 6, Plf. depo. pp. 40-41, 63);

   o That the United States had not been more racially divided than it had the past seven (7) years since President Obama was elected. (Ex. 6, Plf. depo. pp. 39-40);

   o That a diversity training class which defendant made its employees attend only made race relations worse at the hotel; that the attorney providing the training brought up Ferguson, Missouri; that Ferguson had nothing to do with Charleston Place employees; and that after the speaker brought Ferguson up in the training, the whole dynamic of the table changed; it became uncomfortable and race relations changed for the worse after that in the room. (Ex. 6, Plf. depo. p. 65);

   o That it was courageous for the three African-American jurors in the Ferguson, Missouri case to vote against prosecuting a white police officer who shot a black person. (Ex. 7, Plf. Aff. para. 18); and

   o She asked Scott why he "comped" or tried to "comp" Al Sharpton for his stay at the hotel in the aftermath of the shooting. (Ex. 6, Plf. depo. pp. 35, 69).

3

❖ On April 21, 2015, plaintiff was fired for uttering the above words in the cafeteria.

In bringing her race discrimination claims under Title VII and § 1981, plaintiff relied upon the racial tension at the hotel from Scott's repeated and frivolous racial complaints against white employees; racial tension in the hotel created by the Walter Scott shooting and the Black Lives Matter protest; a wealth of comparator evidence involving Scott and others; and a wealth of other circumstantial evidence.  In dismissing plaintiff's Title VII and § 1981 claims, the Magistrate Judge ruled that plaintiff could not satisfy the fourth element of a prima facie race discrimination claim. For the reasons set forth below, the Magistrate Judge erred.

## II.  OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**(i)  The Magistrate Judge erred on page 15 of the Report and Recommendation by holding that plaintiff is required to show she was replaced by someone outside of her protected class.**

On page 15 of the Report and Recommendation, the Magistrate Judge suggests that plaintiff must show she was replaced by someone outside of her protected class to prove the fourth element of a prima facie race discrimination claim.  This is an erroneous statement of the law.  The easy answer is that, since plaintiff relies upon comparator evidence and other evidence which gives rise to an inference of discrimination, she is not required to show she was replaced by someone outside of her own class.

The *McDonnell Douglas* proof scheme is intended to provide flexibility so that it is adaptable to the needs of the myriad of cases in which it is applied.  *Callwood v. Dave & Busters, Inc.*, 98 F.Supp.2d 694, 704 (D. Md. 2000) (*citing Brinkley v. Harbour Rec. Club,* 180 F.3d 598, 611 (4th Cir. 1999).   In *Brinkley,* the Fourth Circuit acknowledged that the *McDonnell Douglas* framework should not be applied in a rigid, mechanized or ritualistic manner.  *Id.* at 611.

4

While proof that a plaintiff is replaced by someone outside his protected class is one way to establish the fourth element of a prima facie discrimination claim, it is not the only way. The fourth element can also be established by using comparator evidence or other evidence that establishes an inference of discrimination. Indeed, the Fourth Circuit has held repeatedly that the fourth element of a plaintiff's prima facie discrimination claim can be established by comparator evidence. For example, in *Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124, 133 (4th Cir. 2002), the Fourth Circuit held that, to establish a prima facie case, the plaintiff had to establish that (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he was fired; and (4) **other employees who are not members of the protected class were retained under apparently similar circumstance.** (emphasis supplied). According to the *Bryant* case, those were the only elements a plaintiff had to establish to prove a prima facie case of race discrimination.

The Fourth Circuit again sanctioned the use of comparator evidence to satisfy the fourth element of a prima facie race discrimination case in *Haywood v. Locke,* 387 F.Appx. 355, 359 (4th Cir. 2010). In *Haywood,* the Fourth Circuit, citing *Bryant,* stated that a plaintiff is not, as a matter of law, required to use comparator evidence to establish the fourth element of a prima facie discrimination case, but that a plaintiff certainly may do so and, if they do, **"The validity of their prima facie case depends upon whether that comparator is, indeed, similarly situated."** (emphasis supplied). *See also Young v. CareAlliance Health Servs.,* 2014 U.S. Dist. LEXIS 137140 (D.S.C. 2014) (holding that the fourth element of plaintiff's race discrimination claim can be satisfied by comparator evidence). Similarly, the Fourth Circuit has also held that to establish a prima facie case of race discrimination in the enforcement of employee disciplinary measures (as is the case here), the plaintiff must show (1) that he is a member of a protected class; (2) **that the prohibited conduct in which he engaged was comparable in**

5

**seriousness to misconduct of employees outside the protected class;** and (3) **that the disciplinary measures enforced against him were more serious than those enforced against those other employees.** *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir. 1993). (emphasis supplied). Otherwise, just about every circuit to have addressed the issues has held that a plaintiff need not prove, as part of her prima facie case, that she was replaced by someone outside of the relevant class. *Pivirotto v. Innovative Sys.,* 191 F.3d 344, 353 (3rd Cir. 1999). In the Report and Recommendation, the Magistrate Judge at page 12 even correctly identified that a plaintiff could establish the fourth element of her prima facie case by use of comparator evidence.

The Magistrate Judge at page 15 of the Report and Recommendation relies on the *Miles* case in support of his conclusion that the failure to prove replacement by a person outside of the plaintiff's protected class is fatal. *Miles v. Dell, Inc.,* 429 F.3d 480 (4th Cir. 2005). This is a misreading of *Miles.* On the contrary, *Miles* specifically holds that any requirement that a plaintiff prove replacement outside their protected class is <u>not</u> dictated by Supreme Court precedent; that the fourth prong of the prima facie case set forth by the Supreme Court in *McDonnell Douglas* did not require the plaintiff to show the person ultimately hired by defendant was outside the plaintiff's protected class; and that the prima facie elements suggested in *McDonnell Douglas*…was never intended to be rigid, mechanized or ritualistic. *Miles Id.* at 485, 486-487. All *Miles* stands for is that, if a plaintiff is seeking to establish the fourth element of a prima facie race discrimination claim by showing replacement by someone outside of plaintiff's class, that there are exceptions that would allow a plaintiff to bypass this element. *Miles* says nothing about comparator evidence.

Here, plaintiff seeks to use comparator evidence to establish the fourth element of her prima facie case. This method has been repeatedly approved by the Fourth Circuit.

There is not a single case that holds a plaintiff is required to establish both comparator evidence and replacement outside her protected class to make out a prima facie case. At the absolute most, replacement of a plaintiff with someone of the same protected class is merely circumstantial evidence the defendant is free to use to prove a lack of animus against the plaintiff. Nothing more, nothing less. However, as in any case, this one bit of circumstantial evidence favoring the defendant is not enough, on its own, to utterly destroy plaintiff's claim.

**(ii)    The Magistrate Judge erred at pages 17-29 of the Report and Recommendation by holding that plaintiff did not establish the fourth element of her prima facie case because she failed to produce valid comparator evidence. In so holding, the Magistrate Judge construed the law on comparator evidence too narrowly and failed to construe evidence and the inferences arising therefrom in plaintiff's favor, as required by Rule 56, FRCP. Plaintiff has produced compelling comparator evidence.**

**(a)    Comparators**

In evaluating comparator evidence, it is important to identify the defendant's stated reason for the discharge. Here, defendant states it fired Collins "because of her unprofessional and unacceptable workplace behavior towards three members of management on April 13, 2015" in the cafeteria. (Ex. 8, Defs. Ans. to Plf. First Interrogs. #13). Defendant essentially says Collins was overly aggressive in delivering her message on the day in question. (Ex. 2, P. Stracey depo. p. 180). Defendant has never contended that it fired plaintiff for insubordination in the traditional sense, i.e., that plaintiff refused to follow a direct order from a supervisor. There is no such evidence in this case. That is an important point overlooked in the Report and Recommendation. Of course, Collins adamantly denies she delivered her message in a rude or insubordinate fashion. Collins contends (and compelling evidence supports her contention) that she was fired for what she said, not how she said it (and because of her race). Nevertheless, there is strong evidence that when African-Americans engaged in the same

alleged conduct as plaintiff, they were treated more favorably. This evidence involves the following comparators:

**(1)  Leon Scott (African-American)**

(a)    In 2014, Stracey (Scott's direct supervisor) directed Scott and another employee, Sandra Manigault, to start working the evening shift. Scott flat out refused the directive, telling Stracey "No, no, no, no no. This isn't going to work" and "We are not doing this." When Stracey reiterated the order to Scott, Scott said "I don't have to do any of this" and threatened to resign. Scott never did work the evening shift, and his blatant insubordination went entirely unpunished. (Ex. 5, L. Scott depo. pp. 36-43; Ex. 2., P. Stracey depo. p. 109).

(b) On or about October 11, 2014, Scott sent a rambling, insubordinate email to Stracey, bemoaning that he has an "Uncle Tom" reputation among his associates at defendant; that Rhonda Millard ("Millard"), an Executive Housekeeper working under him, would not recognize him as her boss; and that "It's 2014. A simple diversity class is not a fix." When Stracey reminded Scott that Scott had been a supporter of Millard and questioned Scott as to whether Scott had addressed the issue in Millard's performance evaluations, Scott shot back with another rambling email, stating in part, "…What a sucker I was but never again. Your bullying ME is over. I will be bullied by no one." Stracey forwarded the email to Jennifer Casselli ("Casselli"), defendant's Director of Human Resources, and Ann Robertson, the defendant's Compliance Officer, stating "After this last **insubordinate** rant I don't think it is wise to try and reason with Leon over the Yolanda case." (emphasis supplied). Casselli testified that Scott's emails to Stracey were "unreasonable" and "unprofessional." (Ex. 4, J. Casselli depo. pp. 224-225). Again, Scott was not disciplined for the incident. (Ex. 4, J. Casselli depo. pp. 220-224 and exhibit 33 thereto).

8

(c) On or about November 4, 2014, Scott told Mickey Bakst ("Bakst") the Restaurant Manager at defendant, that he (Scott) was going to take the whole place down and that he was going to start with Paul Stracey. (Ex. 2, P. Stracey depo. pp. 116-117). When Bakst relayed the threat to Stracey, Stracey filed a Speak up Report against Scott. In the report, Stracey states:

> He said (Leon Scott) they have no idea what I can do. He said he was from a place no one knew and he had watched someone get killed when he was 5 and he did bad things and still can. **He hated Paul Stracey and would not stop until he was gone.** (Ex. 4. J. Casselli depo., pp. 225-228 and exhibit 34 thereto).

Incredibly, Scott was not disciplined for his threat of violence against his direct supervisor. (Ex. 4, J. Casselli depo. p. 228).

(d) On or about December 24, 2015, Stracey learned from an employee Annette Sandford-Lopez ("Sandford-Lopez") that Scott had a gun on the work premises. Possessing a firearm on the premises is a terminable offense. (Ex. 2, P. Stracey depo. p. 124 and exhibit 10 thereto, pp. 79-82 of handbook). Stracey reported the matter to Casselli, and Casselli filed a Speak up Report against Scott in regard to the incident. Casselli's Speak up Report states, "Leon is carrying and showed a manager a weapon that he had on his hip at work in the hotel…." She further indicated that the incident occurred about a week ago but that she just became aware of it. (Ex. 4, J. Casselli depo. pp. 164-175, and exhibit 25 thereto). That same day (December 24, 2015) Robertson instructed Casselli to speak with the witness, Sandford-Lopez, and to then question Scott. When Casselli spoke to Sandford-Lopez, Sandford-Lopez confirmed that she saw Scott with a gun. (Ex. 4, J. Casselli depo. pp. 181-182). When Casselli confronted Scott, he denied he had a gun at work, but he did say he recently obtained a concealed weapon permit. (Ex. 4, J. Casselli depo. pp. 177-178). Thereafter, an investigation took place. (Ex. 3, C.

Etheridge depo. p. 106; Ex. 4, J. Casselli depo. pp. 182-184). Carol Etheridge ("Etheridge"), the defendant's Regional Human Resource Director, and Robertson conducted the investigation. In the course of the investigation, Sandford-Lopez confirmed to Etheridge that she saw a gun on Scott. Sandford-Lopez also provided a written statement which, in pertinent part, stated that Scott told her he recently obtained his weapons permit and then "lifted his jacket away from his body to show a gun that was attached to his beltline…." (Ex. 3, C. Etheridge depo. pp. 96-104; Ex. 4, J. Casselli depo. pp. 184-188 and exhibit 27 thereto). Moreover, a bellboy, Robert Asten, also stated that Leon spoke and kidded about having a gun at work. (Ex. 3, C. Etheridge depo. pp. 104-105). Throughout the investigation, Scott continued to deny he had a gun at work but offered a multitude of excuses for why he would need one. By this time, Collins and Millard had both been fired and Scott had recommended termination for both of the employees. In attempting to defend himself from charges that he had a gun at work, Scott claimed he feared for his safety and referenced both Collins and Millard in a bizarre email string to Casselli dated December 28, 2015 at 8:48 a.m. In the email, Scott speaks about Collins' young son's Facebook page and falsely equates plaintiff's son to Dylann Roof. In the same email, he speaks about Millard having "Russian connections" and an "armed family." (Ex. 4, J. Casselli depo. pp. 193-200 and exhibit 28 thereto). In another email dated the same day at 11:32 a.m., Scott talks about constantly looking over his shoulder at work; parking at different locations at work; and how "any Russian accents get my attention." *Id.* at 201. In deposition, Scott testified he felt threatened because of his role in the Urban League and because of the Dylann Roof shootings. (Ex. 5, L. Scott depo. pp. 76-77). Before these emails (and before being accused of having a gun at work) Scott never complained to Stracey or Casselli that he felt threatened at work. (Ex. 2, P. Stracey depo. pp. 128-129; Ex. 4, J. Casselli depo. p. 196).

Despite the seriousness of the allegations, Scott was not suspended during the investigation and, instead, was allowed to work. (Ex. 5, L. Scott depo. p. 70). Ultimately, Stracey gave Scott a written warning for (1) possessing a weapon at work and for (2) lying during the investigation. Stracey-with good reason-did not believe Scott. Stracey believed Scott really did have a handgun at work. (Ex. 2, P. Stracey depo. pp. 121-124 and exhibit 13 thereto). The decision to provide Scott with a written warning instead of termination was made by Stracey, Etheridge, Robertson and in-house counsel, Rich Levine. (Ex. 2, P. Stracey depo. p. 131).

(e) In 2014 Scott sent an inappropriate email to Casselli telling her people at the hotel did not feel comfortable with her or trust her because she is white. Casselli found this email to be false and rude. Scott was not disciplined for sending it, despite the fact that Casselli complained. (Ex. 4, J. Casselli depo. pp. 39-45).

**(2)  African-American Employee "X"**

Employee X is an African-American hired in February of 1997 as a server in the defendant's Palmetto Café. She reported to Mike Barto ("Barto"), the Palmetto Café Manager. Barto reported to Geno Matesi ("Matesi"), the Director of Food and Beverage, and Matesi reported to Stracey. (Ex. 4, J. Casselli depo. pp. 116-118). On or about May 17, 2011, Employee X was suspended for three (3) days because many of her coworkers complained to Matesi and Casselli that she was creating a hostile and unpleasant work environment by being rude and condescending to them. According to the written discipline, some of the employees "have even stated that they called off work in order to avoid working a shift with you." The suspension notice further stated that "According to your employment file, this would be your **third** written documentation within one year and, therefore, we must suspend you for 3 consecutive days. Any further violations of any company policy will result in the termination of your

employment." (emphasis supplied). The discipline notice was signed by Casselli, but Stracey, Casselli and Matesi made the decision to give Employee X the final warning and suspension. (Ex. 4, J. Casselli depo. pp. 123-125 and exhibit 12 thereto). Then, on or about April 16, 2015, defendant terminated Employee X because on April 15, 2015 she "engaged in an argument with a coworker that, according to witnesses, became aggressive. This argument ended with an employee walking off the job in order to remove themselves from the situation." The termination notice states "You were previously placed on suspension with a final warning in 2011 for the same infraction." Again, Casselli signed the termination notice, and Stracey, Casselli and Matesi made the decision to terminate Employee X. (Ex. 4, J. Casselli depo. pp. 119-123, 129-131 and exhibits 11 and 13 thereto). Etheridge and Scott had input into the decision. (Ex. 4, J. Casselli depo. pp. 122-123).

Defendant uses Employee X as a comparator for the proposition that it did not discriminate against plaintiff, since it fired Employee X (an African-American) around the same time it fired Collins for a similar offense. (Def. brief, p. 16). At the same time, defendant wholly ignores the fact that, unlike Collins, Employee X received two (2) written warnings and then a final written warning and suspension before her termination. This admission by defendant - that Employee X is a comparator - makes her one. The Magistrate Judge wholly ignored this admission.

**(3)  Caucasian Employee "Y"**

Employee Y, who is Caucasian, was a pastry cook at defendant. He reported to Chris Ryan ("Ryan"), the Executive Pastry Chef. Ryan reported to Matesi and Matesi reported to Stracey. On or about September 25, 2013, Employee Y was terminated for having a handgun at work. Casselli signed the termination notice, but the termination decision was made by Stracey, Casselli and Matesi. (Ex. 4, J. Casselli depo. pp. 131-145, and exhibits 14, 15, 16, 17 and

12

18 thereto).   As with Scott, there was an investigation prior to Employee Y's termination. However, unlike Scott, Employee Y was sent home and not allowed to work while the investigation was pending.  (Ex. 4, J. C  asselli depo., pp. 141-142).  And, unlike Scott, Employee Y did **not** have any prior discipline in his file.  (Ex. 4, J. Casselli depo. p. 142).

### (4)  Scott/Etheridge (African-American)

Both Scott and Etheridge expressed their political opinions in aggressive ways, but were not fired or even disciplined.  In describing the protest in his April 13, 2015 email, Scott opined "This particular group is well guided and respectful."  Coming from the Chair of the Urban League, this certainly does express a political opinion.  As for Etheridge, plaintiff testified that Etheridge instigated the incident in the cafeteria by aggressively telling plaintiff that plaintiff should not have sent the emails to the large group customers.  Moreover, during the exchange in the cafeteria on April 13, 2015, Etheridge engaged Collins in dialogue by telling her not all people view the President the same way Collins did and by accusing Collins of not being supportive of her in past racial protests at the hotel.

### (b)  Comparator Law

From a legal standpoint, a showing that the employer treated a similarly situated employee differently is a common and especially effective method of establishing a prima facie case of discrimination.  *McGuiness v. Lincoln Hall,* 263 F.3d 49, 53 (2nd Cir. 2001).  The similarly-situated analysis calls for a "flexible, common-sense" examination of all relevant factors.  *Coleman v. Donahoe,* 667, F.3d 835, 840 (7th Cir. 2012).  Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way.  *Id.* at 846.  So long as the distinctions between the plaintiff and the proposed comparator are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied.  *Id.*  The Supreme Court has cautioned that

precise equivalence between employees is not the ultimate question. *McDonald v. Sana Fe Trail Transp. Co.,* 427 U.S. 273, 283 n.11 (1976). The touchstone of the similarly-situated inquiry is simply whether the employees are comparable. *Id.* As one court put it, we are looking for comparators, not clones. *Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908, 916 (7th Cir. 2010). Otherwise, whether two employees are similarly situated ordinarily presents a question of fact for the jury. *Coleman,* 667 F.3d at 846-847; *George v. Leavitt,* 407 F.3d 405, 414-415 (D.C. Cir. 2005).

Generally, to be similarly situated the employees outside of the protected class must have dealt with the same decision maker, been subject to the same standards, and have engaged in the same conduct without mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it. *Taylor v. Millennium Corp.,* 2016 U.S. Dist. LEXIS 28174 at *19 (E.D. Va. 2016); *Surratt v. Apple Gold, Inc.,* 2012 U.S. Dist. LEXIS 178740 at *25 (W.D.N.C. 2012); *Cole v. Lexington-Richland Sch. Dist. 5,* 2010 U.S. Dist. LEXIS 141174 at *10 (D.S.C. 2010). In evaluating these factors, the court must consider the record as a whole, rather than examining one isolated piece of evidence out of context. *Cole,* 2010 U.S. Dist. LEXIS 141174 at *12 (citing *Edwards v. Newport News Shipbuilding & Dry Dock Co.,* 1998 U.S.App. LEXIS 30857 at *8 (4th Cir. 1998). Moreover, the comparator's conduct need only be of comparable seriousness to the plaintiff's conduct - it does not need to be an identical offense. *Id. at *12 (citing *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir. 1993); *Blunt-Ferguson v. Agape Cnty. Hospice of the Pee-Dee, Inc.,* 2015 U.S. Dist. LEXIS 23097 at *16 (D.C.S. 2015). Likewise, the comparator need not hold an identical position to the plaintiff. *Taylor,* 2016 U.S. Dist. LEXIS 28174 at *19 (citing *Bateman v. Am. Airlines, Inc.,* 614 F.Supp.2d 660, 674 (E.D.Va. 2009).

To this point, Collins was the only one at defendant's hotel that held her particular position. This fact needs to be considered when evaluating which employees would be a valid comparator. *See Taylor,* 2016 U.S. Dist. LEXIS 28174 at *19 (if any employee in a

unique position was required to only use those in the same position as comparators, it would be virtually impossible for that employee to make out a prima facie case). Indeed, courts have not hesitated to hold that employees in different positions, even employees in supervisory and non-supervisory positions, make strong comparators. *White v. Duke Energy Ky., Inc.,* 603 Fed.Appx. 442, 448 (6th Cir. 2015) (holding that management employee plaintiff and non-management employee were valid comparators where policies invoked in terminating plaintiff did not make any meaningful distinctions between management and non-management employees); *Rodgers v. White,* 657 F.3d 511, 518 (7th Cir. 2011) (holding that plaintiff and plaintiff's direct supervisor were valid comparators and further stating that, when uneven discipline is the basis for a discrimination claim, title and rank are not dispositive, rather the most relevant similarities are between the employee's alleged misconduct, performance standards, and the disciplinary supervisor); *Coleman v. Donahoe,* 667 F.3d 835, 848-849 (7th Cir. 2012) (holding that plaintiff, a maintenance support clerk, and two maintenance mechanics were valid comparators, even though they had different job titles and duties and recognizing that, where the issue is misconduct (as opposed to performance), comparisons between employees with different positions is likely to be more useful); *Lathem v. Department of Children & Youth Servs.,* 172 F.3d 786, 793 (11th Cir. 1999) (holding that plaintiff, a part-time intake officer, and her direct supervisor, a unit director, were valid comparators and stating "The relevant  inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to the same employment policies"); *George v. Leavitt,* 407 F.3d at 414-415 (holding a probationary employee (plaintiff) is similarly situated to at-will, non-probationary employees); *Johnson v. United States Capitol Police Bd.,* 2005 U.S. Dist. LEXIS 13811 at *9-11 (D.D.C. 2005) (holding that plaintiff, an accountant in defendant's accounting section, was similarly situated to a purchasing agent in defendant's procurement section); *Cole,* 2010 U.S. Dist. LEXIS 141174 at *20-

24 (holding that the plaintiff, a principal, is similarly situated to an assistance principal and to plaintiff's direct supervisor, the Chief Instructional Officer).

In analyzing the comparator evidence here, it is important to focus on the following:

- ❖ Review of the entire record as a whole; *Taylor;*

- ❖ That title and rank are not dispositive and that this is especially true in cases where, as here, the alleged offense is misconduct rather than performance; *Rodgers, Coleman;* and

- ❖ That in such cases, the most relevant focus is on whether the plaintiff and her comparators dealt with the same decision maker; whether they engaged in similar offenses; and whether they were subject to the same disciplinary policies; *White, Rodgers, Coleman, Lathem.*

Given the above, it is crystal clear that Collins and Scott are extremely strong comparators. They both reported to the exact same supervisor - Stracey. They were both subject to the same discipline policies in defendant's handbook, including policies on insubordination (Offense 3), furnishing false information (Offense 16), failure to maintain satisfactory…working relations with…other associates (Offense 22), using abusive or threatening language (Offense 24), verbal altercations (Offense 25), handguns (Offense 27) and dishonesty (Offense 30). (*See* Ex. K to Def. Motion). Indeed, the discipline given by Stracey to Scott for having a handgun at work and lying about it during the investigation states "The Hotel's Handbook provides a list of certain conduct which may result in disciplinary action, up to and including termination." The discipline goes on to site Offense 27 regarding handguns and Offense 30 regarding dishonesty. **Thus, there can be no dispute that plaintiff and Scott were subject to the very same work rules found in defendant's handbook.** Finally, Collins and Scott both engaged in the same alleged conduct - unprofessional and unacceptable

workplace conduct - although Scott's behavior was far more serious, as he engaged in repeated instances of flat-out insubordination and unprofessional conduct, including alleged threats of violence to his supervisor.

Despite this strong comparator evidence, the Magistrate Judge erroneously held that plaintiff's comparators were not valid. As to Scott's threat of physical violence against Stracey - that "he did bad things and still can" and that he "hated Stracey and would not stop until he was gone" - the Magistrate Judge held it did not involve the kind of insubordination or confrontational conduct plaintiff engaged in. (R&R p. 24 n.19). That is not a valid distinction. Collins never engaged in insubordination. All plaintiff did was express benign political opinions of a conservative nature to persons who did not supervise her. She never refused to carry out an order from her supervisor, and she never, ever, threatened Scott, Crawford, or Etheridge with physical violence, or in any other fashion. Moreover, plaintiff testified she was calm and composed when she made her remarks in the cafeteria. In contrast, Scott threatened his direct supervisor in an extremely aggressive manner. The fact that Scott made his serious threat of harm towards Stracey to the restaurant Manager instead of to Stracey face-to-face does not distinguish it from plaintiff's incident in the cafeteria. Indeed, the fact Scott made his threat indirectly to Baskt makes it more sinister. Significantly, while Scott's conduct is more serious than plaintiff's alleged conduct, both incidents implicate the same rules in defendant's handbook: Rule 22, "failure to maintain satisfactory…working relations with…other associates," Rule 24, "using…abusive or threatening language," and Rule 25, "…verbal altercations toward fellow associates." None of these rules, which apply to both Scott and plaintiff, makes any distinction between whether the threat or conduct is made directly or indirectly (through another associate) to the intended victim. Nothing in defendant's work rules distinguishes Scott's alleged behavior from plaintiff's alleged behavior.

17

As to Scott's refusal to work the night shift, that was flat out insubordination in the traditional sense. He refused a direct order from his direct Supervisor, Stracey. The Magistrate Judge distinguishes this indistinguishable circumstance by stating that Scott's insubordination was somehow linked to discrimination. (R&R p. 22). No it was not. Scott never complained to Stracey at the time Stracey directed him to work the night shift that the directive was discriminatory. That is undisputed. (Ex. 5, L. Scott depo. p. 39). When Scott was asked in deposition whether he reported the incident to management, he testified that he reported it to Etheridge. When asked if he raised the issue of race in relation to the report, Scott testified "I don't think I did. I can't recall but I don't think so." When asked the same question again, Scott testified "I could have." (Ex. 5, L. Scott depo. pp. 42-43). Etheridge testified under oath that, when Scott made the complaint to her, he did <u>not</u> say anything about race. (Ex. 3, C. Etheridge depo. pp. 67-70). Thus, it was err for the Magistrate Judge to find that Scott's insubordination was different than plaintiff's incident because Scott's circumstance involved a complaint of discrimination. It did not. To hold otherwise ignores evidence and the proper standards applicable under Rule 56, FRCP, which states the non-moving party should receive the benefit of inferences arising from the evidence.

It is undisputed that Scott's insubordinate behavior did not involve any racial complaints at all - he just said "No, no, no, no, no….we are not doing this" in response to Stracey's directive that he work a different shift. At that point Stracey could have (and should have) disciplined Scott as he saw fit because there was no protected activity in Scott's aggressive insubordination to his direct Supervisor.

As to Scott's October 11, 2014 email where he tells Stracey that Stracey used him for twenty (20) years and he further accuses Stracey of being a bully, the Magistrate Judge opines this is the closest plaintiff comes to producing comparator evidence. But the Magistrate

Judge holds that this evidence fails because Scott "did not make his comments to Stracey in front of anyone, nor did he engage in a face-to-face confrontation." (R&R p. 23). These are not distinguishing facts. Plaintiff did not make her comments in front of anyone either. She made her remarks directly to Crawford, Scott and Etheridge. According to plaintiff's testimony, the cafeteria was closed and no one else was around. (Ex. 6, Plf. depo. p. 50). Plaintiff also testifies her remarks were made in a calm, appropriate manner. (Ex. 6, Plf. depo. pp. 28, 33). To suggest otherwise is to ignore the inferences plaintiff is entitled to at the Summary Judgment stage under Rule 56, FRCP. And, whether an insubordinate rant is done face-to-face or via email cannot in any rational analysis be distinguishable. Inappropriate or unprofessional language carries the same amount of venom regardless of how it is transmitted. An email from plaintiff's counsel's paralegal calling him an irritable scoundrel would be just as offensive if she walked into his office and uttered the same words (though they may be true). The point being that Stracey himself characterized Scott's emails as an "insubordinate rant." And Casselli, for her part, testified the email was "unreasonable and unprofessional." Unprofessional conduct is exactly what defendant accuses the plaintiff of. And again, the applicable work rules in defendant's handbook do not distinguish between face-to-face insults or those carried out over the computer.

Finally, the Magistrate Judge distinguishes Scott's "insubordinate rant" because he says it constitutes a complaint of discrimination. This, too, is err. There is no evidence of that and to suggest otherwise ignores the inferences the plaintiff is entitled to under Rule 56, FRCP. On its face, the email begins with Scott, in a confusing manner, complaining about Rhonda - the Executive Housekeeper under him. Significantly, Stracey reminds Scott that he (Scott) was a massive supporter of Rhonda's and he also asks Scott whether Scott mentioned anything about Rhonda's alleged disrespect in the performance evaluations Scott gave her - a

perfectly reasonable response by a supervisor to a subordinate. Scott responds in another confusing email calling Stracey a bully. It is hard to see a complaint of discrimination in the said email.

As to Scott's 2014 email to Casselli (defendant's Director of Human Resources) telling her, without any details or information, that people at the hotel did not trust her because she is white, the Magistrate Judge held this was not similar to plaintiff's situation because it "did not involve any type of confrontation between the two, nor was Casselli Scott's supervisor." This is err. Casselli may not have been Scott's supervisor, but she was the Director of Human Resources at defendant's hotel. At the same time, none of the people plaintiff spoke to in the cafeteria were her supervisors either. Plaintiff did not report to Scott, Crawford or Etheridge. She reported to Stracey. That is not in dispute. And, Scott's rude or inappropriate behavior is not distinguishable from plaintiff's just because he used email to communicate as opposed to saying it to Casselli's face. Casselli certainly testified that the email "furrowed [her] brow" - much like plaintiff's speech apparently furrowed the brows of Scott, Etheridge and Crawford. And, the cafeteria was closed and no one else was around when plaintiff made her remarks to those present.

The Magistrate Judge also erred in holding that Scott and Etheridge's expression of their own political opinions around or at the time of the cafeteria incident did not constitute comparator evidence. In this regard, Scott sent an email out after the protest expressing his opinion that the protestors were "well guided and respectful." And, Etheridge engaged plaintiff in dialogue during the cafeteria incident by admonishing plaintiff for sending letters to customers assuring them there would not be protests at the hotel, and by telling plaintiff that not all people hold the same views as plaintiff about President Obama, and accusing plaintiff of not supporting her during past protests by African-Americans. The Magistrate Judge ruled

Scott and Etheridge could not be comparators because they held different, higher, positions than plaintiff. This is err in light of overwhelming case law cited above holding that persons in different (and even higher) positions can be comparators - especially when the issue is misconduct as opposed to performance. The Magistrate Judge also erroneously held that Etheridge and Scott, as plaintiff's supervisors, could never be insubordinate to the plaintiff. However, neither Scott nor Etheridge were plaintiff's supervisor. And, the conduct plaintiff is charged with is not traditional insubordination. Instead, plaintiff is charged with being unprofessional. As such, Scott and Etheridge certainly could violate a work rule for being unprofessional or inappropriate to plaintiff. The pertinent work rules on inappropriate or unprofessional behavior apply to all employees, without distinction as to their position. Finally, the Magistrate Judge holds that Stracey, the decision maker, was not aware of the conduct. He was certainly aware of Scott's email. And, if he was unaware of Etheridge's remarks, it is because he refused to get plaintiff's side of the story.

        As to Employee X who, unlike plaintiff, received the benefit of written warnings and a suspension before being fired for repeated instances of rude and/or unprofessional conduct, the Magistrate Judge held she was not a proper comparator because there was no evidence she was rude to her supervisor. Again, this narrow view of comparator evidence is err. To be sure, plaintiff was never accused of rude behavior towards her supervisor, Stracey. She was charged with being rude or inappropriate to three employees who were not her supervisors. Crawford, Etheridge and Scott may have held higher positions than plaintiff, but they were not her supervisors. Plus, the work rules which plaintiff and Employee X are accused of violating do not distinguish who the offending behavior needs to be directed towards in order to constitute a violation. Work Rule 22 relates to failure to maintain satisfactory and harmonious working relations with "other associates." And, Work Rule 25 addresses verbal

altercations "toward fellow associates." (See Def. exhibit K, handbook). Thus, plaintiff and Employee X are both charged with violating the same work rules and committing the same offense.

More importantly, the defendant itself identified Employee X as a comparator in its Brief to this court. In doing so, the defendant argued that its termination of Employee X, an African-American, for engaging in the same conduct as plaintiff was proof that it did not discriminate against plaintiff. Specifically, in referring to Employee X defendant says, "Moreover, another non-Caucasian employee has been terminated for **similar aggressive behavior**." (Def. Brief p. 16). (emphasis supplied). This admission forecloses any finding that Employee X is not a comparator. The Magistrate Judge wholly ignored this compelling admission/evidence and erred in ruling that Employee X is not a comparator.

The Magistrate Judge also erred when he ruled that Scott bringing a handgun to work and lying about it, in conjunction with Employee Y (a white employee fired for having a gun at work), did not constitute valid comparator evidence. To be sure, this evidence, without Employee Y, is valid comparator evidence. A witness saw Scott with a gun in his possession at work. When confronted, Scott lied about it. These two terminable offenses are particularly egregious given Scott's prior threat of physical violence to Stracey. Yet Stracey only wrote Scott up for the offense. In so disciplining Scott, Stracey stated that Scott lied about having the gun at work during the defendant's investigation into the offense. These offenses are somewhat different than the offense plaintiff is changed with. Indeed, they are far more serious. But they are of comparable seriousness because Scott and plaintiff's offenses are all potentially terminable offenses. Employee Y is added to the mix to tighten the comparison. He is a Caucasian employee, caught with a gun at work. Unlike Scott, he was suspended during the investigation; unlike Scott, he was immediately fired; unlike Scott, he had no prior discipline in

his file; and, unlike Scott, he told the truth to management when confronted about his offense. And, of course, Stracey was one of the decision makers for Employee Y's discharge. Thus, it is, in all respects, a perfect comparison. The Magistrate Judge distinguishes all of this by holding the above is not valid comparator evidence because Scott was not proven to have brought a gun to work. Yes he was. A witness testified she saw Scott with a gun at work, and Stracey stated he did not believe Scott's denials. Apparently the employer's perception carries significant weight. Moreover, to make a distinction because one employee lied about the charge and another did not is disingenuous. It rewards dishonesty. The Magistrate Judge also tries to distinguish the incident by stating Employee Y waived the gun around while Scott just showed his on his hip. That is not a distinction with any meaning, and it too narrowly construes comparator law as well as law under Rule 56, FRCP. The work rule both employees are charged with violating - having a gun at work - makes no such distinction. *See* Ex. K to Def. Motion, Offense 27 regarding handguns. Finally, the Magistrate Judge holds this evidence is meaningless because plaintiff was not accused of having a gun at work and lying about it. Plaintiff's position in this regard is explained above. Plus, such a ruling, again, too narrowly views circumstantial evidence in a race discrimination case.

**(iii)** **The Magistrate Judge erred at pages 17-29 of the Report and Recommendation by holding that plaintiff did not establish the fourth element of her prima facie case because she failed to provide valid comparator evidence. In so holding, the Magistrate Judge failed to apply or recognize the lower standard applicable to review of the elements of the plaintiff's prima facie discrimination case.**

The Magistrate Judge dismissed plaintiff's claim on the grounds that plaintiff did not prove the fourth element of her prima facie case. That is the only issue before the court - whether plaintiff established her prima facie case. In finding that plaintiff had not, the Magistrate Judge ignored or failed to apply the relaxed standards applicable to review of elements of a plaintiff's prima facie race discrimination claim.

The Fourth Circuit, and district courts within this Circuit, have repeatedly held that the plaintiff's burden in proving the prima facie elements of a discrimination claim is not onerous, but instead, "relatively modest" or "relatively easy." *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (describing the plaintiff's burden in satisfying the elements of a prima facie race discrimination case as "relatively modest"); *Wesley v. Arlington County*, 354 Fed.Appx. 775, 778-779 (4th Cir. 2009) (describing plaintiff's burden in this regard as "not onerous," "relatively modest" and a "relatively easy test.") *Ugbo v. Alliance Legal Corp., P.L.L.C.*, 2016 U.S. Dist. LEXIS 178143 (E.D.Va. 2016) (same). Of course, as stated above, the plaintiff can establish the fourth element of her prima facie case by pointing to comparators. As such, any analysis of comparator evidence at the prima facie stage (which is what is at issue here) must be pursuant to the relatively easy or modest standard adopted by the Fourth Circuit. The Magistrate Judge ignored this standard by holding that none of plaintiff's comparator evidence was valid, and by making hair-splitting and non-existent distinctions between plaintiff's incidents and those of her comparators. *See also* Argument II (ii) above.

**(iv)** <u>**The Magistrate Judge also erred at pages 29-31 of the Report and Recommendation by holding the plaintiff did not establish the fourth element of her prima facie case because she did not produce other evidence (or circumstances) which give rise to an inference of discrimination. On the contrary, plaintiff produced a wealth of such evidence.**</u>

In addition to comparator evidence or evidence that a plaintiff was replaced by someone outside her protected class, a plaintiff can also establish the fourth element of a prima facie race discrimination case by showing other circumstances that give rise to an inference of discrimination.

At page 29 of the Report and Recommendation, the Magistrate Judge describes plaintiff's case as involving only plaintiff's own subjective speculation and conjecture. At page 30 the Magistrate Judge holds plaintiff has no other evidence that gives rise to an inference of

discrimination.  This is err.  It ignores serious and tight comparator evidence.  See above.  It also ignores a wealth of other evidence which establishes an inference of discrimination necessary to satisfy the fourth element of a plaintiff's prima facie case at the Summary Judgment stage.

To this end, Collins has produced evidence that she never engaged in the conduct that resulted in her termination.  Defendant is quick to point out that plaintiff was fired for the way she delivered her message in the cafeteria-not the content of the message.  (Ex. 2, P. Stracey depo. p. 187; Ex. 5. L. Scott depo. pp. 104, 115; Ex. 3, C. Etheridge depo. p. 155).  According to defendant, Collins had a disrespectful tone, she was pacing back and forth, pointing her finger and being aggressive in her behavior during the lunchroom conversation.  (Ex. 3. C. Etheridge depo. pp. 155, 159).  Yet Collins denies she was aggressive or unprofessional during the incident.  Instead, Collins testified that she was calm, not yelling, not pacing, and that she did not point her finger or raise her voice.  (Ex. 6. Plf. depo. pp. 41, 43).  In fact, Collins states she was shocked at Scott and Etheridge's demeanor during the exchange.  *Id.*  Even Scott admits that Collins did not use profanity and did not point her finger at him.  (Ex. 5, L. Scott depo. pp. 107-108).  Etheridge also admits Collins did not use profanity or touch her or strike her or even bend over and point her finger in her face during the incident.  (Ex. 3. C. Etheridge depo. pp. 143-144).

Moreover, Scott's email to Casselli and Etheridge the day after the incident provides more evidence that Collins did not act aggressive or insubordinate in the lunchroom.  Careful review of Scott's email shows he did not complain about Collins' behavior or how she delivered the message.  Instead, Scott's email complains about the content of the message or **what** Collins said.  To this end, in the email Scott states "**What she said** was not only offensive and wrong…" and "**What she said** was despicable, distasteful…."  In forwarding the email to

Stracey, Scott stated "Even I was surprised at **what she was spewing out**." (emphasis supplied). (Ex. 2, P. Stracey depo., exhibit 27 thereto).

Also, according to Collins, during her suspension and termination, Stracey did not bring up any allegation of aggressive behavior in the lunchroom. Instead, he told Collins she was being suspended and fired because, given race relations in the Charleston area, he could not have anyone in his office expressing political opinions to managers in the cafeteria. (Ex. 6, Plf. depo. pp. 80, 95; Ex. 7, Plf. Aff. para 21). For his part, Stracey admits that during plaintiff's suspension and termination he told her he could not have someone representing the office as an Executive Secretary walking around making judgments on behalf of the office. (Ex. 2, P. Stracey depo. pp. 187-188). Indeed, defendant did not raise allegations about plaintiff's **behavior** in the cafeteria until after it received plaintiff's demand letter in June of 2015 and then conducted its investigation the following month, July 2015. To this point, the evidence that defendant shifted its reason for terminating plaintiff from what she said in the cafeteria to how she said it is further evidence of pretext. *EEOC v. Sears Roebuck and Co.*, 243 F.3d 846, 853 (4th Cir. 2001) (an employer's offer of different and arguably inconsistent explanations for termination is evidence of pretext); *Dennis v. Columbia Colleton Med. Ctr. Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) (an employer's inconsistent explanation for its employment decisions are probative of pretext). Furthermore, the fact that defendant did not get Collins' side of the story before terminating her is even more evidence of pretext. *Nemeth v. Citizens Fin. Group, Inc.*, 2011 U.S. Dist. LEXIS 68122 at *32 (E.D. Mich. 2011) (terminating 25-year employee with an untarnished employment history without hearing her side of the story is evidence of pretext); *Reese v. Barton Healthcare Sys.*, 693 F.Supp.2d 1170, 1184-1185 (E.D. Cal. 2010) (suspending plaintiff without getting her side of the story is evidence of pretext).

Finally, terminating plaintiff without following its own discipline policy, without going through its diversity committee, and without involving Casselli in the investigation, is evidence of pretext.  Casselli testified that defendant follows a progressive discipline policy for all but the most serious offenses.  According to Casselli, an employee is required to receive a first written warning, a second written warning, and then a three-day suspension before termination.  Casselli felt she was required to follow this discipline policy.  Casselli also testified she is typically involved in investigations at the hotel and that it was unusual that she was not involved in plaintiff's.  (Ex. 4, J. Casselli depo. pp. 20-22, 28, 101-102).  Stracey testified to the mandatory nature of defendant's progressive discipline policy stating that he felt he was required to follow it, and that defendant had to have good cause to fire an employee.  (Ex. 2, P. Stracey depo. pp. 80-87).  Defendant certainly followed its discipline policies "to the T" in dealing with Employee X, an African-American.  Yet defendant fired plaintiff, a long-time employee of almost thirty (30) years with no prior discipline, on her first offense without a verbal warning, written warning or suspension and without going through its diversity program.  It also fired plaintiff without involving its Human Resource Director in the investigation leading up to the discharge.  *Mohammed v. Cent. Driving Mini Storage, Inc.*, 128 F.Supp. 3d 932, 952-953 (E.D. Va. 2015) (failure of defendant to follow formal or even informal progressive discipline is evidence of pretext); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 fn. 29 (5th Cir. 2005) (even though internal progressive discipline policy is not mandatory and plaintiff is an employee at will, failure to follow discipline policy is still evidence of pretext where policy states it should be followed in most circumstances); *Goudeau v. Nat'l Oilwell Varaco, LP,* 793 F.3d 470, 477 (5th Cir. 2015) (when employer opts to have a disciplinary system that involves warnings, failure to follow that system may give rise to an inference of pretext).

(v)    **The Magistrate Judge erred in ignoring significant background evidence that explains why Stracey (a Caucasian) would discriminate against plaintiff, another Caucasian.**

The Magistrate Judge assigns far too much weight to the fact that Stracey is white.  On page 30 of the Report and Recommendation, the Magistrate Judge notes Stracey is white and this weakens any inference of discrimination.  The fact that Stracey is white (and an alleged decision maker) may provide defendant with some evidence for its arguments at trial.  But in no way is that evidence all-encompassing or fatal in and of itself to plaintiff's claim.  And, it ignores all the rich background evidence which explains why Stracey would discriminate against another Caucasian.  Scott was the Chair for the Urban League; Scott forged a relationship between the Urban League and the hotel; starting in 2014, Scott began a campaign to accuse white employees of discrimination against African-Americans; his complaints were unfounded; his complaints created racial tension within the hotel; they resulted in divisive diversity training; he went to Mayor Summey's press conference (along with Etheridge) regarding the Walter Scott shooting; the Walter Scott shooting exacerbated racial tension at the hotel and so did the Black Lives Matter protest.

Stracey admits Scott told him to fire plaintiff; Stracey told plaintiff he was getting pressure to fire her and it was not his decision; and, Etheridge, too, consulted with Stracey on what to do with plaintiff.  It is clear that all of the above had Stracey (and other Caucasian management employees at the hotel) afraid and hesitant to discipline black employees at the hotel for fear of discrimination complaints.  At the same time, they harbored a "jump to judgment" mindset to discipline any white employee accused of misdeeds by black employees.

(vi)   **The Magistrate Judge erred on pages 16-17 and 28-29 of the Report and Recommendation in holding that Stracey had the right to rely on information from Scott, Etheridge, Crawford and Matesi in making the decision to fire plaintiff. The Magistrate Judge also erred in placing undue importance on plaintiff's conversation with Matesi after the cafeteria incident.**

At pages 16-17 and 28-29 of the Report and Recommendation, the Magistrate Judge ruled that Stracey had the right to rely on information given to him by Scott, Etheridge, Crawford and Matesi and that, thus, his decision to terminate plaintiff was made without discriminatory animus. This is err. The discriminatory animus was imposed upon Stracey by internal and external forces (see previous Argument v). Also, Stracey absolutely did not have the right to rely on information provided to him. At the time Stracey fired Collins (or at the time he was pressured to do so) he was aware that Scott had raised dubious complaints of race discrimination against Millard and that he was forced to fire Millard against his will; he was aware that Scott had sent an inappropriate email to Casselli falsely telling her black employees did not trust her because she is white without receiving discipline; he was aware that Scott had raised dubious allegations of race discrimination against him-allegations that disrupted the entire hotel and that resulted in divisive diversity training; he was aware Scott had threatened him with physical violence without being disciplined; he was aware that Employee X had engaged in conduct similar to plaintiff's alleged conduct and that she had first been given three (3) warnings and a suspension before being fired; he was aware Etheridge was accused of not being "black enough" by prior protestors; he was aware of the Walter Scott shooting and the Black Lives Matter protest; he was aware that Scott had been insubordinate and rude directly to him and others without being terminated; he never got Collins' side of the story; and, he was aware that Scott told him to fire plaintiff. In general, he was aware the Scott and Etheridge were particularly sensitive to race-related issues. Thus, Stracey had no right to rely on the information given to him by Scott, Etheridge and Crawford. Even if Stracey had the right to

rely on the information, the information from the three witnesses shows, at best, that plaintiff was passionate about her views with her fellow employees. Stracey certainly knew from his own experiences with Employee X and Scott that this behavior never gave rise to immediate termination at defendant before.

As for the conversation with Matesi after the cafeteria incident, plaintiff went to him and told him what happened. She never told Matesi she thought she was going to get fired over the incident in the cafeteria. For his part, the day after defendant fired plaintiff, Matesi called Collins and told her that her termination was not right; that it was unfair; and that he could not believe defendant fired her. (*See* Ex. 10, Plf. Third Aff.)

**(vii)**    **The Magistrate Judge erred in dismissing plaintiff's state court claim without prejudice.**

The Magistrate Judge erred in dismissing plaintiff's state court claim without prejudice to refile in state court. Instead, the Magistrate Judge should have ruled on the claim in plaintiff's favor for the reasons stated in plaintiff's Response Brief which is incorporated herein.

## III.  CONCLUSION

Plaintiff respectfully prays that the Magistrate Judge's Report and Recommendation be rejected, reversed and not adopted, and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By: s/A. Christopher Potts
Federal ID No.:  5517
31 Broad Street (P.O. Box 1113)
Charleston, SC 29401 (29402)
Telephone:  (843) 577-5000
Email:  hitchp@bellsouth.net
***Attorneys for the Plaintiff***

Charleston, South Carolina
April 7, 2017